FILED

SEP 1 8 2007

SEP. 18, 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

*JH*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

Eastern Division

| | | |
|---|---|---|
| NOVAE UNDERWRITING, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **07CV5278** |
| v. | ) | **JUDGE GRADY** |
| | ) | **MAG. JUDGE NOLAN** |
| CUNNINGHAM LINDSEY U.S., INC., | ) | |
| CUNNINGHAM LINDSEY CLAIMS | ) | |
| MANAGEMENT, INC. and | ) | |
| AMERICAN PATRIOT INSURANCE | ) | |
| AGENCY, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, Novae Underwriting, Ltd. ("Novae"), formerly known as SVB Underwriting, Ltd., for its Complaint against Defendants Cunningham Lindsey U.S., Inc. and Cunningham Lindsey Claims Management, Inc. (together, "Cunningham Lindsey"), and Defendant American Patriot Insurance Agency, Inc. ("American Patriot"), states as follows:

## INTRODUCTION

1.      At the heart of this action is a liability insurance policy that affords coverage for errors and omissions Claims so long as they are "first made"—that is, first reported to the insurers in writing—during the Policy Period.

2.      Nevertheless, Cunningham Lindsey, an Assured under the policy, has demanded coverage for two errors and omissions Claims it first reported in writing to the insurers years after the Policy Period expired.

3.      Firm in its position that neither of those two Claims falls within the relevant insuring clause, because Cunningham Lindsey first reported them outside the Policy Period, and

given the parties' actual and justiciable controversy over this threshold issue of coverage, Novae has come into Court seeking declaratory (and other) relief.

## PARTIES, JURISDICTION AND VENUE

4.        Novae is a limited liability company registered in England and Wales with its registered office and principal place of business in London, England.   Novae, one of the Underwriters at Lloyd's, London ("Underwriters") subscribing to the insurance policy at issue in this dispute, is a member of the Lloyd's syndicate that serves as the Lead Underwriter of the Policy. Of all the Underwriters, Novae bears the single largest (several) share of the insured risk. Novae brings this Complaint solely in its individual capacity and not as a representative of any other Underwriter or insurer.

5.        Cunningham Lindsey U.S., Inc. is a Texas corporation with its principal place of business in Texas.  Cunningham Lindsey U.S., Inc. has offices in, and regularly does business in and from, Schaumburg, Illinois.

6.        Cunningham Lindsey Claims Management, Inc. is a Delaware corporation with its principal place of business in Texas.  Cunningham Lindsey Claims Management, Inc. has offices in, and regularly does business in and from, Schaumburg, Illinois.

7.        American Patriot is a Wisconsin corporation with its principal place of business in Westchester, Illinois.

8.        This Court has jurisdiction over this matter under 28 U.S.C. § 1332(a)(2) because there is a complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.        Venue is proper in this District under 28 U.S.C. § 1391(a)(1) or, in the alternative, under § 1391(a)(3).

## FACTS

I.      The Claims

     A.      The American Patriot Claim

10.      On or about April 16, 2002, American Patriot and its two shareholders filed a lawsuit against Cunningham Lindsey and others in the United States District Court, Northern District of Illinois.

11.      In its federal court complaint, American Patriot, an insurance agency, alleged that in 1997 it had entered into certain agreements with a group of insurers to offer workers' compensation, general liability, and automobile liability insurance products to roofing contractors (the "Roofers Program"). American Patriot further alleged that the group of insurers hired Cunningham Lindsey to administer claims under policies issued to American Patriot's clients as part of the Roofers Program.

12.      Among Cunningham Lindsey's alleged responsibilities as third-party administrator of claims arising under those policies was to set appropriate reserves. American Patriot alleged, however, that Cunningham Lindsey established unreasonably low reserves, which lead to the unwarranted renewal of some policies and the renewal of other policies at underpriced rates. Based on these and other allegations, American Patriot asserted claims against Cunningham Lindsey for breach of contract and negligence.

13.      On or about September 16, 2004, after the parties to the federal court action had litigated, among other things, the question of proper venue, American Patriot voluntarily dismissed its claims against Cunningham Lindsey, without prejudice.

14.      Some three months later, on or about December 13, 2004, American Patriot sued Cunningham Lindsey again, this time in state court in Tyler County, Texas.

3

15.     On or about March 1, 2005, American Patriot's state court action against Cunningham Lindsey was transferred to Texas state court in Denton County, Texas, where the action is now pending.

16.     As it did in its federal court action, American Patriot alleges that Cunningham Lindsey failed to fulfill its contractual obligations to adjust, reserve and manage properly claims under policies issued as part of the Roofers Program.

17.     American Patriot seeks to recover from Cunningham Lindsey actual damages in excess of $1 million, punitive damages (in an unspecified amount), attorney's fees, costs and other relief.

18.     American Patriot's expert in the underlying litigation has opined that American Patriot's actual damages exceed $5 million.

B.     The Anderson Claim

19.     On or about January 16, 2002, Marilyn Anderson ("Anderson"), a resident of Dallas, Texas, filed a lawsuit in Texas state court against Scottsdale Insurance Company ("Scottsdale"), Cunningham Lindsey and others.

20.     In her lawsuit, Anderson alleges that she is the holder of a homeowner's insurance policy issued by Scottsdale. Scottsdale, according to Anderson, employed Cunningham Lindsey as a third-party claims administrator.

21.     In August 2000, Anderson allegedly notified Scottsdale of a claim under her homeowner's policy for water damage. Within a few days, Cunningham Lindsey assumed the administration of Anderson's claim on behalf of Scottsdale and, according to her, grossly mishandled the repairs needed, ultimately resulting in the contamination of her entire home with toxic mold and the loss of many of her possessions.

4

22.     Asserting claims for breach of contract, conversion, negligence, violations of the Texas Insurance Code, and breach of the duty of good faith and fair dealing. Anderson seeks to recover from Cunningham Lindsey actual damages in excess of $1.1 million, punitive damages in excess of $8 million, and attorneys' fees.

23.     The Anderson Claim remains pending in Texas state court.

B.      The Policy

24.     The contract at issue in this action is Comprehensive Crime Insurance, Insurance Companies Professional Liability Insurance, Directors and Officers Liability and Company Reimbursement Insurance, Employment Practices Liability Insurance and Fiduciary Liability Insurance Policy No. 823/FD0000493 (the "Policy"), issued in London, England and delivered in Toronto, Canada to Fairfax Financial Holdings ("Fairfax"), the holding company and ultimate parent of a Canadian insurance conglomerate. The Policy Period originally ran from May 31, 2000 to May 31, 2003, but was later extended (subject to certain restrictions on coverage) so that it ultimately expired on May 31, 2004. The Policy's form, declarations and endorsements are attached as Exhibit A.

25.     As "Subsidiaries" of Fairfax, Cunningham Lindsey U.S., Inc. and Cunningham Lindsey Claims Management, Inc. are "Assureds" under the Policy.

26.     At issue here is the Policy's Section Four of Part B, the "Errors and Omissions Coverage Section," Exhibit A at 87. Each Claim under that Coverage Section is subject to a $1,000,000 retention. Id. at 65. The Policy has an aggregate Limit of Liability of $250,000,000 (which has been partially eroded by payment of other Claims). Id. at 6.

27.     The Declarations governing Part B provide, in part:

EACH OF THE COVERAGE SECTIONS OF THIS POLICY (DIRECTORS & OFFICERS AND COMPANY LIABILITY, EMPLOYMENT PRACTICES,

FIDUCIARY LIABILITY AND ERRORS AND OMISSIONS COVERAGE SECTIONS, WHICHEVER ARE APPLICABLE) IS WRITTEN ON A CLAIMS-MADE BASIS. *THESE COVERAGE SECTIONS COVER ONLY CLAIMS FIRST MADE AGAINST THE ASSUREDS DURING THE POLICY PERIOD.*

*Id.* at 65 (italics added).

28.     The Insuring Clause set forth in Section Four of Part B (the "Errors and

Omissions Insuring Clause") provides, in part:

> A.      Underwriters shall pay on behalf of the **Assureds Loss** resulting from any **Claim** first made against the **Assureds** for a **Wrongful Act** in the performance of, or failure to perform, **Professional Services**.
>
> \* \* \*
>
> A **Claim** shall be deemed to have been *first made* against the **Assureds** *on the date the Assureds provide written notice thereof* to Underwriters in accordance with **CLAUSE IV. NOTIFICATION** of this Policy.

*Id.* at 87 (italics added).

29.     For purposes of Part B, the term "Claim" means, among other things, "any civil,

criminal, administrative or regulatory proceeding initiated against any of the **Assureds**, including

any appeal therefrom." *Id.* at 67.

30.     For purposes of the Policy's errors and omissions coverage, the term

"Professional Services" means, among other things, "insurance services by the Assureds, or by

persons or entities for whose actions the Assureds are legally liable, for or on behalf of a

customer or client of such Assureds, pursuant to an agreement between such customer or client

and such Assureds." *Id.* at 87.

31.     The Policy's Clause IV. NOTIFICATION states (in part):

> A.      In the event a **Claim** is made against any of the **Assureds** during the **Policy Period** which the Corporate Risk Manager reasonably believes could involve payment by the **Assureds** or Underwriters under this Policy for an amount exceeding USD1,000,000, the **Assureds** shall give to the

> **Lead Underwriter** notice in writing of such **Claim** as soon as practicable after the **Assureds** become aware of such **Claim** pursuant to Clause IV.C. below but in no event later than 60 days after the end of the **Policy Period**.

<div align="center">* * *</div>

> D.   Every six months during the **Policy Period**, the **Assureds** may, at their sole discretion, provide to the **Lead Underwriter** cumulative written notice by bordereau of all **Claims** under any Coverage Section which the **Assureds** reasonably believe will not exceed 50% of the respective applicable Retention for each such Coverage Section.

*Id.* at 70.

32.   The Policy's Clause VII (entitled "Assistance, Cooperation, Subrogation and Recoveries) provides, in part:

> The **Assureds** agree to provide Underwriters with such information, assistance and cooperation as Underwriters may request, and they further agree that they shall not take any action which in any way increases Underwriters' exposure under this Policy.

*Id.* at 71.

C.   Cunningham Lindsey's Notices Of The American Patriot and Anderson Claims

33.   As Cunningham Lindsey has itself confirmed in writing, Cunningham Lindsey did not provide Underwriters *any* written notice of the American Patriot Claim or the Anderson Claim before the Policy Period expired on May 31, 2004.

34.   Indeed, Cunningham Lindsey first provided Underwriters written notice of the American Patriot Claim on October 5, 2006, more than four years after American Patriot had filed its original lawsuit in federal court and more than two years after the Policy Period had expired.

35.   As it happened, Underwriters first learned about the American Patriot Claim in April 2005, when a Cunningham Lindsey paralegal mentioned American Patriot's name, in passing, during a claims review meeting with Underwriters' counsel. At that April 2005

<div align="center">7</div>

meeting, Underwriters' counsel asked Cunningham Lindsey for documents showing it had reported the American Patriot Claim in writing to Underwriters during the Policy Period. At that same time, Underwriters' counsel also requested copies of all pleadings, correspondence and other materials pertaining to the Claim. Despite repeated subsequent requests for those items, however, Cunningham Lindsey provided Underwriters with *nothing* pertaining to the American Patriot Claim until October 5, 2006, some eighteen months later, when Cunningham Lindsey sent Underwriters (via email) its first written notice of the Claim and American Patriot's original and amended complaints.

36.     Underwriters first learned of the Anderson Claim when Cunningham Lindsey provided Underwriters written notice of that Claim in April 2007, more than five years after Anderson had filed her lawsuit and nearly three years after the Policy Period had expired.

<div align="center">

**COUNT I**
**(CLAIM FOR DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201 ET SEQ.)**

</div>

37.     Novae incorporates by reference and restates, as if fully set forth herein, the allegations in paragraphs 1 through 36 of this Complaint.

38.     There is an actual and justiciable controversy between the parties as to whether Cunningham Lindsey is entitled to coverage for Claims, including, but not necessarily limited to, the American Patriot Claim and the Anderson Claim, first reported in writing to Underwriters *outside* the Policy Period.

39.     Novae's position is grounded in the very language of the Policy, which plainly provides that the only way for an Assured to trigger coverage for a Claim under the Errors and Omissions Insuring Clause is to report the Claim in writing to Underwriters *during the Policy Period*. Otherwise, the Claim is deemed "first made" outside the Policy Period and ineligible for coverage.

<div align="center">8</div>

40.     Cunningham Lindsey did not report either the American Patriot Claim or the Anderson Claim in writing to Underwriters until long after the Policy Period had expired.

41.     Consequently, neither the American Patriot Claim nor the Anderson Claim falls within the Errors and Omissions Insuring Clause, and Cunningham Lindsey can have no viable claim for coverage with respect to either Claim.

## COUNT II
## (BREACH OF DUTY TO COOPERATE)

42.     Novae incorporates by reference and restates, as if fully set forth herein, the allegations in paragraphs 1 through 41 of this Complaint.

43.     The Policy's Clause VII provides, in part:

The Assureds agree to provide Underwriters with such information, assistance and cooperation as Underwriters may request, and they further agree that they shall not take any action which in any way increases Underwriters' exposure under this Policy.

44.     By failing to provide Underwriters "information, assistance and cooperation" they (through their counsel) requested with respect to the American Patriot Claim, Cunningham Lindsey breached its duty to cooperate and, therefore, has no viable claim for coverage.

## PRAYER FOR RELIEF

WHEREFORE, Novae prays that judgment be entered in its favor as follows on its claims for relief:

On Count I, a declaratory judgment that the neither the American Patriot Claim nor the Anderson Claim falls within the Insuring Clause set forth in Coverage Section Four of Part B of the Policy because both claims were "first made"—that is, first reported in writing to Underwriters—after the Policy Period expired.

9

On Count II, a judgment that Novae has no liability under the Policy in connection with the American Patriot Claim due to Cunningham Lindsey's breach of its obligations under Clause VII.

Novae further prays that the Court award it such other and additional relief as the Court deems just, appropriate and equitable.

Dated: September 18, 2007

Respectfully submitted,

Theodore A. Boundas
Peter F. Lovato, III
Ellen D. Jenkins
W. Joel Vander Vliet
BOUNDAS, SKARZYNSKI, WALSH & BLACK, LLC
200 E. Randolph St., Suite 7200
Chicago, IL 60601
312-946-4200

Attorneys for Plaintiff,
Novae Underwriting, Ltd.

# Exhibit A

COMPREHENSIVE CRIME INSURANCE, INSURANCE COMPANIES PROFESSIONAL LIABILITY
INSURANCE, DIRECTORS AND OFFICER LIABILITY AND COMPANY REIMBURSEMENT
INSURANCE, EMPLOYMENT PRACTICES LIABILITY INSURANCE AND FIDUCIARY LIABILITY
INSURANCE

## GENERAL ENDORSEMENTS APPLICABLE TO ALL PARTS OF THIS POLICY

| | |
|---|---|
| General Endorsement No. 1 | Nuclear Incident Exclusion Clause-Liability-Direct (Broad) - Canada - NMA 1978a. |
| General Endorsement No. 2 | Service of Suit Clause (Canada) - NMA 1970a. |
| General Endorsement No. 3 | Combined Aggregate Limit of Liability and Reinstatement Endorsement. |

## GENERAL ENDORSEMENT NUMBER ONE

Attaching to and forming part of Policy No. 823/FD0000493.

In favour of: FAIRFAX FINANCIAL HOLDINGS.

### NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD)-CANADA
*(For use with all Public Liability Policies except Personal, Farmers' and Storekeepers')*

It is agreed that this Policy does not apply:

(a)     to liability imposed by or arising under the Nuclear Liability Act, law or statute, or any law amendatory thereof; nor

(b)     to bodily injury or property damage with respect to which an Insured under this policy is also insured under a contract of nuclear energy liability insurance (whether the Insured is unnamed in such contract and whether or not it is legally enforceable by the Insured) issued by the Nuclear Insurance Association of Canada or any other insurer or group or pool of insurers or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; nor

(c)     to bodily injury or property damage resulting directly or indirectly from the nuclear energy hazard arising from:

  (i)     the ownership, maintenance, operation or use of a nuclear facility by or on behalf of an Insured;

  (ii)    the furnishing by an Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility; and

  (iii)   the possession, consumption, use, handling, disposal or transportation of fissionable substances, or of other radioactive material (except radioactive isotopes, away from a nuclear facility, which have reached the final stage of fabrication so as to be usable for any scientific, medical, agricultural, commercial or industrial purpose) used, distributed, handled or sold by an Insured.

As used in this policy:

1.     The term "nuclear energy hazard" means the radioactive, toxic, explosive, or other hazardous properties of radioactive material;

2.     The term "radioactive material" means uranium, thorium, plutonium, neptunium, their respective derivatives and compounds, radioactive isotopes of other elements and any other substances which may be designated by or pursuant to any law, act or statute, or law amendatory thereof as being prescribed substances capable of releasing atomic energy, or as being requisite for the production, use or application of atomic energy;

3.     The term "nuclear facility" means:

  (a)     any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of plutonium, thorium and uranium or any one or more of them;

  (b)     any equipment or device designed or used for (i) separating the isotopes of plutonium, thorium and uranium or any one or more of them, (ii) processing or utilizing spent fuel, or (iii) handling, processing or packaging waste;

  (c)     any equipment or device used for the processing, fabricating or alloying of plutonium, thorium or uranium enriched in the isotope uranium 233 or in the isotope uranium 235, or any one or more of them if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

01534580/MH
05/06/2000                                Page 3

(d)     any structure, basin, excavation, premises or place prepared or used for storage or disposal of waste radioactive material;

and includes the site on which any of the foregoing is located, together with all operations conducted thereon and all premises used for such operations.

4.      The term "fissionable substance" means any prescribed substance that is, or from which can be obtained, a substance capable of releasing atomic energy by nuclear fission.

5.      With respect to property, loss of use of such property shall be deemed to be property damage.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this Clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

01/4/96
N.M.A. 1978a.

All other terms, conditions and limitations remain unaltered.

<u>GENERAL ENDORSEMENT NUMBER TWO</u>

Attaching to and forming part of Policy No. 823/FD0000493.

In favour of: FAIRFAX FINANCIAL HOLDINGS.

### SERVICE OF SUIT CLAUSE (CANADA)

#### (Action against Insurer)

In any action to enforce the obligations of the Underwriters liable hereunder they can be designated or named as "M. J. Oppenheim in his quality as Attorney in Fact in Canada, for Lloyd's Underwriters, Members of Lloyd's, London, England" and such designation shall be binding on the Underwriters liable hereunder as if they had each been individually named as Defendant. Service of such proceedings may validly be made upon M.J. Oppenheim, C.A., whose address for such service is 1155, rue Metcalfe, Suite 1540, Montreal, Quebec, H3B 2V6.

N.M.A. 1970a (01/10/95)

All other terms, conditions and limitations remain unaltered.

<u>GENERAL ENDORSEMENT NUMBER THREE</u>

Attaching to and forming part of Policy No. 823/FD0000493.

In favour of: FAIRFAX FINANCIAL HOLDINGS.

**COMBINED AGGREGATE LIMIT OF LIABILITY AND ROUND THE CLOCK REINSTATEMENT**

Notwithstanding anything to the contrary contained herein, it is understood and agreed that Underwriters liability under this Policy in respect of Part A - Comprehensive Crime Policy and Part B - Insurance Companies Professional Liability Insurance, Directors and Officers Liability and Company Reimbursement Insurance, Employment Practices Liability Insurance and Fiduciary Liability Insurance is subject to an overall aggregate limit of USD250,000,000 combined during the Policy Period expressed in the respective Declarations.

It is further understood and agreed that said overall aggregate limit shall be reduced by the amount of any payment made under any Part of the Policy or Insuring Clauses or Insuring Agreements and only the remaining amount of the aggregate limit so reduced shall be available for subsequent payments under any Part of the Policy or Insuring Clause or Insuring Agreement.

Notwithstanding anything contained herein to the contrary, it is further understood and agreed that the Combined Aggregate Limit of Liability hereunder may be reinstated a single time upon payment of any additional premium (calculated at 150% of the pro-rata unearned premium for the Policy, but not less than USD1,973,333) within 30 days of written notification to Underwriters of the Assured's/Parent Company's election to reinstate the Combined Limit of Liability; provided however, that there shall be no coverage under such reinstated Combined Aggregate Limit of Liability for any Claim made or loss arising out of any fact, circumstance or situation for which payment has already been made under this Policy.

The Reinstated Combined Aggregate Limit of Liability shall:

(1)     not apply to any Claim made or loss discovered prior to the Assured's/Parent Company's election to receive the Reinstated Combined Aggregate Limit of Liability except to the extent that any Claim made or loss discovered after the Assured's/Parent Company's election to receive the Reinstated Combined Aggregate Limit of Liability has eroded the original Combined Limit of Liability, and

(2)     only apply where the Combined Aggregate Limit of Liability of this Policy and the limit of liability of all policies of insurance providing excess coverage above this Policy are exhausted by actual payment of Loss or claim.

It is further understood and agreed that Underwriters shall not be liable to pay more than one Limit of Liability in respect of any one loss or any one Claim or claim.

All other terms, conditions and limitations remain unaltered.

**PART A**

COMPREHENSIVE CRIME INSURANCE

## SECTION ONE

### FINANCIAL INSTITUTION BOND
Standard Form No. 25, Revised to October, 1987

### DECLARATIONS

Bond Number: 823/FD0000493

Item 1.     Name of Assured (herein called Assured):     **FAIRFAX FINANCIAL HOLDINGS**

        Principal Address:     95 Wellington Street West
                             Suite 800
                             Toronto M5J 2N7
                             Canada

---

Item 2.     Bond Period:   From:   31st May, 2000

                      To:     31st May, 2003

                      both days at 23.59 local standard time.

---

Item 3.     The Aggregate Liability of the Underwriters during the Bond Period shall be USD250,000,000.

---

Item 4.     Subject to Sections 4 and 11 hereof
the Single Loss Limit of Liability is USD250,000,000
and the Single Loss Deductible is USD500,000

Provided, however, that if any amounts are inserted below opposite specified Insuring Agreements or Coverage, those amounts shall be controlling. Any amount set forth below shall be part of and not in addition to amounts set forth above. (If an Insuring Agreement or Coverage is to be deleted, insert "Not Covered.")

| Amount applicable to: | Limit of Liability | Deductible |
|---|---|---|
| Insuring Agreement (D) - FORGERY OR ALTERATION | USD | USD |
| Insuring Agreement (E) - SECURITIES | USD | USD |
| Insuring Agreement (G) - PROFESSIONAL FEES AND EXPENSES | USD100,000 | USD10,000 |
| Insuring Agreement (J) - FIDELITY CLAIMS EXPENSES | USD250,000 | USD |
| Optional Insuring Agreements and Coverage | USD | USD |

If "Not Covered" is inserted above opposite any specified Insuring Agreement or Coverage, such Insuring Agreement or Coverage and any other reference thereto in this bond shall be deemed to be deleted therefrom.

---

Item 5.     The liability of the Underwriters is subject to the terms of the following riders attached hereto:

        1 - 17.

---

01534580/MH
05/06/2000

Page 8

Item 6.          Assured's Offices Covered - All offices established by the Assured and all premises occupied by Assured anywhere in the world and all offices and premises of any Agent or Processor of the Assured.

Item 7.          The Assured by the acceptance of this bond gives notice to the Underwriters terminating or cancelling prior bond(s) or policy(ies) No.(s) 823/FD9805747, such termination or cancellation to be effective as of the time this bond becomes effective.

The Underwriters, in consideration of an agreed premium, and in reliance upon all statements made and information furnished to the Underwriters by the Assured in applying for this bond, and subject to the Declarations, Insuring Agreements, General Agreements, Conditions and Limitations and other terms hereof, agrees to indemnify the Assured for:

## INSURING AGREEMENTS

FIDELITY

(A)    Loss resulting directly from dishonest, fraudulent or malicious acts by Employees of the Assured committed with the manifest intent to cause the Assured to sustain such loss or to obtain an improper financial gain for

　　　　(i)    themselves, or

　　　　(ii)    another person or organisation whom the Employee committing the dishonest or fraudulent act intended should receive such improper financial gain.

The foregoing shall include loss of Property through such acts by an Employee.

Notwithstanding the foregoing, it is agree that with regard to trading and loans, transactions in the nature of a loan or other extensions of credit, this Insuring Agreement covers only loss resulting directly from dishonest, fraudulent or malicious acts by Employees of the Assured committed with the manifest intent to obtain and which results in improper financial gain for

　　　　(i)    themselves, or

　　　　(ii)    another person or organisation with whom the Employee committing the dishonest, fraudulent or malicious act was acting in collusion provided that the Assured establishes that the Employee manifestly intended to participate in improper financial gain.

Salaries, fees, commissions, bonuses, promotions and other similar emoluments shall not constitute an improper financial gain.

In determining loss covered by this Insuring Agreement the Assured may include as part of its loss any specific bonus, commission or similar emolument paid to an Employee as the direct result of a specific dishonest, fraudulent or malicious act covered by this Insuring Agreement where such bonus, commission or emolument would not have been paid or payable by the Assured if such act had not been committed.

ON PREMISES

(B)    (1)    Loss of Property resulting directly from;

　　　　　　(a)    robbery, burglary, misplacement, mysterious unexplainable disappearance and damage thereto or destruction thereof, or

　　　　　　(b)    common-law or statutory larceny, committed by a person present in an office of the Assured covered under this bond,

　　　　while such Property is within any of the Assured's premises or actually within any recognised place of safe deposit anywhere in the world or any other premises where the Property is held for safe keeping or is actually within the premises of any transfer or registration agent for the purpose of exchange, conversion, registration or transfer in the usual course of business.

　　　　(2)    Loss of or damage to

　　　　　　(a)    furnishings, fixtures, supplies or equipment within an office of the Assured covered under this bond resulting directly from larceny or theft in, or by burglary or robbery of, such office, or attempt thereat, or by vandalism or malicious mischief, or

　　　　　　(b)    such office resulting from larceny or theft in, or by burglary or robbery of such office or attempt thereat, or to the interior of such office by vandalism or malicious mischief,

provided that

(i)    the Assured is the owner of such furnishings, fixtures, supplies, equipment, or office or is liable for such loss or damage, and

(ii)    the loss is not caused by fire.

IN TRANSIT

(C)    By reason of loss of or damage to Property from any cause while the Property is in transit by any means anywhere in the World.

Transit shall be deemed to commence immediately upon receipt of such Property by the transporting person or persons and to end immediately upon delivery to the designated recipient or its agent.

FORGERY OR ALTERATION

(D)    Loss resulting directly from:

(1)    Forgery or alteration of, on, or in any

1.    request made for change of beneficiary in any policy issued by the Assured.

2.    policy loan agreement made with the Assured.

3.    assignment to the Assured of any of its policies.

4.    Negotiable instruments other than registered or bearer obligations, made or drawn by or drawn upon the Assured, or made or drawn by one acting as agent of the Assured, or purporting to have been made as herein before set forth.

(2)    the Assured having transferred, paid or delivered any funds or property through an electronic funds transfer system on the faith of an original Electronic Payment Instruction received in the Assured's communications room which instruction purports to have been signed by at least two authorised signatories of the Assured in handwriting with their full signatures but which

1.    bears a Forged Signature(s) of an authorised signatory of the Assured upon which the Assured relied; or

2.    bears a fraudulent alteration upon which the Assured relied.

Special Definition:

Electronic Payment Instruction means a written instruction prepared by the Assured bearing a sequential number authorising the transfer, payment or delivery of funds or property by the Assured through an electronic funds transfer system. The foregoing instrument must be in a format with which the Employee, acting upon such instrument is conversant. Mechanically reproduced facsimile signatures shall NOT be deemed to be hand-written signatures.

Condition Precedent to Liability:

It is a condition precedent to Underwriters' liability under this Endorsement that the hand-written authorised signatures of the Assured's Employees upon the Electronic Payment Instruction be verified by the Assured's Employee prior to acting upon such Electronic Payment Instruction and that such Employee has actual physical possession of the original Electronic Payment Instruction at the time of such verification.

SECURITIES

(E)    Loss resulting directly from the Assured having, in good faith, for its own account or for the account of others,

(1) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, any original

    (a) Certificated Security

    (b) deed, mortgage or other instrument conveying title to, or creating or discharging a lien upon, real property,

    (c) Evidence of Debt,

    (d) corporate, partnership or personal Guarantee,

    (e) Security Agreement,

    (f) Letter of Credit,

    (g) Instruction to a Federal Reserve Bank of the United States or

(h) Statement of Uncertificated Security

which

    (i) bears a signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent, registrar, acceptor, surety, guarantor, or of any person signing in any other capacity which is a Forgery, or

    (ii) is altered, or

    (iii) is lost or stolen;

(2) guaranteed in writing or witnessed any signature upon any transfer, assignment, bill of sale, power of attorney, Guarantee, or any items listed in (a) through (g) above;

(3) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of any item listed in (a) or (b) above which is a Counterfeit.

Actual physical possession of the items listed in (a) through (h) above by the Assured or its authorised representative is a condition precedent to the Assured's having relied on the faith of such items.

A mechanically reproduced facsimile signature is treated the same as a handwritten signature.

This Policy shall also cover loss sustained by the Assured which meets the requirements of Insuring Clause (E) arising out of work carried out on behalf of the Assured by custodians or sub-custodians, subject always to the Assured retaining their full rights of subrogation against such custodians or sub-custodians.

## COUNTERFEIT CURRENCY

(F) Loss by reason of the receipt by the Assured in good faith of any counterfeited or altered paper currency (including money orders) or coin.

## PROFESSIONAL FEES

(G) Loss by reason of professional fees and expenses incurred and paid by the Assured, with prior approval of Underwriters, to determine the amount and extent of the loss covered hereunder.

## EXTORTION – THREATS TO PERSONS

(H) Loss of Property surrendered away from an office of the Assured as a result of a threat communicated to the Assured to do bodily harm to:

(1) a director, trustee, Employee or partner of the Assured or to the proprietor (if the Assured be a sole proprietorship), or

(2) a relative or invitee of any person enumerated in (1) above

who is, or allegedly is, being held captive; provided, however, that the captivity take place within any of the states of the United States of America, the District of Columbia, Virgin Islands, Puerto Rico, Canal Zone or Canada, and that prior to the surrender of such Property (a) the person receiving the threat has made a reasonable effort to report the extortionist's demand to an associate, and (b) a reasonable effort has been made to report the extortionist's demand to the Federal Bureau of Investigation and to local law enforcement authorities.

### EXTORTION - THREATS TO PROPERTY

(I)     Loss of Property surrendered away from an office of the Assured as a result of a threat communicated to the Assured to do damage to the premises or property of the Assured located within any of the states of the United States of America, the District of Columbia, Virgin Islands, Puerto Rico, Canal Zone or Canada; provided, however, that prior to the surrender of such Property (a) the person receiving the threat has made a reasonable effort to report the extortionist's demand to an associate, and (b) a reasonable effort has been made to report the extortionist's demand to the Federal Bureau of Investigation and to local law enforcement authorities.

The Underwriters shall not be liable for loss under this Insuring Agreement unless the amount of such loss, after deducting the net amount of all reimbursement and/or recovery obtained or made by the Assured (other than from any bond or insurance policy issued by a surety or insurance company and covering such loss) or by the Underwriters on account thereof before the payment by the Underwriters of such loss, is in excess of the Deductible Amount, if any, applicable to Insuring Agreements (A), (B) and (C), and then for eighty percent (80%) of such excess only, but in no event to exceed the amount of coverage applicable to such loss as set forth in the Declarations.

Anything in the attached bond to the contrary notwithstanding, if the Assured shall sustain a loss under this Insuring Agreement, and reimbursement or recovery, whether recovered before or after payment of such loss, less the expense of collection, shall be divided between the Assured and the Underwriters in such proportion that the net loss to the Assured and the Underwriters after deducting such reimbursement or recovery shall be twenty percent (20%) and eighty percent (80%), respectively, the net loss to the Underwriters after deducting any reimbursement or recovery, not in any event to exceed the amount of coverage applicable to such loss as set forth in the Declarations.

### FIDELITY CLAIM EXPENSES

(J)     Any reasonable additional costs and expenses incurred by the Assured (other than employee/premises costs) following discovery of a loss covered under Insuring Agreement (A) which results in a paid claim to Underwriters in excess of the applicable deductible to mitigate, contain or reduce by way of recoveries the amount of such loss.

The Assured agrees to use good faith efforts to consult with Underwriters as to the appropriate steps to be taken and costs to be incurred.

### GENERAL AGREEMENTS

### ADDITIONAL OFFICES OR EMPLOYEES - CONSOLIDATION, MERGER OR PURCHASE OF ASSETS - NOTICE

A.      If the Assured shall, while this bond is in force, establish any additional offices, other than by consolidation or merger with, or purchase or acquisition of assets or liabilities of, another institution, such offices shall be automatically covered hereunder from the date of such establishment without the requirement of notice to the Underwriters or the payment of additional premium for the remainder of the premium period; provided, however, that with respect to any purchase or acquisition as provided hereinbefore, there shall be no coverage afforded hereunder for any loss sustained prior to such establishment.

If the Assured shall, while this bond is in force, consolidate or merge with, or purchase or acquire assets or liabilities of, another institution, the Assured shall not have such coverage as is afforded under this bond for loss which was sustained prior to such consolidation, merger, purchase or acquisition. Further the Assured shall not have such coverage as is afforded under this bond for loss which:

(b)     has occurred or will occur in offices or premises of such institution, or

(c)     has been caused or will be caused by an employee or employees (including any agents or processors) of such institution, or

(d)     has arisen or will arise out of the assets or liabilities acquired by the Assured as a result of such consolidation, merger or purchase or acquisition of assets or liabilities

unless the Assured shall have complied with the following conditions:

(1)     With respect to any such consolidation, merger, purchase or acquisition of any entity, assets or liabilities valued at 10% or less of the consolidated assets of the Assured as set forth in the Assured's latest combined quarterly convention statements, no notice or additional premium shall be required.

(2)     With respect to any other such consolidation, merger, purchase or acquisition of any entity, assets or liabilities, the Assured shall

        (i)     give the Underwriters written notice of the consolidation, merger or purchase or acquisition of assets or liabilities within one hundred and twenty (120) days after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities and

        (ii)    obtain the written consent of the Underwriters to extend the coverage provided by this bond to such additional offices or premises, Employees and other exposures, and

        (iii)   upon obtaining such consent, pay to the Underwriters any additional premium.

The Underwriters' consent required in condition (2) (ii) above shall be deemed to have been given only if

(1)     such consent is given in writing by the Underwriters, or

(2)     the Underwriters have not responded to the Assured's written notice within fifteen days of Underwriters' receipt thereof, in which event consent shall be deemed to have been given effective from the date of consolidation, merger, acquisition or purchase.

CHANGE OF CONTROL - NOTICE

B.      When the Assured learns of a change in control, it shall give written notice to the Underwriters within 90 (ninety) days.

        As used in this General Agreement, a change in control means: (a) the Assured merging into or consolidating with another entity such that the Assured is not the surviving entity; or (b) another entity or group of entities or persons acting in concert acquires securities or voting rights which results in ownership or voting control by the other entity(ies) or person(s) of more than 50% of the outstanding securities representing the present right to vote for the election of directors of the Assured.

        Failure to give the required notice shall result in termination of coverage for any loss involving a transferee, to be effective upon the date of stock transfer.

REPRESENTATION OF INSURED

C.      The Assured represents that the information furnished in the application for this bond is complete, true and correct to the best of their knowledge.

        Any inadvertent error, inadvertent omission or inadvertent misrepresentation contained in the application shall not constitute grounds for rescission of this Policy.

JOINT INSURED

D.    If two or more Assureds are covered under this bond, the first named Assured shall act for all Assureds. Payment by the Underwriters to the first named Assured of loss sustained by any Assured shall fully release the Underwriters on account of such loss. If the first named Assured ceases to be covered under this bond, the Assured next named shall thereafter be considered as the first named Assured. Knowledge possessed or discovery made by any Assured shall constitute knowledge or discovery by all Assureds for all purposes of this bond. The liability of the Underwriters for loss or losses sustained by all Assureds shall not exceed the amount for which the Underwriters would have been liable had all such loss or losses been sustained by one Assured.

NOTICE OF LEGAL PROCEEDINGS AGAINST INSURED - ELECTION TO DEFEND

E.    The Assured shall notify the Underwriters at the earliest practicable moment, but in no event later than 60 days after the end of the Bond Period, of any legal proceeding brought to determine the Assured's liability for any loss, claim or damage, which, if established would constitute a collectible loss under this bond. Concurrently, the Assured shall furnish copies of all pleadings and pertinent papers to the Underwriters.

The Underwriters, at their sole option, may elect to conduct the defence of such legal proceeding, in whole or in part. The defence by the Underwriters shall be in the Assured's name through attorneys selected by the Underwriters. The Assured shall provide all reasonable information and assistance required by the Underwriters for such defence.

If the Underwriters elect to defend the Assured in whole or in part, any judgement against the Assured on those counts or causes of action which the Underwriters defended on behalf of the Assured or any settlement in which the Underwriters participate and all attorneys' fees, costs and expenses incurred by the Underwriters in the defence of the litigation shall be a loss covered by this bond.

If the Assured does not give the notices required in subsection (a) of Section 5 of this bond and in the first paragraph of this General Agreement, or if the Underwriters elect not to defend any causes of action, neither a judgement against the Assured, nor a settlement of any legal proceeding by the Assured, shall determine the existence, extent or amount of coverage under this bond for loss sustained by the Assured, and the Underwriters shall not be liable for any attorneys' fees, costs and expenses incurred by the Assured.

With respect to this General Agreement, subsections (b) and (d) of Section 5 of this bond apply upon the entry of such judgement or the occurrence of such settlement instead of upon discovery of loss. In addition, the Assured must notify the Underwriters within 30 days after such judgement is entered against it or after the Assured settles such legal proceeding, and, subject to subsection (e) of Section 5, the Assured may not bring legal proceedings for the recovery of such loss after the expiration of 24 months from the date of such final judgement or settlement.

## CONDITIONS AND LIMITATIONS

DEFINITIONS

Section 1. As used in this bond:

(a)    Acceptance means a draft which the drawee has, by signature written thereon, engaged to honour as presented.

(b)    Accomplice means a person who knowingly and with common intent with an Employee unites with such Employee in the commission of a fraudulent or dishonest act with the intent, at the time of such act, that the Assured shall be permanently deprived of such Property.

(c)    Certificate of Deposit means an acknowledgement in writing by a financial institution of receipt of Money with an engagement to repay it.

(d)    Certificated Security means a share, participation or other interest in property of or on enterprise of the issuer or an obligation of the issuer, which is:

(1)    represented by an instrument issued in bearer or registered form;

(2)    of a type commonly dealt in on securities exchanges or markets or commonly recognised in any area in which it is issued or dealt in as a medium for investment; and

(3)    either one of a class or series or by its terms divisible into a class or series of shares, participations, interests or obligations.

(e)    Counterfeit means an imitation of an actual valid original which is intended to deceive and to be taken as the original.

(f)    Employee means

(1)    a natural person in the service of the Assured at any of the Assured's offices or premises covered hereunder whom the Assured compensates directly by salary or commissions and whom the Assured has the right to direct and control while performing services for the Assured;

(2)    an attorney retained by the Assured and an employee of such attorney while either is performing legal services for the Assured;

(3)    a person provided by an employment contractor to perform employee duties for the Assured under the Assured's supervision at any of the Assured's offices or premises covered hereunder; and a guest student pursuing studies or duties in any of said offices or premises;

(4)    an employee of an institution merged or consolidated with the Assured prior to the effective date of this bond; and

(5)    each natural person, partnership or corporation authorised by the Assured to perform services as data processor of cheques or other accounting records of the Assured (not including preparation or modification of computer software or programs), herein called Processor (Each such Processor, and the partners, officers and employees of such Processor shall, collectively, be deemed to be one Employee for all the purposes of this bond, excepting, however, the second paragraph of Section 12. A Federal Reserve Bank or clearing house shall not be construed to be a processor.)

(6)    any compensated or non-compensated officer, director or trustee of any Assured

(7)    officers of the Assured whilst acting as bankruptcy trustees at the request of the Assured.

Employee does not mean brokers, general agents, sub-agents, loan agents, fiscal agents, property management agents, real estate agents, other representatives of the same general character, except as provided for in the Agents Rider attaching to and forming part of this Policy, or independent contractors except contractors as set forth in (2) or (5) above.

An Employee as defined in (1) or (4) above shall continue to be deemed an Employee of the Assured for the purposes of Insuring Agreement (A) of this Policy, for a period of ninety (90) days following termination of his or her employment.

(g)    Evidence of Debt means an instrument, including a Negotiable Instrument, executed by a customer of the Assured and held by the Assured which in the regular course of business is treated as evidencing the customer's debt to the Assured.

(h)    Forgery means the signing of the name of another person or organisation with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

(i)    Guarantee means a written undertaking obligating the signer to pay the debt of another to the Assured or its assignee or to a financial institution from which the Assured has purchased participation in the debt, if the debt is not paid in accordance with its terms.

(j)    Instruction means a written order to the issuer of an Uncertificated Security requesting that the transfer, pledge, or release from pledge of the Uncertificated Security specified be registered.

(k)    Letter of Credit means an engagement in writing by a bank or other person made at the request of a customer that the bank or other person will honour drafts or other demands for payment upon compliance with the conditions specified in the Letter of Credit.

(l)    Money means a medium of exchange in current use authorised or adopted by a domestic or foreign government as a part of its currency.

(m)    Negotiable Instrument means any writing

    (1)    signed by the maker or drawer; and

    (2)    containing any unconditional promise or order to pay a sum certain in Money and no other promise, order, obligation or power given by the maker or drawer; and

    (3)    is payable on demand or at a definite time; and

    (4)    is payable to order or bearer.

(n)    Property means Money, Certificated Securities, Uncertificated Securities, Negotiable Instruments, Certificates of Deposit, Acceptances, Evidences of Debt, Security Agreements, Withdrawal Orders, Letters of Credit, abstracts of title, deeds and mortgages on real estate, revenue and other stamps, books of account and other records whether recorded in writing or electronically and tangible items of personal property which are not hereinbefore enumerated.

(o)    Security Agreement means an agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation.

(p)    Statement of Uncertificated Security means a written statement of the issuer of an Uncertificated Security containing:

    (1)    A description of the issue of which the Uncertificated Security is a part;

    (2)    the number of shares or units;

        (a)    transferred to the registered owner;

        (b)    pledged by the registered owner to the registered pledgee;

        (c)    released from pledge by the registered pledgee;

        (d)    registered in the name of the registered owner on the date of the statement; or

        (e)    subject to pledge on the date of the statement;

    (3)    the name and address of the registered owner and registered pledgee;

    (4)    a notation of any liens and restrictions of the issuer and any adverse claims to which the Uncertificated Security is or may be subject or a statement that there are none of those liens, restrictions or adverse claims; and

    (5)    the date;

        (a)    the transfer of the shares or units to the new registered owner of the shares or units was registered;

        (b)    the pledge of the registered pledgee was registered, or

        (c)    of the statement, if it is a periodic or annual statement.

(q)    Subsidiary means:

    (1)    any entity in which more than 50% of the outstanding securities representing the present right to vote for the election of such entity's directors are owned by the First Named Assured, directly or indirectly, if such entity:

        (a)    was so owned prior to the inception date of this Policy, or

(b)    becomes so owned after the inception date of this Policy, provided that the assets of the entity do not exceed 10% of the consolidated assets of the Assured as set forth in the Assured's latest combined quarterly convention statements and then only with respect to losses discovered after the date such entity became a Subsidiary; or

(c)    becomes so owned after the inception date of this Policy, provided that if the assets of the entity exceed 10% of the consolidated assets of the Assured as set forth in the Assured's latest combined quarterly convention statements and the Assured gives written notice to Underwriters of such acquisition within one hundred and twenty (120) days after the effective date of such acquisition, together with such information as Underwriters reasonably may require, and shall pay any additional premium required by Underwriters. If the Assured fails to comply with the foregoing, coverage otherwise afforded hereunder shall terminate as of one hundred and twenty (120) days after the effective date of such acquisition; or

(2)    TRG Associates, L.L.C.; or

(3)    any entity which is not described in (1) or (2) above in which the First Named Assured or any Subsidiary maintains an ownership interest but only to the extent of such ownership interest

(r)    Transportation Company means any organisation which provides its own or leased vehicles for transportation or which provides freight forwarding or air express services.

(s)    Uncertificated Security means a share, participation or other interest in property of or an enterprise of the issuer or an obligation of the issuer, which is;

(1)    not represented by an instrument and the transfer of which is registered upon books maintained for that purpose by or on behalf of the issuer;

(2)    of a type commonly dealt in on securities exchanges or markets; and

(3)    either one of a class or series or by its terms divisible into a class or series of shares, participations, interests or obligations.

## EXCLUSIONS

Section 2. This bond does not cover;

(a)    loss resulting directly or indirectly from forgery or alteration, except when covered under Insuring Agreements (A), (D), or (E);

(b)    loss due to riot or civil commotion outside the United States of America and Canada; or loss due to military, naval or usurped power, war or insurrection unless such loss occurs in transit in the circumstances recited in Insuring Agreement (C), and unless, when such transit was initiated, there was no knowledge of such riot, civil commotion, military, naval or usurped power, war or insurrection on the part of any person acting for the Assured in initiating such transit;

(c)    loss resulting directly or indirectly from the effects of nuclear fission or fusion or radioactivity; provided, however, that this paragraph shall not apply to loss resulting from industrial uses of nuclear energy;

(d)    loss resulting directly or indirectly from any acts of any director or trustee of the Assured other than one employed as a salaried, pensioned or elected official or an Employee of the Assured, except when performing acts coming within the scope of the usual duties of an Employee, or while acting as a member of any committee duly elected or appointed by resolution of the board of directors or trustees of the Assured to perform specific, as distinguished from general, directorial acts on behalf of the Assured.

(e)     loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, any loan or transaction involving the Assured, as a lender or borrower, or extension of credit, including the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements or Evidences of Debt, whether such loan, transaction or extension was procured in good faith or through trick, artifice, fraud or false pretenses, except when covered under Insuring Agreements (A), (D) or (E);

(f)     loss resulting directly or indirectly from

      (i)     an incorrectly or dishonestly prepared title search, survey, inspection or other report made by an Employee,

      (ii)     a defective document or instrument taken by the Assured whether or not the Employee accepting such document or instrument knew of such defect, or

      (iii)     contractual or extra-contractual liability sustained by the Assured

      in connection with the issuance of contracts or purported contracts of insurance, indemnity or suretyship;

(g)     loss caused by an Employee, except when covered under Insuring Agreement (A) or when covered under Insuring Agreement (B) or (C) and resulting directly from misplacement, mysterious unexplainable disappearance or destruction of or damage to Property;

(h)     loss resulting directly or indirectly from counterfeiting, except when covered under Insuring Agreements (A) or (E);

(i)     loss resulting directly or indirectly from trading, with or without the knowledge of the Assured, whether or not represented by any indebtedness or balance shown to be due the Assured on any account, actual or fictitious, and notwithstanding any act or omission on the part of any Employee in connection with any account relating to such trading, indebtedness, or balance, except when covered under Insuring Agreements (D) or (E);

(j)     loss of any tangible item of personal property which is not specifically enumerated in the paragraph defining Property if such property is specifically insured by other insurance of any kind and in any amount obtained by the Assured, and in any event, loss of such property occurring more than 60 days after the Assured takes possession of such property, except when covered under Insuring Agreement (A);

(k)     loss of Property while

      (1)     in the mail, or

      (2)     in the custody of any Transportation Company, unless covered under Insuring Agreement (C)

      except when covered under Insuring Agreement (A);

(l)     potential income, including but not limited to interest and dividends, not realised by the Assured;

(m)     loss through the surrender of Property away from an office of the Assured as a result of a threat

      (1)     to do bodily harm to any person, except loss of Property in transit in the custody of any person acting as messenger provided that when such transit was initiated there was no knowledge by the Assured of any such threat, or

      (2)     to do damage to the premises or property of the Assured,

      except with respect to (1) above, when covered under Insuring Agreements (A) or (H), and with respect to (2) above, when covered under Insuring Agreements (A) or (I).

(n)     damages of any type for which the Assured is legally liable, except compensatory damages, but not multiples thereof, arising directly from a loss covered under this bond;

(o)   all fees, costs and expenses incurred by the Assured

    (1)   in establishing the existence of or amount of loss covered under this bond, or

    (2)   as a party to any legal proceeding whether or not such legal proceeding exposes the Assured to loss covered by this bond.

Provided, however, this exclusion shall not apply to Professional Fees as provided for in Insuring Agreement (G).

(p)   indirect or consequential loss of any nature;

(q)   loss resulting from any violation by the Assured or by any Employee

    (1)   of law regulating (i) the issuance, purchase or sale of securities, (ii) securities transactions upon security exchanges or over the counter market, (iii) investment companies, or (iv) investment advisers, or

    (2)   of any rule or regulation made pursuant to any such law, unless it is established by the Assured that the act or acts which caused the said loss involved fraudulent or dishonest conduct which would have caused a loss to the Assured in a similar amount in the absence of such laws, rules or regulations;

(r)   loss resulting directly or indirectly from the failure of a financial or depository institution, or its receiver or liquidator, to pay or deliver, on demand of the Assured, funds or Property of the Assured held by it in any capacity, except when covered under Insuring Agreements (A) or (B)(1)(a);

(s)   loss involving any Uncertificated Security except an Uncertificated Security of any Federal Reserve Bank of the United States or when covered under Insuring Agreement (A);

(t)   damages resulting from any civil, criminal or other legal proceeding in which the Assured is alleged to have engaged in racketeering activity except when the Assured establishes that the act or acts giving rise to such damages were committed by an Employee under circumstances which result directly in a loss to the Assured covered by Insuring Agreement (A). For the purposes of this exclusion, "racketeering activity" is defined in 18 United States Code 1961 et seq., as amended;

(u)   loss resulting directly or indirectly from any dishonest or fraudulent act or acts committed by any non-Employee who is a securities, commodities, money, mortgage, real estate, loan, insurance, property management, investment banking broker, agent or other representative of the same general character.

## DISCOVERY

Section 3.  This bond applies to loss discovered by the Assured during the Bond Period.  Discovery occurs when the Corporate Risk Manager first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

Discovery also occurs when the Assured receives notice of an actual or potential claim in which it is alleged that the Assured is liable to a third party under circumstances which, if true, would constitute a loss under this bond.

## LIMIT OF LIABILITY

Section 4. Aggregate Limit of Liability

The Underwriters' total liability for all losses discovered during the Bond Period shown in Item 2 of the Declarations shall not exceed the Aggregate Limit of Liability shown in Item 3 of the Declarations. The Aggregate Limit of Liability shall be reduced by the amount of any payment made under the terms of this bond.

Upon exhaustion of the Aggregate Limit of Liability by such payments;

(a)   The Underwriters shall have no further liability for loss or losses regardless of when discovered and whether or not previously reported to the Underwriters, and

(b)   The Underwriters shall have no obligation under General Agreement E to continue the defense of the Assured, and upon notice by the Underwriters to the Assured that the Aggregate Limit of Liability has been exhausted, the Assured shall assume all responsibility for its defense at its own cost.

The Aggregate Limit of Liability shall not be increased or reinstated by any recovery made and applied in accordance with subsections (a), (b) and (c) of Section 7. In the event that a loss of Property is settled by the Underwriters through the use of a lost instrument bond, such loss shall not reduce the Aggregate Limit of Liability.

Single Loss Limit of Liability

Subject to the Aggregate Limit of Liability, the Underwriters' liability for each Single Loss shall not exceed the applicable Single Loss Limit of Liability shown in Item 4 of the Declarations. If a Single Loss is covered under more than one Insuring Agreement or Coverage, the maximum payable shall not exceed the largest applicable Single Loss Limit of Liability.

Single Loss Defined

Single Loss means all covered loss, including court costs and attorneys' fees incurred by the Underwriters under General Agreement E, resulting from

(a)   any one act or series of related acts of burglary, robbery or attempt thereat, in which no Employee is implicated, or

(b)   any one act or series of related unintentional or negligent acts or omissions on the part of any person (whether an Employee or not) resulting in damage to or destruction or misplacement of Property, or

(c)   all acts or omissions other than those specified in (a) and (b) preceding, caused by any person (whether an Employee or not) or in which such person is implicated, or

(d)   any one casualty or event not specified in (a), (b) or (c) preceding.

NOTICE/PROOF - LEGAL PROCEEDINGS AGAINST UNDERWRITERS

Section 5.

✓(a)   At the earliest practicable moment after discovery of loss by the Corporate Risk Manager, the Assured shall give Underwriters notice thereof.

✓(b)   Within 6 months after such discovery, the Assured shall furnish to the Underwriters proof of loss, duly sworn to, with full particulars.

(c)   Lost Certificated Securities listed in a proof of loss shall be identified by certificate or bond numbers if such securities were issued therewith.

(d)   Legal proceedings for the recovery of any loss hereunder shall not be brought prior to the expiration of 60 days after the original proof of loss is filed with the Underwriters or after the expiration of 24 months from the discovery of such loss.

(e)   If any limitation embodied in this bond is prohibited by any law controlling the construction hereof, such limitation shall be deemed to be amended so as to equal the minimum period of limitation provided by such law.

(f)   This bond affords coverage only in favour of the Assured. No suit, action or legal proceedings shall be brought hereunder by any one other than the named Assured.

## VALUATION

Section 6.

Any loss of Money, or loss payable in Money, shall be paid, at the option of the Assured, in the Money of the country in which the loss was sustained or in the United States of America dollar equivalent thereof determined at the rate of exchange at the time of payment of such loss.

## SECURITIES

The Underwriters shall settle in kind their liability under this bond on account of a loss of any Securities or, at the option of the Assured shall pay to the Assured the cost of replacing such securities, determined by the market value thereof at the time of such settlement. In case of a loss of subscription, conversion or redemption privileges through the misplacement or loss of securities, the amount of such loss shall be the value of privileges immediately preceding the expiration thereof. If such securities cannot be replaced or have no quoted market value, or if such privileges have no quoted market value, their value shall be determined by agreement or arbitration.

If the applicable coverage of this bond is subject to a Deductible Amount and/or is not sufficient in amount to indemnify the Assured in full for the loss of securities for which claim is made hereunder, the liability of the Underwriters under this bond is limited to the payment for, or the duplication of, so much of such securities as has a value equal to the amount of such applicable coverage.

Books of Account and Other Records

In case of loss of, or damage to, any books of account or other records used by the Assured in its business, the Underwriters shall be liable under this bond only if such books or records are actually reproduced and then for not more than the cost of the blank books, blank pages or other materials plus the cost of labour for the actual transcription or copying of data which shall have been furnished by the Assured in order to reproduce such books and other records.

Property other than Money, Securities or Records

In case of loss of, or damage to, any Property other than Money, Securities, books of account or other records, or damage covered under Insuring Agreement (B)(2), the Underwriters shall not be liable for more than the actual cash value of such Property, or of items covered under Insuring Agreement (B)(2). The Underwriters may, at their election, pay the actual cash value of, replace or repair such property. Disagreement between the Underwriters and the Assured as to the cash value or as to the adequacy of repair or replacement shall be resolved by arbitration.

Set-Off

Any loss covered under this bond shall be reduced by a set-off consisting of any amount owed to the Employee (or to his or her assignee) causing the loss if such loss is covered under Insuring Agreement (A).

## ASSIGNMENT - SUBROGATION - RECOVERY - COOPERATION

Section 7.

(a)     In the event of payment under this bond, the Assured shall deliver, if so requested by the Underwriters, an assignment of such of the Assured's rights, title and interest and causes of action as it has against any person or entity to the extent of the loss payment.

(b)     In the event of payment under this bond, the Underwriters shall be subrogated to all of the Assured's rights of recovery therefor against any person or entity to the extent of such payment.

(c)     Recoveries, whether effected by the Underwriters or by the Assured, shall be applied net of the expense of such recovery first to the satisfaction of the Assured's loss which would otherwise have been paid but for the fact that it is in excess of either the Single or Aggregate Limit of Liability, secondly, to the Underwriters as reimbursement of amounts paid in settlement of the Assured's claim, and thirdly, to the Assured in satisfaction of any Deductible Amount. Recovery on account of loss of securities as set forth in the second paragraph of Section 6 or recovery from reinsurance and/or indemnity of the Underwriters shall not be deemed a recovery as used herein.

(d)     Upon the Underwriters' request and at reasonable times and places designated by the Underwriters the Assured shall

    (1)     submit to examination by the Underwriters and subscribe to the same under oath; and

    (2)     produce for the Underwriters' examination all pertinent records; and

    (3)     cooperate with the Underwriters in all matters pertaining to the loss.

(e)     The Assured shall execute all papers and render assistance to secure to the Underwriters the rights and causes of action provided for herein. The Assured shall do nothing after discovery of loss to prejudice such rights or causes of action.

## LIMIT OF LIABILITY UNDER THIS BOND AND PRIOR INSURANCE

Section 8.

With respect to any loss set forth in sub-section (c) of Section 4 of this bond which is recoverable or recovered in whole or in part under any other bonds or policies issued by the Underwriters to the Assured or to any predecessor in interest of the Assured and terminated or cancelled or allowed to expire and in which the period for discovery has not expired at the time any such loss thereunder is discovered, the total liability of the Underwriters under this bond and under such other bonds or policies shall not exceed, in the aggregate, the amount carried hereunder on such loss or the amount available to the Assured under such other bonds or policies, as limited by the terms and conditions thereof, for any such loss if the latter amount be the larger.

If the coverage of this bond supersedes in whole or in part the coverage of any other bond or policy of insurance issued by an insurer other than the Underwriters and terminated, cancelled or allowed to expire, the Underwriters, with respect to any loss sustained prior to such termination, cancellation or expiration and discovered within the period permitted under such other bond or policy for the discovery of loss thereunder, shall be liable under this bond only for that part of such loss covered by this bond as is in excess of the amount recoverable or recovered on account of such loss under such other bond or policy, anything to the contrary in such other bond or policy notwithstanding.

## OTHER INSURANCE OR INDEMNITY

Section 9.

Coverage afforded hereunder shall apply only as excess over any valid and collectible insurance or indemnity obtained by the Assured, or by one other than the Assured on Property subject to exclusion (i) or by a Transportation Company, or by another entity on whose premises the loss occurred or which employed the person causing the loss or the messenger conveying the Property involved.

## OWNERSHIP

Section 10.

This bond shall apply to loss of Property (1) owned by the Assured, (2) held by the Assured in any capacity, or (3) for which the Assured is legally liable. This bond shall be for the sole use and benefit of the Assured named in the Declarations.

## DEDUCTIBLE AMOUNT

Section 11.

The Underwriters shall be liable hereunder only for the amount by which any single loss, as defined in Section 4, exceeds the Single Loss Deductible amount for the Insuring Agreement or Coverage applicable to such loss, subject to the Aggregate Limit of Liability and the applicable Single Loss Limit of Liability.

The Assured shall, in the time and in the manner prescribed in this bond, give the Underwriters notice of any loss of the kind covered by the terms of this bond, whether or not the Underwriters are liable therefor, and upon the request of the Underwriters shall file with them a brief statement giving the particulars concerning such loss.

TERMINATION OR CANCELLATION

Section 12.

This bond terminates as an entirety upon occurrence of any of the following:- (a) 90 days after the receipt by the Assured of a written notice from the Underwriters of their desire to cancel this bond, or (b) immediately upon the receipt by the Underwriters of a written notice from the Assured of their desire to cancel this bond, or (c) immediately upon the taking over of the Assured by a receiver or other liquidator or by State or Federal officials, or (d) immediately upon the taking over of the Assured by another institution, or (e) immediately upon exhaustion of the Aggregate Limit of Liability, or (f) immediately upon expiration of the Bond period as set forth in Item 2 of the Declarations.

This bond terminates as to any Employee or any partner, officer or employee of any Processor (a) as soon as any Assured, or any director or officer not in collusion with such person, learns of any dishonest or fraudulent act committed by such person at any time, whether in the employment of the Assured or otherwise, which has, or is likely to exceed USD2,500, whether or not the type covered under Insuring Agreement (A), against the Assured or any other person or entity, without prejudice to the loss of any Property then in transit in the custody of such person, or (b) 15 days after the receipt by the Assured of a written notice from the Underwriters of their desire to cancel this bond as to such person.

Termination of the bond as to any Assured terminates liability for any loss sustained by such Assured which is discovered after the effective date of such termination.

## ENDORSEMENTS APPLICABLE TO SECTION ONE OF PART A

## ENDORSEMENT NUMBER ONE

### AGENTS RIDER

It is agreed that:

1.  Each natural person, partnership or corporation appointed and authorized by an Assured to act as its Agent shall, while acting in such capacity on behalf of such Assured be deemed to be an Employed of such Assured for the purposes of Insuring Agreement (A) of this Policy. Each such Agent and the partners, officers and employees of such Agent shall, collectively, be deemed to be one Employee for all the purposes of Insuring Agreement (A) of this Policy.

2.  This Policy does not afford coverage in favour of any Agent and upon payment to the Assured by the Underwriters on account of any loss for which the Agent is liable to the Assured, an assignment of such of the Assured's rights and causes of action as it may have against any such Agent by reason of such liability shall, to the extent of such payments, be given by the Assured to the Underwriters, and the Assured shall execute all papers necessary to secure to the Underwriters the rights herein provided for.

3.  "Agent" shall mean:

    (a)  a Soliciting Agent

    (b)  a General Agent

    (c)  a Marketing Agent

    (d)  a Premium Collection Agent

    (e)  a Registered representative

    (f)  an Accountant/Auditor

    (g)  a Tax Processor

    (h)  a Draft Signer

    (j)  any other natural person, partnership or corporation while in the custody of Property of the Assured in the normal course of performing services on behalf of the Assured pursuant to a written contract which authority of the Assured and subject to the Assured's control in the performance of such services.

4.  "Soliciting Agent" means a natural person, firm or corporation engaged or authorised by the Assured or by any General Agent of the Assured to solicit insurance for the account of the Assured or of such General Agent, and shall be deemed to include any insurance broker under contract with the Assured or with such General Agent.

5.  "General Agent" means a natural person, firm or corporation engaged or authorised by the Assured to solicit insurance for the account of the Assured.

6.  "Marketing Agent" means a natural person, firm or corporate engaged by the Assured for the primary purpose of promoting interest in the Assured's products with the authority ad subject to the control of the Assured.

7.  "Premium Collection Agent" means

    (a)  any natural person, firm or corporation authorised in writing by the Assured to collect premiums on behalf of the Assured, or

    (b)  any policyholder of group insurance of the Assured authorised in writing by the Assured to collect premiums for individual group member or

    (c)  any employer accepting specific authorization from the Assured to enroll the employees of the employer in a group insurance or pension program and agreeing to collect premiums therefore from such employees and remit them to the Assured.

8.  "Registered Representative" means a registered representative or registered principal associated with an Assured which is a securities broker/dealer

9.   "Accountant/Auditor" means a natural person, firm or corporation which has been engaged by the Assured to perform accounting or auditing services while performing such services for the Assured.

10.  "Tax Processor" shall mean any natural person, firm or corporation who receives withholding tax monies from the Assured with instructions to deposit such monies on behalf of the Assured with Federal, State or local authorities within the United States of America.

11.  "Draft Signer" means any natural personal authorised to sign drafts on behalf of the Assured, either for the Assured or for a policyholder of the Assured empowered by contract with the Assured to settle its own claims.

12.  Coverage under Insuring Agreement (A) of this Policy shall also apply to loss of property or funds of policyholders of the Assured or beneficiaries under policies issued by the Assured resulting directly from dishonest or fraudulent acts committed by a Soliciting Agent acting alone or in collusion with others. Such dishonest or fraudulent acts must be committed with the manifest intent:

(a)    to cause such policyholder or beneficiary to sustain such loss or

(b)    to obtain financial benefit for the Soliciting Agent or other person or entity.

As used herein, "financial benefit" does not include any benefits earned in the normal course of the agency relationship, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions.

13.  With respect to Tax Processors:

(a)    a "dishonest or fraudulent" act, as used in Insuring Agreement (A) of this policy, committed by Tax Processor means only the larceny or embezzlement of withholding tax monies of the Assured by such Tax Processor.

(b)    In the event of a loss of withholding tax monies o the Assured, covered under Insuring Agreement (A) of this Policy, caused by a dishonest or fraudulent act of a Tax Processor coverage under Insuring Agreement (A) of this Policy is extended to indemnify the Assured for penalties and interest which the Assured becomes legally obligated to pay to the Internal Revenue Service, or to be a similar tax collecting authority of a State or local government within the United States of America, directly and solely because the larceny or embezzlement of such withholding tax monies to be late.

(c)    The Underwriters shall not be liable hereunder for any penalties or interest which may attach or accrue on undeposited withholding tax monies after the close of the business day following the discovery by the Assured that such withholding tax monies were not duly deposited by the Tax Processor.

(d)    Nothing herein shall be construed as increasing the Underwriters' Limit of Liability with respect to any loss hereunder.

All other terms, conditions and limitations remain unaltered.

## ENDORSEMENT NUMBER TWO

## COLLATERAL MARKETING EXTENSION

It is agreed that:

1.  In the event that a duly appointed Agent of an Assured hereunder is also engaged in the collateral marketing of other products or services of another Assured hereunder, such activities shall be deemed to be part of such Agent's authorised activities on behalf of the Assured appointing such Agent.

2.  In the event that an Employee or Agent of the Assured is also engaged in the collateral marketing of products or services under another company or firm which is not an Assured hereunder, such activities shall be deemed to be a part of such Employee's or Agent's employee or agent activities on behalf of the Assured, but only if:

    (a)  the Assured has a written agreement with the provider of such products or services which provides for the marketing of such products or services by the Assured's Employees and/or Agents, or

    (b)  the Assured is actually held to be legally liable for such activities of its Employee Agents in connection with such other products or services.

    With respect to sub-paragraph (b) above it is a condition precedent to coverage hereunder that the Assured shall not voluntarily assume liability or do anything to compromise its legal defenses with respect to any such acts and shall co-operate with the Underwriters in defending any suits arising therefrom.

3.  With respect to the activities deemed in paragraph 2 above to be part of such Employee's or Agent's employee or agent activities on behalf of the Assured, any coverage hereunder for loss arising therefrom shall be no broader than coverage would have been had such loss been sustained directly by the Assured arising from activities actually performed directly for the Assured.

All other terms, conditions and limitations remain unaltered.

## ENDORSEMENT NUMBER THREE

### ERISA RIDER

It is agreed that:

1.    The following shall be included as Assured:

      any employee benefit plan approved by the Assured of the type which are required to be bonded in the United States under the Employee Retirement Income Security Act of 1974.

2.    "Employee" as used in the attached bond shall include any natural person who is a director or trustee of the Assured while such director or trustee is engaged in handling funds or other property of any Employee Welfare or Pension Benefit Plan owned, controlled or operated by the Assured or any natural person who is a trustee, manager, officer or employee of any such Plan.

3.    If the bond, in accordance with the agreements, limitations and conditions thereof, covers loss sustained by two or more Employee Welfare or Pension Benefit Plans or sustained by any such Plan in addition to loss sustained by an Assured other than such Plan, it is the obligation of the Assured or the Plan Administrator(s) of such Plans under Regulations published by the Secretary of Labour implementing Section 13 of the Welfare and Pension Plans Disclosure Act of 1958 to obtain under one or more bonds issued by one or more Insurers an amount of coverage for each such Plan at least equal to that which would be required if such Plans were bonded separately.

4.    In compliance with the foregoing, payment by the Company in accordance with the agreements, limitations and conditions of the bond shall be held by the Assured, or, if more than one, by the Assured first named, for the use and benefit of any Employee Welfare or Pension Benefit Plan sustaining loss so covered and to the extent that such payment is in excess of the amount of coverage required by such Regulations to be carried by said Plan sustaining such loss, such excess shall be held for the use and benefit of any other such Plan also covered in the event that such other Plan discovers that it has sustained loss covered thereunder.

5.    If money or other property of two or more Employee Welfare or Pension Benefit Plans covered under the bond is co-mingled, recovery for loss of such money or other property through fraudulent or dishonest acts of Employees shall be shared by such Plans on a pro rata basis in accordance with the amount for which each such Plan is required to carry bonding coverage in accordance with the applicable provisions of said Regulations.

6.    The Deductible Amount applicable to loss sustained through acts or defaults committed by Employees shall not apply to loss sustained by any Employee Welfare or Pension Benefit Plan covered through acts or defaults committed by any Employee of any such Plan.

7.    Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the bond, other than as stated herein.

8.    This rider is effective as of 1st October 1998.

ERISA RIDER

SR-6145a

## ENDORSEMENT NUMBER FOUR

## CENTRAL HANDLING OF SECURITIES RIDER

It is agreed that:

1.  A "System" is hereby defined as the System for the central handling of securities maintained by the Depository Securities Depository Trust Company, Pacific Securities Depository Trust Company, Midwest Securities Trust Company, New England Securities Depository Trust Company or any other such depository institutions.

2.  Securities included in such System(s) shall be deemed to be Property as defined in the attached Policy to the extent of the Assured's interest therein as effected by the making of appropriate entries on the books and records of such System(s).

3.  The word "Employee" as defined in the attached Policy shall be deemed to include the officers, partners, clerks, and other employees of such System(s) or any nominee in whose name is registered any security included within such System(s) and any employee of any recognised service company, while such officers, partners, clerks, other employees and employees of service companies perform services for such System(s). For the purpose of the above definition a recognised service company shall be any company providing personnel to, or performing work for, such System(s) on a contract basis.

4.  The Underwriters shall not be liable under the attached Policy as modified by this rider on account of any loss in connection with the central handling of securities within such System(s) unless such loss shall be in excess of the amount(s) recoverable or recovered under any bonds or policies of insurance indemnifying such System(s) against such loss, plus any Deductible Amount applicable to the attached Policy, and then the Underwriters shall be liable under the attached Policy as modified by this rider only for the Assured's share of such excess loss but in no event for more than the amount of indemnity carried under the attached Policy on such loss. This paragraph shall not apply to any loss or to that portion of any loss of securities when such securities are held in custody by the Assured under a Custody Agreement(s) between the Assured and such System(s).

    For the purposes of determining the Assured's share of such excess loss, it shall be deemed that the Assured has an interest in any certificate representing any security included within such System(s) equivalent to the interest the Assured than has in all certificates representing the same security included within such System(s) and that such System(s) shall use its best judgement in apportioning the amount(s) so recoverable or its best judgement in apportioning the amount(s) so recoverable or recovered under any bonds or policies of insurance indemnifying such

    System(s) against such loss in connection with the central handling of securities within such System(s) among all those having an interest as recorded by appropriate entries in the books and records of such System(s) in Property involved in such loss on the basis that each such interest shall share in the amount(s) so recoverable or recovered in the ratio that the value of each such interest in such Property in excess of the amount(s) so apportioned to the Assured by such System(s).

5.   The attached Policy as amended by this rider does not afford coverage in favor of such System(s) or any nominee in whose name is registered any security included within such System(s) and upon payment to the Assured by the Underwriters on account of any loss through dishonest or fraudulent acts committed by any of the officers, partners, clerks or other employees of such System(s) or its nominee, whether acting alone or in collusion with others, an assignment of such of the Assured's rights and causes of action as it may have against any of such officers, partners, clerks or other employees by reason of such acts so committed shall, to the extent of such payment, be given by the Assured to the Underwriters and the Assured shall execute all papers necessary to secure to the Underwriters the rights herein provided for. The Underwriters hereby waive all rights or causes of action which it may at any time have against such System(s) or its nominee arising from any payment made to the Assured under the attached Policy as modified by this rider on account of the central handling of securities within such System(s).

All other terms, conditions and limitations remain unaltered.

## ENDORSEMENT NUMBER FIVE

### ADDENDUM NUMBER ONE

It is understood and agreed that the Assured shall not be required to give the underwriters written notice of loss as set forth in Subsections 5 and 11 of CONDITIONS AND LIMITATIONS of this Policy unless or until the Assured has reason to believe that the amounts actually or potentially involved will exceed USD 250,000.

All other terms, conditions and limitations remain unaltered.

## ENDORSEMENT NUMBER SIX

### ADDENDUM NUMBER TWO

It is understood and agreed that if a loss is alleged to have been caused by the fraud or dishonesty, as defined in Insuring Agreement (A) of the Policy, of any one or more of the Employees and the Assured shall be unable to designate the specific Employees causing such loss, the Assured shall nevertheless have the benefit of Insuring Agreement (A) of the Policy, subject to the provisions of Subsection 2 of this Policy, provided that the evidence submitted reasonably proves that the loss was in fact due to the fraud or dishonesty, ad defined in Insuring Agreement (A) of the Policy, of one or more said Employees, and provided further, that the aggregate liability of the Underwriters for any such loss shall not exceed the Limit of Liability applicable to Insuring Agreement (A) of this Policy.

## SECTION TWO
## LLOYD'S ELECTRONIC AND COMPUTER CRIME POLICY
## (U.S.A. VERSION)
## LSW 209 (1/91)

## LLOYD'S ELECTRONIC AND COMPUTER CRIME POLICY

WHEREAS the Assured, named in the Schedule, has made to Us, who have hereunto subscribed our Names (hereinafter called "the Underwriters") a Proposal Form which it is agreed shall form the basis of this Insurance, and has paid or promised to pay the premiums specified in the Schedule, all provisions of the said Schedule and the Proposal Form being hereby incorporated in and forming part of this Policy.

NOW WE THE UNDERWRITERS hereby undertake and agree, subject to the following terms, exclusions, limitations and conditions, to make good to the Assured, as stated in the Schedule, in excess of the amounts of the deductibles stated to be applicable, such direct financial loss sustained by the Assured subsequent to the Retroactive Date and discovered by the Assured during the period of the Policy and subject always to the Policy Limits as stated in the Schedule.

The Assured is requested to read this Policy and, if it is incorrect, return it immediately for correction.

The attention of the Assured is particularly drawn to each of the Insuring Agreements, Definitions, Exclusions and General Conditions of this Insurance.

In all communications the Policy Number appearing in Item 1 of the Schedule should be quoted.

01534580/MH
05/06/2000

## SCHEDULE

**ITEM 1.**      POLICY NO.:   823/FD0000493

---

**ITEM 2.**      NAME OF INSURED:   FAIRFAX FINANCIAL HOLDINGS

Principal Address:     95 Wellington Street West
Suite 800
Toronto M5J 2N7
Canada

---

**ITEM 3.**      POLICY PERIOD:     From:   31st March, 2000

To:     31st March, 2003

Both days at 23.59 local standard time.

---

**ITEM 4.**      RETROACTIVE DATE:  No retroactive limitation.

---

**ITEM 5.**      PREMIUM:     See General Endorsement Number 5.

---

**ITEM 6.**      PROPOSAL FORM dated:     No proposal form completed.

The Proposal Form together with any correspondence relative thereto signed by or on behalf of the Assured shall be the basis of the insurance.

---

**ITEM 7.**      AGGREGATE POLICY LIMIT:   USD250,000,000

---

**ITEM 8.**      SINGLE LOSS LIMIT:

The Limit of Indemnity under this Policy for any Single Loss subject to the Aggregate Policy Limit and subject to General Condition H, shall be USD250,000,000

PROVIDED, however, that if lesser amounts are inserted against the several Insuring Agreements shown below, the Underwriters' liability in respect of any Single Loss falling within those Insuring Agreements is limited to such lesser amounts which are considered as part of and not in addition to the above-mentioned Aggregate Policy Limit.

Insuring Agreement 1
    Computer Systems

Insuring Agreement 2
    Assured's Service Bureau Operations

Insuring Agreement 3
    Electronic Computer Instructions

Insuring Agreement 4
    Electronic Data and Media

Insuring Agreement 5
    Computer Virus

Insuring Agreement 6
    Electronic Communications

Insuring Agreement 7
    Electronic Transmissions

Insuring Agreement 8
    Electronic Securities

Insuring Agreement 9
    Forged Telefacsimile

Insuring Agreement 10
    Voice Initiated Transfers

Insuring Agreement 11
    Outward Computer and Wire Transfer Fraud

Insuring Agreement 12
    Computer Software Piracy

Insuring Agreement 13
    Clean Up Costs                         USD250,000

Insuring Agreement 14
    Outward Facsimiles

Insuring Agreement 15
    Telephone Toll Calls                 USD250,000

Insuring Agreement 16
    Extortion

---

**ITEM 9. SINGLE LOSS DEDUCTIBLE:**

The amount of the deductible under this Policy for any Single Loss subject to General Condition N, is as follows:

(i)       USD10,000 in respect of Insuring Agreement 11, 13 and 15.

(ii)      USD500,000 in respect of all Insuring Agreements and entities, except as expressed in (i) above.

---

**ITEM 10.**    **SERVICE OF SUIT:**    Mr. E. Stork, Sedgwick Detert Moran & Arnold, Los Angeles, California.

---

**ITEM 11.**    **LOSSES TO BE NOTIFIED TO:** Aon Group Limited, Financial Institutions and Professional Risks, 8 Devonshire Square, London, EC2M 4PB.

---

**ITEM 12.**    **ENDORSEMENTS:**    1 - 12.

---

I.    INSURING AGREEMENTS

## INSURING AGREEMENT 1

COMPUTER SYSTEMS

By reason of the Assured having transferred, paid or delivered any funds or property, established any credit, debited any account or given any value as the direct result of

(a)    the fraudulent or malicious input of Electronic Data directly into:

(1)    the Assured's Computer System; or

(2)    a Service Bureau's Computer System; or

(3)    any Electronic Funds Transfer System; or

(4)    a Customer Communication System; or

b)    the fraudulent or malicious modification or the fraudulent or malicious destruction of Electronic Data stored within or being run within any of the above systems or during electronic transmission through data communication lines including satellite links to the Assured's Computer System or a Service Bureau's Computer System.

which fraudulent or malicious acts were committed by a person who intended to cause the Assured to sustain a loss or to obtain financial gain for himself or any other person.

## INSURING AGREEMENT 2

INSURED'S SERVICE
BUREAU OPERATIONS

By reason of a customer of the Assured having transferred, paid or delivered any funds or property, established any credit, debited any account or given any value as the direct result of the fraudulent or malicious input, the fraudulent or malicious modification or the fraudulent or malicious destruction of Electronic Data stored within or being run within the Assured's Computer System or during electronic transmission through data communication lines including satellite links from the Assured's Computer System into the customer's Computer System while the Assured is acting as a Service Bureau for said customer which fraudulent or malicious acts were committed by a person who intended to cause the Assured or the Assured's customer to sustain a loss or to obtain financial gain for himself or any other person and for which loss the Assured is held to be legally liable.

## INSURING AGREEMENT 3

ELECTRONIC
COMPUTER
INSTRUCTIONS

By reason of the Assured having transferred, paid or delivered any funds or property, established any credit, debited any account or given any value as the direct result of the fraudulent or malicious preparation or the fraudulent or malicious modification of Electronic Computer Instructions which fraudulent or malicious acts were committed by a person who intended to cause the Assured to sustain a loss or to obtain financial gain for himself or any other person.

## INSURING AGREEMENT 4

ELECTRONIC DATA
AND MEDIA

A.   By reason of the malicious destruction or attempt thereat of the Assured's Electronic Data by any person while the Electronic Data are stored within the Assured's Computer System or a Service Bureau's Computer System or while recorded upon Electronic Data Processing Media within the offices or premises of the Assured or in the custody of a person designated by the Assured to act as its messenger (or a person acting as messenger or custodian during an emergency arising from the incapacity of such designated messenger) while the Electronic Data Processing Media upon which such Electronic Data are recorded is in transit anywhere, such transit to begin immediately upon receipt of such Electronic Data Processing Media by said messenger and to end immediately upon delivery to the designated recipient or its agent, provided that the Assured is the owner of such Electronic Data Processing Media or is legally liable for such loss or damage.

B.   By reason of Electronic Data Processing Media being lost, damaged or destroyed as the direct result of robbery, burglary, larceny, theft, misplacement or mysterious unexplainable disappearance while the Electronic Data Processing Media is lodged or deposited within offices or premises located anywhere, or in the custody of a person designated by the Assured to act as its messenger (or a person acting as a messenger or custodian during an emergency arising from the incapacity of such designated messenger) while the Electronic Data Processing Media is in transit anywhere, such transit to begin immediately upon receipt of such Electronic Data Processing Media by said messenger and to end immediately upon delivery to the designated recipient or its agent, provided that the Assured is the owner of such Electronic Data Processing Media or is legally liable for such loss or damage.

## INSURING AGREEMENT 5

COMPUTER VIRUS

A.   By reason of the Assured having transferred, paid or delivered any funds or property, established any credit, debited any account or given any value as the direct result of the destruction or attempt thereat of the Assured's Electronic Data due to a Computer Virus caused by any person while such Electronic Data are stored within the Assured's Computer System or a Service Bureau's Computer System.

B.   By reason of the destruction or attempt thereat of the Assured's Electronic Data as the result of a Computer Virus caused by any person while such Electronic Data are stored within the Assured's Computer System or a Service Bureau's Computer System.

## INSURING AGREEMENT 6

**ELECTRONIC COMMUNICATIONS**

By reason of the Assured having transferred, paid or delivered any funds or property, established any credit, debited any account or given any value on the faith of any electronic communications directed to the Assured authorising or acknowledging the transfer, payment, delivery or receipt of funds or property which communications were transmitted or appear to have been transmitted

(1)     through an Electronic Communication System, or

(2)     by Tested telex, Tested TWX or similar means of Tested communication, or

(3)     through communications recorded on Electronic Data or Electronic Data Processing Media

directly into the Assured's Computer System or to the Assured's Communications Terminal and fraudulently purport to have been sent by a customer, Automated Clearing House or financial institution but which communications were either not sent by said customer, Automated Clearing House or financial institution or were fraudulently modified during physical transit of Electronic Data Processing Media to the Assured or during electronic transmission through data communication lines including satellite links to the Assured's Computer System or to the Assured's Communications Terminal.

## INSURING AGREEMENT 7

**ELECTRONIC TRANSMISSIONS**

By reason of a customer of the Assured, an Automated Clearing House or a financial institution having transferred, paid or delivered any funds or property, established any credit, debited any account or given any value on the faith of any electronic communications purporting to have been directed by the Assured to its customer, an Automated Clearing House or a financial institution authorising or acknowledging the transfer, payment, delivery or receipt of funds or property which communications were transmitted or appear to have been transmitted

(1)     through an Electronic Communication System, or

(2)     by Tested telex, Tested TWX or similar means of Tested communication, or

(3)     through communications recorded on Electronic Data or Electronic Data Processing Media

directly into a Computer System or a Communications Terminal of said customer, Automated Clearing House or financial institution and fraudulently purport to have been sent by the Assured but which communications were either not sent by the Assured or were fraudulently modified during physical transit of Electronic Data Processing Media from the Assured or during electronic transmission through data communication lines including satellite links from the Assured's Computer System or the Assured's Communications Terminal and for which loss the Assured is held to be legally liable.

ELECTRONIC
SECURITIES

## INSURING AGREEMENT 8

By reason of a Central Depository having transferred, paid or delivered any funds or property or debited any account of the Assured on the faith of any electronic communications purporting to have been directed by the Assured to the Central Depository authorising the transfer, payment or delivery of said funds or property or the debiting of the Assured's account in connection with the purchase, sale, transfer or pledge of an Electronic Security which communications were transmitted or appear to have been transmitted

(1)     through an Electronic Communication System, or

(2)     by Tested telex, Tested TWX or similar means of Tested communication

directly into a Computer System or a Communications Terminal of said Central Depository and fraudulently purport to have been sent by the Assured to the Central Depository but which communications were either not sent by the Assured to the Central Depository or were fraudulently modified during physical transit of Electronic Data Processing Media from the Assured or during electronic transmission through data communication lines including satellite links from the Assured's Computer System or the Assured's Communications Terminal to the Central Depository and for which loss the Assured is held to be legally liable to the Central Depository.

FORGED
TELEFACSIMILE

## INSURING AGREEMENT 9

By reason of the Assured having transferred, paid or delivered any funds or property, established any credit, debited any account or given any value on the faith of any Instructions directed to the Assured authorising, or acknowledging, the transfer, payment, delivery or receipt of funds or property which instructions were transmitted by Telefacsimile directly to the Assured and fraudulently purport to have been sent by a customer, an office of the Assured or another financial institution, but which instructions were sent without the knowledge or consent of said person and bear a Forged Signature.

SPECIAL CONDITION

The term 'instruction' as expressed in this Insuring Agreement shall mean:

(1)     Tested instructions, or

(2)     instructions that are subject to a call-back to an authorised person other than the individual initiating the transfer request.

## INSURING AGREEMENT 10

VOICE INITIATED
TRANSFERS

A.  By reason of the Assured having transferred any funds or property on the faith of any voice initiated funds transfer instructions directed to the Assured authorising the transfer of funds or property in a Customer's account to other banks for the credit to persons designated by the Customer and which instructions were made over the telephone to those employees of the Assured specifically authorised to receive said instructions at the Assured's offices and fraudulently purport to have been made by a person authorised and appointed by a Customer to request by telephone the transfer of such funds or property but which instructions were not made by said Customer or by any officer, director, partner or employee of said Customer or were fraudulently made by an officer, director, partner or employee of said Customer whose duty, responsibility or authority did not permit him to make, initiate, authorise, validate or authenticate Customer voice initiated funds transfer instructions, which fraudulent acts were committed by said person who intended to cause the Assured or the Customer to sustain a loss or to obtain financial gain for himself or any other person.

B.  By reason of the Assured having transferred any funds or property on the faith of any voice initiated funds transfer instructions purportedly communicated between the Assured's offices authorising the transfer of funds or property in a Customer's account to another financial institution for the credit to persons allegedly designated by the Customer and which instructions were purportedly made over the telephone between the Assured's offices by those employees of the Assured specifically authorised to send and receive said inter-office instructions by telephone, which fraudulent acts were committed by a person other than an employee of the Assured who intended to cause the Assured or the Customer to sustain a loss or to obtain financial gain for himself or any other person.

SPECIAL DEFINITION

"Customer" as used in this Insuring Agreement means any corporate, partnership or trust customer or similar business entity, individual customer or private customer which has a written agreement with the Assured for customer voice initiated funds transfers, such written agreement shall outline the terms and conditions under which the services is provided including a limitation of liability accepted by the Assured.

## INSURING AGREEMENT 11

**OUTWARD COMPUTER AND WIRE TRANSFER FRAUD COVERAGE**

By reason of the theft of funds from the Assured's Transfer Account at a Financial Institution through Fraudulent Transfer Instructions communicated to such Financial Institution.

SPECIAL DEFINITIONS

(a)     Financial Institution means:

      (i)     a banking, savings or thrift institution, or

      (ii)    a stockbroker, mutual fund, liquid asset fund or similar investment institution,

at which the Assured maintains a Transfer Account.

(b)     Fraudulent Transfer Instructions means:

      (i)     fraudulent electronic, telegraphic, cable teletype or telephonic instructions to a Financial Institution to debit a Transfer Account and to transfer, pay or deliver funds from such account, which instructions purport to have been transmitted by the Assured or by a person duly authorised by the Assured to issue such instructions but which have been fraudulently transmitted by another with the intent to cause the Assured or the Financial Institution to sustain a loss and to obtain financial gain for himself or any other person.

      (ii)    fraudulent written instructions to a Financial Institution to debit a Transfer Account and to transfer, pay or deliver funds from such account through an electronic funds transfer system at specified times or under specific conditions, which written instructions purport to have been duly issued by the Assured but which have been fraudulently issued, forged or altered by another.

(c)     Transfer Account means an account maintained by the Assured at a Financial Institution from which the Assured or the Assured's authorised representatives may cause the transfer, payment or delivery of funds (1) by means of electronic, telegraphic, cable, teletype or telephonic instructions (communicated directly or through a cash management service or funds transfer system, or (2) by means of written instructions establishing the conditions under which such transfers are to be initiated by such Financial Institutions through an electronic funds transfer system. Such account must be subject to a written agreement in the form of a corporate resolution of the Assured containing a list of individuals authorised to initiate and authenticate voice initiated funds transfers, which list must specify the telephone numbers as well as monetary limits for all initiators/authenticators. The arrangement with the Financial Institution shall be such that all voice initiated requests for the transfer of funds must be Tested (as defined in Definition (u) of this Policy or subject to a call-back to an authorised person other than the individual initiating the transfer request.

SPECIAL CONDITIONS

1.     LIMIT OF LIABILITY

The maximum limit of the Underwriter's liability under this Insuring Agreement 11 to pay all loss arising from one occurrence shall be USD250,000,000 forming part of the Aggregate Liability limit set forth in Item 7 of the Schedule. All acts committed by any person or in which such person is concerned or implicated will be considered one occurrence. Unless the circumstances reasonably prove the contrary all acts committed by unidentified persons shall be considered to have been committed by one person. If loss arising from or attributable to an occurrence is insured under two or more Insuring Clauses, the Underwriter's liability shall not be cumulative and the Underwriter's total liability on account of such loss shall not exceed the largest available Limit of Liability.

2.     EXCLUSIVE POLICY BENEFIT

The Insurance afforded under Insuring Agreement 10 - Voice Initiated Transfers, does not inure directly or indirectly to the benefit of any Financial Institution (other than the Assured) or to any electronic funds transfer system or electronic data processor and any coverage hereunder shall be specifically excess of any indemnity from or insurance taken for the benefit of customers of any of the aforesaid.

3.     TERRITORIAL LIMITS

Coverage under this Insuring Agreement 11 applies only with respect to funds or deposits in a Transfer Account of the Assured at a Financial Institution within the United States its possessions and territories and Canada.

EXCLUSIONS

Insuring Agreement 11 set forth above does not apply to:

(a)    loss of computer time or use,

(b)    loss due to unintentional errors or omissions,

(c)    loss due to the voluntary giving or surrendering of insured property in a purchase or exchange, whether legitimate or fraudulent.

## INSURING AGREEMENT 12

**COMPUTER SOFTWARE PIRACY**

By reason of loss resulting directly from the use of or reproduction and use of a Computer Program which is licensed or sublicensed from a third party vendor or consultant and used as part of the Assured's Computer System where such use of or reproduction and use of said Computer Program is in violation of the terms and conditions of any written license or sublicence agreement pertaining thereto, provided however that

(a)    such use of or reproduction and use of said Computer Program is done

(i)     on or within the Assured's offices or premises wherever located, and

(ii)    without the authorisation by or knowledge of any officer or director of the Assured or any Employee of the Assured having supervisory responsibility for Computer Program licensing contract compliance, and

(iii)   the Assured is legally liable for such loss.

SPECIAL CONDITION

Under this Insuring Agreement loss shall not include the licensing fee payable for any Computer Program found to have been used or reproduced and used in violation of said written licensing or sublicensing agreement.

## INSURING AGREEMENT 13

CLEAN UP COSTS

Loss by reason of costs and expenses incurred and paid by the Assured all with the prior approval of the Underwriter, for the verification and/or reconstitution and/or removal of Electronic Computer Instructions, following a paid loss under Insuring Agreement 3 or 5.

## INSURING AGREEMENT 14

OUTWARD FACSIMILES

By reason of a customer of the Assured, or Automated Clearing House or a financial institution having transferred, paid or delivered any funds or property, established any credit, debited any account or give any value on the faith of any Tested Instruction directed to such customer, Automated Clearing House or financial institution authorising or acknowledging the transfer, payment, credit or debit or giving of value, which Tested Instructions were transmitted directly to such customer, Automated Clearing House or financial institution by Telefacsimile and fraudulently purport to have been sent by the Assured but which Telefacsimile was either not sent by the Assured or was fraudulently modified during transmission including satellite links and for which loss the Assured is held to be legally liable.

## INSURING AGREEMENT 15

TELEPHONE TOLL CALLS

By reason of loss resulting directly from long distance telephone toll call charges incurred due to fraudulent access or fraudulent manipulation of an Account Code or System Password contained in a Voice Computer System that is part of the Assured's Voice Computer System, provided however that such loss did not result from failure to

a) change a System Password when the Voice Computer System was first installed and made operational and periodically thereafter with each subsequent change not to exceed a period of thirty (30) days;

and

b) install and keep operational a call disconnect feature which automatically terminates a caller's access to the Voice Computer System after not more than three (3) unsuccessful attempts to input an Account Code.

Special Condition:

Under this Insuring Clause a loss means toll call charges made only on telephone lines directly controlled by one Voice Computer System and only toll call charges occurring for a period of not more than thirty (30) days inclusive of the date on which the first such toll call charge was made.

Special Definitions:

a) "Account Code" means a confidential and protected string of characters that identifies or authenticates a person and permits said person to gain access to a Voice Computer System for the purpose of making long distance toll calls or utilising voice mail box messaging capabilities or other similar functional features of said system.

b) "System Password" means a confidential and protected string of characters that identifies or authenticates a person and permits said person to gain access to a Voice Computer System or any portion thereof for the purpose of performing System Administration or System Maintenance activities.

c) "Voice Computer System" means a Computer System installed in one location which functions as a private branch exchange (PBX), voice mail processor, automated call attendant or provides a similar capability used for the direction or routing of telephone calls in a voice communications network.

Special Exclusion

Loss resulting directly or indirectly from the use or purported use of a telephone credit, debit, charge, identification or similar card to gain access to the Assured's Voice Computer System.

## INSURING AGREEMENT 16

EXTORTION

By reason of loss resulting from the Assured having surrendered any funds or property to a person other than an Employee of the Assured where said person has gained or alleges to have gained unauthorised access to the Assured's Computer System and threatens to

(a)     cause the Assured to transfer, pay or deliver any funds or property by means of the Assured's Computer System; or

(b)     sell or disclose confidential security codes to another person or party, which disclosure will enable the recipient of such confidential security codes to cause the Assured to transfer, pay or deliver any funds or property by means of the Assured's Computer System; or

(c)     cause damage to or destruction of the Assured's Electronic Computer Instructions or Assured's Electronic Data while stored within the Assured's Computer Systems; or

(1)     the introduction of a Computer Virus into the Assured's Computer System, or

(2)     the activation of a Computer Virus that such person has allegedly introduced into the Assured's Computer System but where such Computer Virus is inactive at the time said threat is communicated to the Assured;

provided however that before surrendering any funds or property the Assured makes every reasonable effort to conduct an investigation which provides a reasonable basis for concluding said threat is technologically credible and the Assured reports said threat to the police or local law enforcement authorities having jurisdiction over such matters and reasonably complies with their recommendations, instructions or suggestions under the circumstances.


II.     **DEFINITIONS**

(a)     "Assured's Computer System" means those Computer Systems operated by the Assured and which are either owned or leased by the Assured.

(b)     "Automated Clearing House" means any corporation or association which operates an electronic clearing and transfer mechanism for the transfer of preauthorized recurring debits and credits between financial institutions on behalf of the financial institutions' customers.

(c)     "Central Depository" means any clearing corporation, including any Federal Reserve Bank of the United States, where as the direct result of an electronic clearing and transfer mechanism entries are made on the books reducing the account of the transferor, pledgor or pledgee and increasing the account of the transferee, pledgee or pledgor by the amount of the obligation or the number of shares or rights transferred, pledged or released.

(d)     "Communications Terminal" means any teletype, teleprinter or video display terminal or similar device capable of sending and/or receiving information electronically and usually equipped with a keyboard.

(e)    "Computer System" includes a computer or personal computer and all input, output, processing, storage and communication facilities which are connected to such a device. Off-line media libraries are deemed to be part of said Computer System.

(f)    "Computer Virus" means a set of unauthorised instructions, programmatic or otherwise, that propagate themselves through the Assured's Computer System and/or networks which instructions were maliciously or fraudulently introduced by a person other than by an identifiable employee.

(g)    "Customer Communication System" means those communications systems in use by the Assured which provide customers of the Assured with direct access to the Assured's Computer System.

(h)    "Electronic Communication System" means electronic communication operations by Fedwire, Clearing House Interbank Payment System (CHIPS), Society for Worldwide Interbank Financial Telecommunication (SWIFT), Clearing House Automated Payment System (CHAPS), the funds transfer system for the transfer of preauthorized recurring debits and credits of an Automated Clearing House Association which is a member of the National Automated Clearing House Association and similar automated communication systems in use by the Assured.

(i)    "Electronic Computer Instructions" means computer programs, i.e., facts or statements converted to a form usable in a Computer System to act upon Electronic Data.

(j)    "Electronic Data" means facts or information converted to a form usable in a Computer System and which is stored on Electronic Data Processing Media for use by computer programs.

(k)    "Electronic Data Processing Media" means the punched cards, magnetic tapes, punched tapes or magnetic discs or optical discs or other bulk media on which Electronic Data are recorded.

(l)    "Electronic Funds Transfer Systems" means those systems which operate automated teller machines or point of sale terminals and include any shared networks or facilities for said system in which the Assured participates.

(m)    "Electronic Security" means a share, participation or other interest in property of or an enterprise of the issuer or an obligation of the issuer which

(1)    is a type commonly dealt in upon securities exchanges or markets; and

(2)    is either one of a class or series or by its terms is divisible into a class or series of shares, participations, interests or obligations; and

(3)    (a)    is not represented by an instrument, or

(b)    is part of a master or global certificate, or

(c)    represents a paper certificate that has been surrendered by a financial institution and which paper certificate has been combined into a master depository note and the paper certificates are immobilised

and such security is shown as an electronic entry on the account of the transferor, pledgor or pledgee on the books of a Central Depository.

(n)    "Evidences of Debt" means instruments executed by a customer of the Assured and held by the Assured which in the regular course of business are treated as evidencing the customer's debt to the Assured including records of charges and accounts receivable.

(o)    "Forged Signature" means the handwritten signing of the name of another genuine person or a copy of said person's signature without authority and with intent to deceive; it does not include the signing in whole or in part of one's own name, with or without authority, in any capacity, for any purpose.

(p)    "Service Bureau" means a natural person, partnership or corporation authorised by written agreement to perform data processing services using Computer Systems.

(q)     "Service Bureau's Computer System" means those Computer Systems operated by a Service Bureau and which are either owned by or leased to a Service Bureau.

(r)     "Telefacsimile" means a system of transmitting written documents by means of electronic signals over telephone lines to equipment maintained by the Assured within its communication room for the purpose of reproducing a copy of said document. It does not mean electronic communications sent by telex, TWX or similar means of communication or through an Electronic Communication System.

(s)     "Tested" means a method of authenticating the contents of a communication by affixing thereto a valid test key which has been exchanged between the Assured and a customer, Automated Clearing House, Central Depository, another financial institution or between offices of the Assured for the purpose of protecting the integrity of the communication in the ordinary course of business.

III.    **EXCLUSIONS**

This Policy does not cover:

(a)     Loss resulting from any of the perils covered by Section One of this Policy.

(b)     Loss caused by an identifiable employee of the Assured or by a person or persons in collusion with any employee of the Assured.

        Prior knowledge by any employee that a fraudulent act by a person or persons, not in the employ of the Assured, has been or will be perpetrated, shall for the intent and purpose of this Policy be deemed to be collusion should said employee wilfully or deliberately withhold this knowledge from the Assured. The withholding of knowledge from the Assured by an employee because of a threat to do bodily harm to any person or to do damage to the premises or property of the Assured shall not be deemed to be or to constitute collusion.

(c)     Loss of potential income, including but not limited to interest and dividends.

(d)     Indirect or consequential loss of any nature.

(e)     Liability assumed by the Assured by agreement under any contract unless such liability would have attached to the Assured even in the absence of such agreement.

(f)     All fees, costs and expenses incurred by the Assured

        (1)     in establishing the existence of or amount of loss covered under this Policy; or

        (2)     as a party to any legal proceeding except as provided by General Condition F.

        Provided, however, this exclusion shall not apply to fees, costs and expenses as provided for in Insuring Agreement 13.

(g)     Loss due to riot or civil commotion outside the United States of America and Canada; or loss due to military, naval or usurped power, war or insurrection unless such loss occurs in transit and unless, when such transit was initiated, there was no knowledge of such riot, civil commotion, military, naval or usurped power, war or insurrection on the part of any person acting for the Assured in initiating such transit.

(h)     (1)     Any loss or destruction of or damage to any property whatsoever or any loss or expense whatsoever resulting or arising therefrom or any consequential loss, or

        (2)     Any legal liability of whatsoever nature

        directly or indirectly caused by, or contributed to by or arising from

        (i)     ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel, or

        (ii)    the radioactive, toxic, explosive or other hazardous properties of any explosive nuclear assembly or nuclear component thereof.

(i) Loss as a result of a threat

    (1) to do bodily harm to any person, except loss of Electronic Data Processing Media or Electronic Data in transit in the custody of any person acting as messenger provided that when such transit was initiated there was no knowledge by the Assured of any such threat, or

    (2) to do damage to the premises or property of the Assured.

(j) Loss of Electronic Data Processing Media or Electronic Data while in the mail or with a carrier for hire other than an armoured motor vehicle company.

(k) Loss of Electronic Data or Electronic Data Processing Media except as provided for under General Condition J.

(l) Loss resulting directly or indirectly from

    (1) written instructions or advices, or

    (2) telegraphic or cable instructions or advices, or

    (3) instructions or advices by voice over telephone, unless such instructions are covered under Insuring Agreement 10, or

    (4) Telefacsimile instructions or advices unless said Telefacsimile instructions or advices are covered under Insuring Agreement 9.

(m) Loss resulting directly or indirectly from forged, altered or fraudulent negotiable instruments, securities, documents or written instruments used as source documentation in the preparation of Electronic Data or manually keyed in a data terminal.

(n) Loss of negotiable instruments, securities, documents or written instruments except as converted to Electronic Data and then only in that converted form.

(o) Loss resulting directly or indirectly from the accessing of any confidential information including but not limited to trade secret information, computer programs or customer information, unless such confidential information be used in any fraudulent act which gives rise to a direct financial loss under the terms of this Policy.

(p) Loss resulting from mechanical failure, faulty construction, error in design, latent defect, wear or tear, gradual deterioration, electrical disturbance, Electronic Data Processing Media failure or breakdown or any malfunction or error in programming or errors or omissions in processing.

(q) Loss resulting directly or indirectly from the fraudulent preparation, fraudulent modification or destruction of Electronic Computer Instructions unless covered under Insuring agreement 3 or 5.

(r) Loss by reason of the input of Electronic Data at an authorised electronic terminal of an Electronic Funds Transfer System or a Customer Communication System by a customer or other person who had authorised access to the customer's authentication mechanism.

(s) Loss resulting from fraudulent features contained in Electronic Computer Instructions developed for sale to or that are sold to multiple customers at the time of their acquisition from a vendor or consultant.

(t) Loss resulting directly or indirectly from any Computer Virus unless covered under Insuring Agreement 5.

(u) Any loss

    (1) sustained prior to the Retroactive Date or any loss involving any act, transaction, or event which occurred or commenced prior to the Retroactive Date, or

    (2) discovered prior to the inception date of the Policy Period stated in the Schedule, or

    (3) discovered subsequent to the termination of the Policy, or

    (4) notified to a prior insurer.

IV.  **GENERAL CONDITIONS**

(A)  **COMPANION POLICY**

The Lloyd's Electronic and Computer Crime Policy is designed to be a companion policy to the Assured's Financial Institution Bond and is intended to provide coverage for computer related crime as defined in the Insuring Agreements which is not covered under the Assured's Financial Institution Bond. Since certain Underwriters who are underwriting the Lloyd's Electronic and Computer Crime Policy may also be underwriting the Assured's Financial Institution Bond by either primary insurance, excess insurance or other contributing insurance or reinsurance and since it is their intention not to increase or double up their coverage to the Assured it is agreed that this Policy will not be deemed to be excess or co-insuring coverage.

(B)  **NOMINEES**

Loss sustained by any nominee organised by the Assured for the purpose of handling certain of its business transactions and composed exclusively of its officers, clerks or other employees shall, for all the purposes of this Policy, be deemed to be loss sustained by the Assured.

(C)  ADDITIONAL OFFICES, COMPUTER SYSTEMS -
CONSOLIDATION, MERGER OR PURCHASE OF ASSETS - NOTICE

If the Assured shall, while this Policy is in force, establish any additional offices or add to the Assured's Computer System, other than by consolidation or merger with, or purchase or acquisition of assets or liabilities of, another institution, such offices or addition to the Assured's Computer System shall be automatically covered hereunder from the date of such establishment without the requirement of notice to Underwriters or the payment of additional premium for the remainder of the premium period; provided, however, that with respect to any purchase or acquisition as provided hereinbefore, there shall be no coverage afforded hereunder for any loss sustained prior to such establishment.

If the Assured shall, while this Policy is in force, consolidate or merge with, purchase or acquire assets or liabilities of another institution, the Assured shall not have such coverage as is afforded under this Policy for loss which was sustained prior to such consolidation, merger, purchase or acquisition. Further the Assured shall not have such coverage as is afforded under this bond for loss which:

(a)  has occurred or will occur in such offices, or premises of such institution; or

(b)  has arisen or will arise out of the assets or liabilities acquired by the Assured as a result of such consolidation, merger or purchase or acquisition of assets or liabilities;

unless the Assured shall have complied with the following conditions:

(1)  With respect to any such consolidation, merger, purchase or acquisition of any entity, assets or liabilities valued at 10% or less of the consolidated assets of the Assured as set forth in the Assured's latest combined quarterly convention statements, no notice or additional premium shall be required.

(2)  With respect to any other such consolidation, merger, purchase or acquisition of any entity, assets or liabilities, the Assured shall

(i)  give the Underwriters written notice of the proposed consolidation, merger or purchase or acquisition of assets or liabilities within one hundred and twenty (120) days after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities and

(ii)  obtain the consent of the Underwriters to extend the coverage provided by this bond to such additional offices or premises, Employees and other exposures, and

(iii)  upon obtaining such consent, pay to the Underwriters any additional premium required by Underwriters.

The Underwriters' consent required in condition (2) (ii) above shall be deemed to have been given only if

(1)   such consent is given in writing by the Underwriters, or

(2)   the Underwriters have not responded to the Assured's written notice within fifteen days of Underwriters' receipt thereof, in which event consent shall be deemed to have been given effective from the date of consolidation, merger, acquisition or purchase.

(D)   CHANGE OF CONTROL - NOTICE

When the Assured learns of a change of control, it shall give written notice to Underwriters.

As used in this General Condition, change in control means: (a) the Assured merging into or consolidating with another entity such that the Assured is not the surviving entity; or (b) another entity or group of entities or persons acting in concert acquires securities or voting rights which results in ownership or voting control by the other entity(ies) or person(s) of more than 50% of the outstanding securities representing the present right to vote for the election of directors of the Assured.

Failure to give the required notice shall result in termination of coverage for any loss involving a transferee, to be effective upon the date of the stock transfer.

(E)   JOINT INSURED

If two or more Assureds are covered under this Policy, the first named Assured shall act for all Assureds. Payment by Underwriters to the first named Assured of loss sustained by any Assured shall fully release Underwriters on account of such loss. If the first named Assured ceases to be covered under this Policy, the Assured next named shall thereafter be considered as the first named Assured. Knowledge possessed or discovery made by any Assured shall constitute knowledge or discovery by all Assureds for all purposes of this Policy. The liability of Underwriters for loss or losses sustained by all Assureds shall not exceed the amount for which Underwriters would have been liable had all such loss or losses been sustained by one Assured.

(F)   COURT COSTS, ATTORNEYS' FEES AND
      ELECTION BY UNDERWRITERS TO DEFEND

Underwriters shall indemnify the Assured against court costs and reasonable attorneys' fees incurred and paid by the Assured in defending any suit or legal proceeding brought against the Assured with respect to which the Assured establishes that the act or acts which were committed would entitle the Assured to recovery under an Insuring Agreement of this Policy in excess of any deductible if any loss resulted therefrom. Court costs and attorneys' fees indemnified to the Assured shall be part of and not in addition to the Aggregate Policy Limit under Item 7 of the Schedule or, if applicable, the lesser amounts under Item 8 of the Schedule.

In any such suit or legal proceeding, if the amount claimed against the Assured or the amount ultimately paid whichever is greater shall exceed the deductible or be in excess of the amount recoverable under the terms of this Policy then the court costs and attorneys' fees shall be pro-rated between the Assured and Underwriters to the amount of each party's potential liability including the deductible.

The Assured shall promptly give notice to Underwriters of the institution of any such suit or legal proceeding and at the request of Underwriters shall furnish them with copies of all pleadings and other papers therein. At Underwriters' election the Assured shall permit Underwriters to conduct the defence of such suit or legal proceeding, in the Assured's name, through attorneys of Underwriters' selection. In such event, the Assured shall give all reasonable information and assistance which Underwriters shall deem necessary to the defence of such suit or legal proceeding.

If Underwriters pay court costs and attorneys' fees in excess of their proportionate share of such costs and attorneys' fees, the Assured shall promptly reimburse Underwriters for such excess.

(G)  **DISCOVERY**

This Policy applies to loss discovered by the Assured during the Policy Period. Discovery occurs when the Corporate Risk Manager first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this Policy has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

Discovery also occurs when the Assured receives notice of an actual or potential claim in which it is alleged that the Assured is liable to a third party under circumstances which, if true, would constitute a loss under this Policy.

(H)  **POLICY LIMITS**

Aggregate Policy Limit

Underwriters' total liability for all losses discovered during the Policy Period shown in Item 3 of the Schedule shall not exceed the Aggregate Policy Limit shown in Item 7 of the Schedule. The Aggregate Policy Limit shall be reduced by the amount of any payment made under the terms of this Policy.

Upon exhaustion of the Aggregate Policy Limit by such payments:

(a)  Underwriters shall have no further liability for loss or losses regardless of when discovered and whether or not previously reported to Underwriters, and

(b)  Underwriters shall have no obligation under General Condition F to pay court costs and attorneys' fees or to continue the defence of the Assured, and upon notice by Underwriters to the Assured that the Aggregate Policy Limit has been exhausted, the Assured shall assume all responsibility for its defence at its own cost.

The Aggregate Policy Limit shall not be increased or reinstated by any recovery made and applied in accordance with General Condition K.

Single Loss Limit

Subject to the Aggregate Policy Limit remaining available for the payment of loss, Underwriters' liability for any Single Loss shall not exceed the applicable Single Loss Limit shown in Item 8 of the Schedule. If a Single Loss is covered under more than one Insuring Agreement or Coverage, the maximum payable shall not exceed the largest applicable Single Loss Limit.

Single Loss Defined

Single Loss means all covered loss, including court costs and attorneys' fees incurred by the Assured or Underwriters under General Condition F, resulting from

(a)  any one act or series of related acts or attempts thereat, or

(b)  all acts or omissions other than those specified in (a) preceding, caused by any person or in which such person is implicated, or

(c)  any one casualty or event not specified in (a) or (b) preceding.

(I)  **NOTICE/PROOF - LEGAL PROCEEDINGS AGAINST UNDERWRITERS**

(a)  At the earliest practicable moment after discovery of loss by the Corporate Risk Manager which the Assured has reason to believe that the amounts actually or potentially involved will exceed USD250,000, the Assured shall give Underwriters notice thereof.

(b)  Within six (6) months after such discovery, the Assured shall furnish to Underwriters proof of loss, duly sworn to with full particulars.

(c)     Legal proceedings for the recovery of any loss hereunder shall not be brought prior to the expiration of sixty (60) days after the original proof of loss is filed with Underwriters or after the expiration of twenty-four (24) months from the discovery of such loss, except that any action or proceeding to recover hereunder on account of any judgment against the Assured in any suit mentioned in General Condition F, or to recover attorneys' fees paid in any such suit, shall be brought within twenty-four (24) months from the date upon which the judgment and such suit shall become final.

(d)     If any limitation embodied in this Policy is prohibited by any law controlling the construction hereof, such limitation shall be deemed to be amended so as to equal the minimum period of limitation provided by such law.

(e)     This Policy affords coverage only in favour of the Assured. No suit, action or legal proceedings shall be brought hereunder by any one other than the named Assured.

(J)    **VALUATION**

**Money**

Any loss of money, or loss payable in money, shall be paid, at the option of the Assured, in the money of the country in which the loss was sustained or in the United States of America dollar equivalent thereof determined at the rate of exchange at the time of payment of such loss.

**Securities**

Underwriters shall settle in kind their liability under this Policy on account of a loss of any security, including Electronic Securities, or, at the option of the Assured, shall pay to the Assured the cost of replacing such security, determined by the market value thereof at the time of such settlement. In case of a loss of subscription, conversion or redemption privileges through the loss of any security, the amount of such loss shall be the value of such privileges immediately preceding the expiration thereof. If such security cannot be replaced or has no quoted market value, or if such privileges have no quoted market value, their value shall be determined by agreement or arbitration.

If the applicable coverage of this Policy is subject to a Deductible Amount and/or is not sufficient in amount to indemnify the Assured in full for the loss of any security for which claim is made hereunder, the liability of Underwriters under this Policy is limited to the payment for, or the duplication of, so much of such securities as has a value equal to the amount of such applicable coverage.

**Electronic Data Processing Media**

In case of loss of, or damage to, Electronic Data Processing Media used by the Assured in its business, Underwriters shall be liable under this Policy only if such items are actually reproduced by other Electronic Data Processing Media of the same kind or quality and then for not more than the cost of the blank media plus the cost of labour for the actual transcription or copying of data which shall have been furnished by the Assured in order to reproduce such Electronic Data Processing Media, subject, of course, to the applicable Limit of Indemnity.

**Other Property**

In case of loss of, or damage to, any Property other than money, securities or Electronic Data Processing Media, Underwriters shall not be liable for more than the actual cash value of such property. Underwriters may, at their election, pay the actual cash value of, replace or repair such property. Disagreement between Underwriters and the Assured as to the cash value or as to the adequacy of repair or replacement shall be resolved by arbitration.

**Electronic Data**

In case of loss of Electronic Data Underwriters shall be liable under this Policy only if such data is actually reproduced by other Electronic Data of the same kind or quality and then for not more than the cost of labour for the actual transcription or copying of data which shall have been furnished by the Assured in order to reproduce such Electronic Data subject, of course, to the applicable Limit of Indemnity.

However, if such Electronic Data cannot be reproduced and said Electronic Data represents securities, or financial instruments having a value, including Evidences of Debt, then the loss will be valued as indicated in the Securities and Other Property paragraphs of this Section.

(K) ASSIGNMENT - SUBROGATION - RECOVERY - CO-OPERATION

(a) In the event of payment under this Policy, the Assured shall deliver, if so requested by Underwriters, an assignment of such of the Assured's rights, title and interest and causes of action as it has against any person or entity to the extent of the loss payment.

(b) In the event of payment under this Policy, Underwriters shall be subrogated to all of the Assured's rights of recovery therefor against any person or entity to the extent of such payment.

(c) Recoveries, whether effected by Underwriters or by the Assured, shall be applied net of the expense of such recovery first to the satisfaction of the Assured's loss which would otherwise have been paid but for the fact that it is in excess of either the Single Loss Limit or Aggregate Policy Limit of the Policy, secondly, to Underwriters as reimbursement of amounts paid in settlement of the Assured's claim, and thirdly, to the Assured in satisfaction of any Deductible Amount. Recovery on account of loss of Securities as set forth in General Condition J or recovery from reinsurance and/or indemnity of Underwriters shall not be deemed a recovery as used herein.

(d) Upon Underwriters' request and at reasonable times and places designated by Underwriters the Assured shall

(1) submit to examination by Underwriters and subscribe to the same under oath; and

(2) produce for Underwriters' examination all pertinent records; and

(3) co-operate with Underwriters in all matters pertaining to the loss.

(e) The Assured shall execute all papers and render assistance to secure to Underwriters the rights and causes of action provided for herein. The Assured shall do nothing after discovery of loss to prejudice such rights or causes of action.

(L) OTHER INSURANCE OR INDEMNITY

Except as provided in General Condition A, coverage afforded hereunder shall apply only as excess over any valid and collectible insurance, whether such other insurance is stated to be primary, contributing, excess or contingent, or indemnity obtained by the Assured or by an armoured motor vehicle company, or by another entity on whose premises the loss occurred or which employed the person causing the loss or the messenger conveying the Electronic Data Processing Media. As excess insurance this Policy shall not apply or contribute to the payment of any loss until the amount of such other insurance or indemnity shall have been exhausted, it being understood and agreed that under this Policy the Assured is to be reimbursed to the extent of the difference between the amount collectible from such other insurance and indemnity and the amount of the actual loss otherwise recoverable hereunder.

(M) OWNERSHIP

This Policy shall apply to loss of property and loss of Electronic Data Processing Media and Electronic Data owned by the Assured, held by the Assured in any capacity or for which the Assured is legally liable. This Policy shall be for the sole use and benefit of the Assured named in the Schedule.

(N)     <u>DEDUCTIBLE AMOUNT/NOTICE OF LOSS WITHIN DEDUCTIBLE</u>

Underwriters shall be liable hereunder only for the amount by which any Single Loss exceeds the Single Loss Deductible shown in Item 9 of the Schedule for the Insuring Agreement applicable to such loss, subject to the Single Loss Limit for such Insuring Agreement and the Aggregate Policy Limit remaining available for the payment of the loss. The Assured shall, in the time and in the manner prescribed in this Policy, give Underwriters notice of any loss of the kind covered by the terms of this Policy which the Assured has reason to believe that the amounts actually or potentially involved will exceed USD250,000, whether or not Underwriters are liable therefor, and upon the request of Underwriters shall file with it a brief statement giving particulars concerning such loss.

(O)     <u>TERMINATION OR CANCELLATION</u>

This Policy shall be deemed terminated or cancelled as an entirety.

     (a)     ninety (90) days after the receipt by the Assured of a written notice from Underwriters of their desire to terminate or cancel this Policy, or

     (b)     immediately upon the receipt by Underwriters of a written request from the Assured to terminate or cancel this Policy, or

     (c)     immediately upon the taking over of the Assured by a receiver or other liquidator or by State or Federal officials, or

     (d)     immediately upon the taking over of the Assured by another institution, or

     (e)     immediately upon exhaustion of the Aggregate Policy Limit, or

     (f)     immediately upon expiration of the Policy Period as set forth in Item 3 of the Schedule.

Underwriters shall, on request, refund to the Assured the unearned premium, computed pro-rata, if this Policy be terminated or cancelled or reduced by notice from, or at the instance of, Underwriters or if terminated or cancelled as provided in subsection (c) or (d) of this paragraph. Underwriters shall refund to the Assured the unearned premium computed at short rates if this Policy be terminated or cancelled or reduced by notice from, or at the instance of, the Assured.

This Policy shall be deemed terminated or cancelled as to any Service Bureau

     (a)     as soon as any Assured, or any director or officer not in collusion with such person, shall learn of any dishonest or fraudulent act committed by any partner, director, officer or employee of any such Service Bureau at any time against the Assured or any other person or entity, without prejudice to the loss of any property then in transit in the custody of such person, or

     (b)     fifteen (15) days after the receipt by the Assured of a written notice from Underwriters of their desire to terminate or cancel this Policy as to such person.

Termination of this Policy as to any Assured terminates liability for any loss sustained by such Assured which is discovered after the effective date of such termination.

(P)     <u>ACTION AGAINST SERVICE BUREAU OR CUSTOMER</u>

This Policy does not afford coverage in favour of any Service Bureau or customer as aforesaid, and upon payment to the Assured by the Underwriters on account of any loss through fraudulent or dishonest acts committed by any of the partners, directors, officers or employees of such Service Bureau or customer whether acting alone or in collusion with others, an assignment of such of the Assured's rights and causes of action as they may have against such Service Bureau or customer by reason of such acts so committed shall, to the extent of such payment, be given by the Assured to the Underwriters, or to one of the Underwriters designated by Underwriters, and the Assured shall execute all papers necessary to secure to the Underwriters, or to one of the Underwriters designated by Underwriters, the rights herein provided for.

(Q)     FRAUD - WARRANTY

If the Assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Policy shall become void and all claims thereunder shall be forfeited; but no statement made by or on behalf of the Assured, whether contained in the Proposal Form or otherwise, shall be deemed to be a warranty of anything except that it is true to the best of the knowledge and belief of the person making the statement.

**ENDORSEMENTS APPLICABLE TO BOTH SECTIONS OF PART A**

## ENDORSEMENT NUMBER ONE

### B. E. J. & H. DISCOVERY LIMITATION CLAUSE NO.1.

There shall be no liability in respect of any claim:

(a)     arising out of or in connection with any circumstances or occurrences which have been notified to the Insurer on any other Policy of Insurance effected prior to the inception of this Policy;

(b)     arising out of or in connection with any circumstances or occurrences known to the Assured prior to the inception hereof.

Inception being:  31st May, 2000.

All other terms, conditions and limitations remain unaltered.

## ENDORSEMENT NUMBER TWO

### ADDENDUM NO. 1.

It is understood and agreed that with respect to

(a)     General Agreements D and E, Subsectons 3, 5, 7, 8, 11 and 12 of CONDITIONS AND LIMITATIONS of Section One of this Policy (or amendments thereof) and B.E.J. & H Discovery Limitation Clause No.1 attached hereto, knowledge or discovery of loss or knowledge or discovery of the commission of a dishonest or fraudulent act shall be deemed to mean knowledge or discovery by any of the following persons, other than a person causing a loss under Insuring Agreement (A) hereon or a person in collusion with such person:

(b)     General Conditions (E), (G), (H), (I), (K), and (O), III, EXCLUSIONS paragraph (u) of Section Two of this Policy and B.E.J. & H. Discovery Limitation Clause No. 1 attached hereto, knowledge or discovery of loss shall be deemed to mean knowledge or discovery by any of the following persons (not in collusion with the person causing the loss):

Corporate Risk Manager

All other terms, conditions and limitations remain unaltered.

## ENDORSEMENT NUMBER THREE

### ADDENDUM NO. 2.

It is understood and agreed that Limited Partnerships in which the Assured is the General Partner shall be deemed to be controlled or operated by the Assured.

All other terms, conditions and limitations remain unaltered.

01534580/MH
05/06/2000

Page 61

## ENDORSEMENT NUMBER FOUR

### ADDENDUM NO. 3.

It is understood and agreed that, notwithstanding anything contained in the Schedules herein to the contrary, the Limit of Indemnity hereunder is an overall limit applicable to Sections One and Two combined and not separately in respect of each Section, and the erosion or exhaustion of the Limit applicable to one Section shall reduce Underwriters' liability for the other Section.

All other terms, conditions and limitations remain unaltered.

## ENDORSEMENT NUMBER FIVE

### ADDENDUM NO. 4.

It is understood and agreed that the term Assured shall mean as follows:

1.  the entity named in the respective Schedules, and

2.  any entity in which more than 50% of the outstanding securities representing the present right to vote for the election of such entity's directors are owned by the Assured, directly or indirectly, if such entity:

    (a)  was so owned prior to the inception date of this Policy, or

    (b)  becomes so owned after the inception date of this Policy, provided that the assets of the entity do not exceed 10% of the consolidated assets of the Assured as set forth in the Assured's latest combined quarterly convention statements; or

    (c)  becomes so owned after the inception date of this Policy, provided that if the assets of the entity exceed 10% of the consolidated assets of the Assured as set forth in the Assured's latest combined quarterly convention statements, the Assured shall give written notice to Underwriters of such acquisition within one hundred and twenty (120) days after the effective date of such acquisition, together with such information as Underwriters reasonably may require, and shall pay any additional premium required by Underwriters. If the Assured fails to comply with the foregoing, coverage otherwise afforded hereunder shall terminate as of one hundred and twenty (120) days after the effective date of such acquisition.

3.  TRG Associates, L.L.C.; or

4.  any entity which is not described in (1) to (3) above in which the Assured maintains an ownership interest but only to the extent of such ownership interest.

All other terms, conditions and limitations remain unaltered.

PART B

INSURANCE COMPANIES PROFESSIONAL LIABILITY INSURANCE, DIRECTORS AND
OFFICERS LIABILITY AND COMPANY REIMBURSEMENT INSURANCE, EMPLOYMENT
PRACTICES LIABILITY INSURANCE AND FIDUCIARY LIABILITY INSURANCE

## DECLARATIONS

EACH OF THE COVERAGE SECTIONS OF THIS POLICY (DIRECTORS & OFFICERS AND COMPANY LIABILITY, EMPLOYMENT PRACTICES, FIDUCIARY LIABILITY AND ERRORS AND OMISSIONS COVERAGE SECTIONS, WHICHEVER ARE APPLICABLE) IS WRITTEN ON A CLAIMS-MADE BASIS. THESE COVERAGE SECTIONS COVER ONLY CLAIMS FIRST MADE AGAINST THE ASSUREDS DURING THE POLICY PERIOD. AMOUNTS INCURRED AS COSTS, CHARGES AND EXPENSES SHALL REDUCE AND MAY EXHAUST THE LIMIT OF LIABILITY AND ARE SUBJECT TO THE RETENTIONS. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY UNDERWRITERS TO DEFEND ANY OF THE ASSUREDS.

UNDERWRITERS HAVE NO DUTY OR OBLIGATION TO DEFEND ANY CLAIM. ALL COSTS, CHARGES AND EXPENSES ARE PART OF AND NOT IN ADDITION TO THE APPLICABLE LIMIT OF LIABILITY.

Policy Number: 823/FD0000493.

| | | |
|---|---|---|
| Item A: | Parent Company: | FAIRFAX FINANCIAL HOLDINGS. |
| | Principal Address: | 95 Wellington Street West<br>Suite 800<br>Toronto M5J 2N7<br>Canada |
| | State of Incorporation: | Canada. |
| Item B. | Policy Period: | From 31st May, 2000 to 31st May, 2003 both days at 23.59 Standard Time at the Principal Address stated in Item A. |
| Item C. | Limit of Liability: | See General Endorsement Number 3. |

Item D.  Retentions:

    (1)  Under the Directors and Officers section, USDNil under Insuring Clause I.A. and USD1,000,000 each Claim under (i) Insuring Clause I.B., (ii) Insuring Clause I.C., and (iii) in the aggregate where coverage for a single Claim is provided under Insuring Clauses I.B. and I.C.

    (2)  USD1,000,000 each Claim under Employment Practices section

    (3)  USD250,000 each Claim under Fiduciary Liability section.

    (4)  USD1,000,000 each Claim under Errors and Omissions section, however;

        With respect to TIG Holdings, Inc and TRG Holding Corporation, USD5,000,000 each Claim and

        With respect to Crum and Forster, USD2,500,000 each Claim.

    (5)  USD100,000 each Claim in respect of Ranger Insurance Services , Inc. under all Coverage Sections as set forth in Item G. of the Declarations.

| | | |
|---|---|---|
| Item E. | Premium: | USD5,920,000 |

Item F.  (1)  Premium for Optional Extension Period: 75% of the annualized premium, as provided in Clause III of the General Terms and Conditions Section of this Policy

    (2)  Length of Optional Extension Period: One year

Item G.  Coverage Summary Description:

    *  **Directors & Officers and Company Liability Coverage**

* **Employment Practices Coverage**

* **Fiduciary Liability Coverage**

* **Errors and Omissions Coverage**

Item H.   Prior/Pending Litigation Date applicable to Limits of Liability available under expired policies. With respect to Limits of Liability excess of the expired policies, the Prior/Pending date shall be 31st May, 2000:

Crum & Forster          31st March, 1999

TIG Holdings, Inc.      27th April, 1993

TRG Holding Corporation  1st September, 1997

With respect to Clause I.B. of the Errors and Omissions Coverage Section, 11th October, 1999.

**DIRECTORS & OFFICERS AND COMPANY LIABILITY COVERAGE, EMPLOYMENT PRACTICES COVERAGE, FIDUCIARY LIABILITY COVERAGE, ERRORS AND OMISSIONS COVERAGE**

**GENERAL TERMS AND CONDITIONS**

I.    **SEVERABILITY OF GENERAL TERMS AND CONDITIONS**

Except for the General Terms and Conditions, or unless stated to the contrary in any Coverage Section, the terms and conditions of each Coverage Section apply only to that Coverage Section and shall not apply to any other Coverage Section.

II.   **DEFINITIONS**

Except where differently defined in a particular Coverage Section, when used in this Policy:

A.    **Application** means any materials submitted by the **Assureds** in applying for this Policy which shall be retained on file by Underwriters and shall be deemed attached hereto, as if physically attached hereto.

B.    **Assured** or **Assureds** means the **Company** and the **Directors and Officers**.

C.    **Claim** means:

(1)    any written or oral demand for damages or other relief against any of the **Assureds**; or

(2)    any civil, criminal, administrative or regulatory proceeding initiated against any of the **Assureds**, including any appeal therefrom.

D.    **Company** means:

(1)    the **Parent Company**, and

(2)    any **Subsidiary**.

E.    **Costs, Charges and Expenses** means reasonable and necessary legal fees and expenses incurred by the **Assureds** in the defense or investigation of any **Claim** and appeals therefrom, and cost of attachment or similar bonds, but shall not include:

(1)    salaries, wages, overhead or benefit expenses associated with officers or employees of the **Company**, or

(2)    any amounts incurred by any other insurer in defense of any **Claim**.

F.    **Directors and Officers** means all natural persons who were, now are, or shall in the future be:

(1)    directors, officers, trustees, trust managers, general partners, partnership managers or joint venture managers of the **Company**,

(2)    with respect to a **Subsidiary** incorporated outside the United States, the functional equivalent of duly elected or appointed directors or officers of the **Company**,

(3)    directors, officers, employees, trustees, trust managers, general partners, partnership managers or joint venture managers of the **Company**, while serving, with the prior written consent of the **Company**, as directors, officers, trustees, trust managers, general partners, partnership managers or joint venture managers of any for-profit or non-profit organization or entity other than the **Company**; provided, however, that any coverage provided by this Policy is to be deemed excess of all indemnification and insurance available from such for-profit or non-profit organization or entity,

(4)    solely with respect to a **Securities Claim** as defined in the Directors & Officers and Company Liability Coverage Section of this Policy, employees of the **Company**, or

(5)    solely with respect to the Directors and Officers and Company Liability Coverage Section, acting as professional manager of TRG Associates, L.L.C.

including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy.

G.     **Interrelated Wrongful Acts** means **Wrongful Acts** which are logically or causally connected by reason of any common fact, circumstance, situation, transaction, casualty, event or decision or series of facts, circumstances, situations, transactions, casualties, events or decisions.

H.     **Lead Underwriter** means Syndicate 1212 at Lloyd's, London.

I.     **Loss** means damages, judgements and **Costs, Charges and Expenses** incurred by any of the **Assureds** under the respective Coverage Section under which coverage is being provided, specifically including punitive, exemplary and multiple damages. Loss shall not include:

    (1)     taxes, criminal or civil fines or penalties imposed by law, except that:

        (a)     with respect to the Fiduciary Liability Coverage Section of this Policy, **Loss** shall include the 5% or less and the 20% of less penalties imposed on fiduciaries under Section 502(i) and Section 502(l) of **ERISA** (as defined in the Fiduciary Liability Coverage Section); and

        (b)     coverage shall be provided for civil fines and penalties imposed outside the United States by any foreign jurisdiction, subject always to the terms, conditions and exclusions of the Policy.

With respect to the insurability of punitive, exemplary or multiple damages, Underwriters agree not to raise the lack of insurability of punitive, exemplary or multiple damages as a coverage defense and, if a choice of law or conflict situation arises with respect to coverage for such damages, Underwriters consent to have the law applicable to such damages of the jurisdiction most favorable to the **Assured** apply. If necessary, Underwriters consent to removal of the action to by the **Assured** to a jurisdiction that provides the most favorable coverage for such damages.

    (2)     conduct deemed uninsurable under the law pursuant to which this Policy shall be construed.

J.     **Optional Extension Period** means the period described in Clause III of the General Terms and Conditions section of this Policy.

K.     **Parent Company** means the entity named in Item A. of the Declarations.

L.     **Policy Period** means the period from the inception date and hour of this Policy to the expiration date and hour as set forth in Item B. of the Declarations, or its earlier cancellation date and hour, if any, or the end of the **Optional Extension Period**, if purchased.

M.     **Subsidiary** means:

    (1)     any entity in which more than 50% of the outstanding securities representing the present right to vote for the election of such entity's directors are owned by the **Parent Company**, directly or indirectly, if such entity:

        (a)     was so owned prior to the inception date of this Policy, or

        (b)     becomes so owned after the inception date of this Policy, provided that the assets of the entity do not exceed 10% of the consolidated assets of the **Company** as set forth in the **Company's** latest combined quarterly convention statements, subject to the provisions of Clause XX.A(1); or

        (c)     becomes so owned after the inception date of this Policy, provided that if the assets of the entity exceed 10% of the consolidated assets of the **Company** as set forth in the **Company's** latest combined quarterly convention statements, the provisions of Clause XX.A(2) must be fulfilled; or

    (2)    TRG Associates, L.L.C.;

    (3)    Ranger Insurance Services, Inc.; or

    (4)    any entity which is not described in (1), (2) or (3) above in which the **Parent Company** or any **Subsidiary** maintains an ownership interest but only to the extent of such ownership interest

N.    **Wrongful Act** means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by:

    (1)    any **Assured**;

    (2)    solely with respect to the Errors and Omissions Coverage Section, any bounty hunters for which the Assureds are legally liable.

Other definitions particular to each Coverage Section are contained in the separate Definitions Clause in each Coverage Section.

III.    **OPTIONAL EXTENSION PERIOD**

A.    If this Policy is canceled pursuant to Clause XXII.A., or if Underwriters or the **Parent Company** decline to renew this Policy for reasons other than non-payment of premium, then the **Parent Company** shall have the right, upon payment of an additional premium calculated at the percentage shown in Item F.(1) of the Declarations of the total premium for this Policy, to an extension of the coverage granted by this Policy with respect to any **Claim** first made during the period of time set forth in Item F.(2) of the Declarations after the effective date of such cancellation or, in the event of such declination to renew, after the Policy expiration date, but only with respect to any **Wrongful Acts** committed before such date.

    For purposes of this Clause III.A., the quotation of a different premium, retention, limit of liability, or terms or conditions does not constitute a declination to renew.

B.    As a condition precedent to the right to purchase the **Optional Extension Period**, the total premium for the Policy must have been paid. The right to purchase the **Optional Extension Period** shall terminate unless written notice, together with full payment of the premium for the **Optional Extension Period**, is given to Underwriters within 30 days after the effective date of cancellation, or, in the event of a declination to renew, within 30 days after the Policy expiration date. If such notice and premium payment is not so given to Underwriters, there shall be no right to purchase the **Optional Extension Period**.

C.    In the event of the purchase of the **Optional Extension Period**, the entire premium therefor shall be deemed earned at its commencement, except as provided in Clause III.D. below.

D.    In the event the **Optional Extension Period** is purchased, it shall terminate forthwith on the effective date of any contract of insurance or indemnity which replaces the coverage afforded by this Policy through the **Optional Extension Period**, but only if such replacement coverage provides substantially the same terms and conditions of coverage as provided by this Policy, and in the event the **Optional Extension Period** is so terminated, Underwriters shall, upon the **Parent Company's** request, refund pro rata any unearned premium for the unexpired period of such extension.

E.    The exercise of the **Optional Extension Period** shall not in any way increase the limit of Underwriters' liability.

**IV.    NOTIFICATION**

A.    In the event a **Claim** is made against any of the **Assureds** during the **Policy Period** which the Corporate Risk Manager reasonably believes could involve payment by the **Assureds** or **Underwriters** under this Policy for an amount exceeding USD1,000,000, the **Assureds** shall give to the **Lead Underwriter** notice in writing of such **Claim** as soon as practicable after the **Assureds** become aware of such **Claim** pursuant to Clause IV.C. below but in no event later than 60 days after the end of the **Policy Period**.

B.    If, during the **Policy Period**, the **Assureds** first become aware of a fact, situation or circumstance which the Corporate Risk Manager of the **Company** reasonably believes is likely to give rise to a **Claim**, and if the **Assureds**, during the **Policy Period**, give written notice thereof to the **Lead Underwriter**, then any **Claim** made subsequently arising out of such fact, circumstance or situation shall be deemed for the purposes of this Policy to have been made at the time such notice was first given to the **Lead Underwriter**.

C.    The **Assureds'** awareness that a **Claim** has been made or of the existence of a fact, circumstance or situation shall be deemed to first exist on the date that:

(1)    the office of General Counsel or the Risk Management Department of the **Company** first becomes aware of such **Claim** or of such fact, circumstance or situation; and

(2)    any one of the following conditions exists:

(a)    the **Claim** is a class action lawsuit or purports to seek relief on a class wide basis;

(b)    the **Costs, Charges and Expenses** incurred or budgeted by the **Assured** exceed 30% of the applicable Retention;

(c)    the **Assured** has received a written settlement demand which exceeds 50% of the applicable Retention;

(d)    the **Assured** has made a settlement offer which exceeds 50% of the applicable retention; or

(e)    the office of General Counsel or Risk Management Department of the **Company** reasonably believes that **Loss** exceeding 50% of the applicable Retention has or will be incurred, even though the exact amount or details of such **Loss** may not then be known.

Should circumstances cause the reasonable evaluation of such a **Claim** to change, the **Assureds** shall provide notice of such **Claim** to the **Lead Underwriter**.

D.    Every six months during the **Policy Period**, the **Assureds** may, at their sole discretion, provide to the **Lead Underwriter** cumulative written notice by bordereau of all **Claims** under any Coverage Section which the **Assureds** reasonably believe will not exceed 50% of the respective applicable Retention for each such Coverage Section.

Six months after the end of the **Policy Period** and every six months thereafter, the **Assureds** will provide to the **Lead Underwriter** an updated bordereau reflecting the current status of all **Claims**.

Inadvertent omission or oversight by the **Assureds** in advising the **Lead Underwriter** of any **Claim** or subsequent developments, including the failure to list any **Claim** on a bordereau, shall not, in any way, affect the liability of Underwriters, unless they have been actually and substantially prejudiced thereby. Such delay shall be promptly reported to the **Lead Underwriter** as soon as the omission or oversight is discovered by the **Assureds**.

    E.    Notice to the **Lead Underwriter** shall be given to the firm shown in Clause X. of the General Terms and Conditions section of this Policy.

**V.    SETTLEMENTS AND DEFENSE**

    A.    No **Loss** in excess of the applicable Retention shall be incurred without the **Lead Underwriter's** prior consent, such consent not to be unreasonably withheld.

    B.    It shall be the right and duty of the **Assureds**, and neither the right nor duty of Underwriters, to investigate and defend **Claims**.

**VI.    ARBITRATION**

The **Assureds** and the **Lead Underwriter** agree that any dispute between the **Assureds** and **Underwriters** arising in connection with or relating to this Policy or to any Coverage Section shall be submitted to non-binding mediation, in any form or forum determined by the parties. If the dispute is not resolved at the mediation, it shall be submitted to binding arbitration in accordance with the rules of the American Arbitration Association ("AAA") then in effect if all parties agree to such binding arbitration.

**VII.    ASSISTANCE, COOPERATION, SUBROGATION AND RECOVERIES**

The **Assureds** agree to provide Underwriters with such information, assistance and cooperation as Underwriters reasonably may request, and they further agree that they shall not take any action which in any way increases Underwriters' exposure under this Policy.

In the event of any payments under this Policy, Underwriters shall be surrogated to the **Assureds'** rights of recovery therefor against any person or entity. The **Assureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents as are necessary to enable Underwriters effectively to bring suit in their name, and shall provide all other assistance and cooperation which Underwriters may reasonably require.

Recoveries, whether effected by Underwriters or by an **Assured**, less the costs of such recovery, shall be distributed as follows:

    1.    first, to the **Parent Company** for the amount of **Loss**, otherwise covered under this Policy, which is in excess of the Limit of Liability;

    2.    second, to Underwriters for the amount paid to the **Parent Company** for covered **Loss**;

    3.    third, to the **Parent Company** for the retention; and

    4.    fourth, to the **Parent Company** for loss excluded under this Policy.

Recovery from reinsurance or indemnity of Underwriters shall not be deemed a recovery hereunder unless such recovery exceeds the amount of loss to the **Parent Company** described in 1, 3 and 4, above.

**VIII.    ASSIGNMENTS AND ACTIONS AGAINST UNDERWRITERS**

Nothing contained herein shall give any person or organization any right to join Underwriters as a party to any **Claim** against the **Assureds** to determine their liability, nor shall Underwriters be impleaded by the **Assureds** or their legal representative in any **Claim**. Assignment of interest under this Policy shall not bind Underwriters unless their consent is endorsed hereon.

**IX.    ENTIRE AGREEMENT**

By acceptance of this Policy, the **Assureds** agree that this Policy embodies all agreements existing between them and Underwriters or any of their agents relating to this insurance. Notice to any agent or knowledge possessed by any agent or other person acting on behalf of Underwriters shall not effect a waiver or a change in any part of this Policy or estop Underwriters from asserting any right under the terms of this Policy, nor shall the terms be deemed waived or changed except by written endorsement or rider issued by Underwriters to form part of this Policy.

X.   NOTICE TO LEAD UNDERWRITER

Notice to the Lead Underwriter shall be provided to Sedgwick, Detert, Moran & Arnold, One Embarcadero Center, Sixteenth Floor, San Francisco, California 94111, Attention: Eugene V. Elsbree III. If mailed, the date of mailing of such notice shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

XI.   TERRITORY

The obligations of Underwriters under this Policy shall apply to **Wrongful Acts** by and **Claims** made against the **Assureds** anywhere in the world, including the dimensions of space and cyberspace.

XII.   VALUATION AND FOREIGN CURRENCY

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. Except as otherwise provided in any Coverage Section, if judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in *The Wall Street Journal* on the date judgment is entered, the amount of the settlement is agreed upon or the other element of **Loss** is to be paid, respectively.

XIII.   CONFORMITY CLAUSE

Notwithstanding differences in the substantive and procedural laws of any foreign jurisdiction as compared to United States of America federal and state laws, Underwriters agree to provide coverage in foreign jurisdictions worldwide and agree to interpret this Policy at least as broadly, and with the same intent of coverage, as if **Loss** had been sustained in the United States or in any foreign jurisdiction whose law gives all of the terms and conditions of this Policy full force and effect.

XIV.   OTHER INSURANCE

Except as otherwise provided in any Coverage Section of this Policy, coverage for any **Loss** shall apply in excess of the applicable Retention and the amount of any payment actually made under any other existing insurance; provided, however it is agreed that the payment by the **Assured** of any retention or deductible applicable to such policies and any payments actually made by the insurers under such policies will erode the applicable Retention of this Policy;

It is understood that this Policy is primary of any reinsurance purchased by the **Assured**, and Underwriters agree not to assert any subrogation right against the **Assured's** reinsurers.

It is further understood and agreed that with respect to TRG Holding Corporation, the "Legal Defense Costs" Trust Fund as outlined in the Private Placement Memorandum, dated 29th August, 1997 for TRG Associates, L.L.C. shall not be considered Other Insurance for the purpose of determining the applicability of this Clause.

XV.   SPOUSAL EXTENSION

If a **Claim** against any of the **Assureds** includes a **Claim** against the current lawful spouse of such **Assured** solely by reason of:

A.   such spousal status; or

B.   such spouse's ownership interest in property or assets that are sought as recovery for Wrongful Acts;

then any loss which such spouse becomes legally obligated to pay on account of such **Claim** shall be deemed **Loss** which such **Assured** becomes legally obligated to pay as a result of such **Claim**; provided, however, that such coverage shall not apply to the extent the **Claim** alleges any independent wrongful act or omission by such spouse. All terms and conditions of this Policy, including the Retention, applicable to **Loss** sustained by such **Assured** in the **Claim** shall also apply to the spouse.

XVI.    **SERVICE OF SUIT**

It is agreed that in the event of the failure of Underwriters to pay any amount claimed to be due hereunder, Underwriters, at the request of any person or entity insured hereunder, will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction. Nothing in this Clause constitutes or should be deemed to constitute a waiver of Underwriters' right to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court, as permitted by the laws of the United States or any state, territory, or district in the United States. It is further agreed that service of process in such suit may be made upon Sedgwick, Detert, Moran & Arnold and that in such suit instituted against any one of them upon this Policy, Underwriters will abide by the final decision of such court or of any appellate court in the event of an appeal.

Sedgwick, Detert, Moran & Arnold is authorized and directed to accept service on behalf of Underwriters in any such suit upon the request of any person or entity to enter a general appearance on behalf of Underwriters in the event such a suit shall be instituted.

Further, pursuant to the applicable statute of any state, territory or district of the United States, Underwriters shall designate the Superintendent, Commissioner or Director of Insurance or other officer specified for the purpose in the statute or any successor in office, as Underwriters' true and lawful attorney, upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of any person or entity insured hereunder or any beneficiary hereunder arising out of this Policy, and hereby designate Sedgwick, Detert, Moran & Arnold as the party to whom such officer is authorized to mail such process.

XVII.   **LIMITS OF LIABILITY AND RETENTIONS**

A.      The amount shown in Item C of the Declarations shall be the maximum aggregate Limit of Liability of Underwriters under this Policy.

B.      In the event that a single **Claim** or series of **Claims** arising from **Interrelated Wrongful Acts** shall be covered, in whole or in part, under two or more Coverage Sections of this Policy, the total applicable Retention shall not exceed the largest single Retention. Such single largest Retention shall apply only once to such **Claim(s)**.

C.      The **Company** shall have the right to arrange separate insurance for any applicable Retention and shall have the right to apply the proceeds of any such insurance in full or partial satisfaction of any applicable Retention amount.

XVIII.  **REINSTATEMENT**

In the event of the reduction in whole or in part of the Limit of Liability stated in the Declarations or amendments thereof by reason of one or more payment of **Loss**, including **Costs, Charges and Expenses**, in connection with one or more **Claim(s)** said Limit of Liability with respect to the Directors and Officers and Company Liability Coverage Section shall be either:

A.      automatically reinstated for TRG Holding Corporation as to the amount of such reduction up to a maximum of USD75,000,000, but solely with respect to subsequent **Claims** made under Clause I.A., or

B.      reinstated for TRG Holding Corporation for an additional premium of USD150,000 as to the amount of such reduction up to a maximum of USD75,000,000

subject always to the provisions of this Policy.

It is agreed that the total liability of Underwriters under this for any one **Claim** shall not exceed the amount stated in Item C. of the Declarations as the Limit of Liability.

If the **Assured** shall have in effect any policy or policies providing excess coverage for limit(s) beyond the amount of this Policy, the reinstatement herein provided shall only apply after the total exhaustion of the limits of liability of all such excess coverage by reason of the payment of **Claims** thereunder, but prior to any similar reinstatement provision contained in such excess policy or policies.

## XIX.  REPRESENTATIONS AND SEVERABILITY AS TO APPLICATION

The **Assureds** represent that the particulars and statements contained in the **Application** are true. This Policy is issued in reliance upon the truth of such representations.

The **Assureds** agree that in the event the particulars and statements contained in the **Application** are untrue and are material to the acceptance of the risk, this Policy shall not afford any coverage:

A.   with respect to any of the **Directors and Officers** and employees who knew as of the inception date of this Policy the facts that were not truthfully disclosed in the **Application**;

B.   solely with respect to the Directors and Officers and Company Liability Coverage Section, with respect to the **Company** where the Chairman, President or Chief Financial Officer knew as of the inception date of this Policy the facts that were not truthfully disclosed in the **Application**.

## XX.  ADJUSTMENT CLAUSE

A(1)   If, during the **Policy Period**, the **Company** acquires securities or voting rights in any other entity or acquires another entity by merger or consolidation with the **Company**, and if the assets of such other entity do not exceed 10% of the consolidated assets of the **Company** as set forth in the **Company's** latest combined quarterly convention statement, such other entity shall become a **Subsidiary** as of the date of such acquisition, and its employees, directors and officers shall be **Assureds** under this Policy, but only for **Wrongful Acts** actually occurring after the date such entity becomes a **Subsidiary**; provided, however, that Underwriters shall not be liable to make any payment in connection with any **Claim** which is based upon or arises out of any litigation brought against such entity, its employees or directors or officers prior to the date of such acquisition.

A(2)   If, during the **Policy Period**, the **Company** acquires securities or voting rights in any other entity or acquires another entity by merger or consolidation with the **Company**, and if the assets of such other entity exceed 10% of the consolidated assets of the **Company** as set forth in the **Company's** latest combined quarterly convention statement, such other entity shall become a **Subsidiary** as of the date of such acquisition, and its directors and officers shall be **Assureds** under this Policy, but only for **Wrongful Acts** actually occurring after the date such entity becomes a **Subsidiary**; provided, however, that Underwriters shall not be liable to make any payment in connection with any **Claim** which is based upon or arises out of any litigation brought against such entity, its employees or directors or officers prior to the date of such acquisition; and provided further that, as a condition precedent to such coverage, the **Company** shall give written notice to Underwriters of such acquisition within one hundred and twenty (120) days after the effective date of such acquisition, together with such information as Underwriters reasonably may require, and shall pay any additional premium required by Underwriters. If the **Company** fails to comply with the foregoing, coverage otherwise afforded hereunder shall terminate as of one hundred and twenty (120) days after the effective date of such acquisition.

B.   In the event any entity ceases to be a **Subsidiary** after the inception date of this Policy, this Policy, subject to its terms, shall continue to apply with respect to **Claims** first made against that entity during the **Policy Period** for **Wrongful Acts** actually committed prior to the time such entity ceased to be a **Subsidiary**.

01534580/MH
05/06/2000                    Page 74

XXI.     **AUTOMATIC CONVERSION TO RUN-OFF COVERAGE**

If, during the **Policy Period**: (a) the **Parent Company** merges into or consolidates with another entity such that the **Parent Company** is not the surviving entity; or (b) another entity or person or group of entities or persons acting in concert acquires securities or voting rights which results in ownership or voting control by the other entity(ies) or person(s) of more than 50% of the outstanding securities representing the present right to vote for the election of directors of the **Parent Company**, then coverage under this Policy shall continue until the later of:

A.       the termination of the **Policy Period**; or

B.       any subsequent date to which Underwriters and the **Parent Company** agree in writing;

but only with respect to **Claims for Wrongful Acts** committed prior to such merger, consolidation or acquisition. Any **Claim** made during such coverage extension shall be deemed to have been made during the **Policy Period** in which such merger, consolidation or acquisition occurred.

XXII.    **CANCELLATION CLAUSE**

A.       By acceptance of this Policy, the **Assureds** hereby confer the exclusive power and authority to cancel this Policy on their behalf to the **Parent Company**. This Policy may be canceled by the **Parent Company** only by reason of the merger, consolidation or acquisition of the **Parent Company** where, as a result of such transaction, the **Parent Company** is not the surviving entity. Such cancellation may be effected by surrender of this Policy to Underwriters, or by mailing to Underwriters written notice stating when thereafter cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the **Policy Period**. Delivery of such written notice shall be equivalent to mailing.

B.       This Policy may not be canceled by Underwriters for any reason other than non-payment of premium. In the event of such non-payment, this Policy may be canceled by Underwriters by mailing to the **Parent Company** written notice stating when, not less than 30 days thereafter, such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the **Policy Period**. Delivery of such written notice by Underwriters shall be equivalent to mailing. If the foregoing notice period is in conflict with any governing law or regulation, then such period shall be amended to afford the minimum notice period permitted thereunder.

C.       If this Policy is canceled pursuant to A., above, Underwriters shall retain the customary short rate proportion of the premium hereon. Payment or tender of any unearned premium by Underwriters shall not be a condition precedent to the effectiveness of cancellation.

XXIII.   **AUTHORIZATION CLAUSE**

By acceptance of this Policy, the **Assureds** agree that the **Parent Company** will act on their collective behalf with respect to the giving of all notices to Underwriters, the receiving of notices from Underwriters, the payment of the premium and the receipt of any return premium.

By issuing this Policy, Underwriters agree that the **Lead Underwriter** will act on their collective behalf with respect to all matters under the Policy including, but not limited to, providing or receiving notices, consenting to the incurrence of **Loss**, issuing endorsements during the **Policy Period**, and the making of coverage determinations with respect to all matters for which coverage is sought under the Policy.

## SECTION ONE

### DIRECTORS & OFFICERS AND COMPANY LIABILITY

### COVERAGE SECTION

Underwriters and the **Assureds** agree as follows:

I.   **INSURING CLAUSES**

A.   Except for **Loss** which Underwriters pay pursuant to Insuring Clause I.B. of this Coverage Section, Underwriters shall pay on behalf of the **Directors and Officers Loss** which the **Directors and Officers** shall become legally obligated to pay as a result of a **Claim** first made against such **Directors and Officers** for a **Wrongful Act.**

B.   Underwriters shall pay on behalf of the **Company Loss** for which the **Company** has, to the extent permitted or required by law, indemnified the **Directors and Officers** resulting from any **Claim** first made against such **Directors and Officers** for a **Wrongful Act.**

C.   Underwriters shall pay on behalf of the **Company Loss** which the **Company** becomes legally obligated to pay as a result of a **Securities Claim** first made against the **Company** for a **Wrongful Act.**

A **Claim** shall be deemed to have been first made against the **Assureds** on the date the **Assureds** provide written notice thereof to Underwriters in accordance with **CLAUSE IV. NOTIFICATION** of this Policy.

II.  **DEFINITIONS**

The following terms, whenever used in this Coverage Section in boldface type, shall have the meanings indicated:

A.   **Claim** means:

(1)   any written or oral demand for damages or other relief; or

(2)   any civil, criminal, administrative or regulatory proceeding, including any appeal therefrom; or

(3)   any formal investigatory proceeding before the Securities and Exchange Commission or any similar federal, state or local governmental body with jurisdiction over any securities law violation.

B.   **Loss** means:

(1)   in connection with any **Securities Claim**, damages, settlements and **Costs, Charges and Expenses** incurred by the **Directors and Officers** and the **Company,** or

(2)   in connection with any **Claim** which is not a **Securities Claim**, damages, settlements and **Costs, Charges and Expenses** incurred by the **Directors and Officers;**

provided always that **Loss** specifically includes punitive, exemplary and multiple damages, where insurable under law, but shall not include:

(1)   taxes, criminal or civil fines or penalties imposed by law; or

(2)   conduct deemed uninsurable under the law pursuant to which this Policy shall be construed.

With respect to the insurability of punitive, exemplary or multiple damages, Underwriters agree not to raise the lack of insurability of punitive, exemplary or multiple damages as a coverage defense and, if a choice of law or conflict situation arises with respect to coverage for such damages, Underwriters consent to have the law applicable to such damages of the jurisdiction most favorable to the **Assured** apply. If necessary, Underwriters consent to removal of the action by the **Assured** to a jurisdiction that provides the most favorable coverage for such damages.

C.  **Securities Claim** means any **Claim** which:

(1)  alleges a violation of the Securities Act of 1933, the Securities Exchange Act of 1934, any similar state statute or similar common law, or any rules or regulations promulgated thereunder; or

(2)  arises from the purchase or sale of, or offer to purchase or sell, any securities issued by the **Company**, whether such purchase, sale or offer involves a transaction with the **Company** or occurs in the open market; or

(3)  is brought by a security holder of the **Company** in his, her or its capacity as such, whether directly, as a class action, or as a derivative action on behalf of the **Company**, or otherwise, alleging a **Wrongful Act** by an **Assured**.

D.  **Wrongful Act** means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty: (1) by any of the **Directors and Officers**, while acting in their capacity as a director or officer of the **Company**; or (2) by the **Company** with respect to any **Securities Claim**.

III.  **EXCLUSIONS**

Underwriters shall not be liable to make any payment in connection with any **Claim**:

A.  for actual or alleged bodily injury, sickness, disease, death, or damage to or destruction of tangible property (including loss of use thereof), defamation or invasion of privacy;

B.  based upon or arising from any **Wrongful Act**, or any fact, circumstance or situation, which has been the subject of any notice given to an insurer prior to the **Policy Period** under any other policy which provides coverage similar to that provided under this Coverage Section;

C.  based upon or arising from the actual or alleged seepage, pollution or contamination of any kind; provided, however, that this exclusion does not apply to **Claims** for which coverage applies solely under Insuring Clause I.A., nor shall this exclusion apply to any **Claim** brought by a security holder of the **Company** in his/her/its capacity as such, whether such **Claim** is brought as a class or derivative action or otherwise;

D.  for violation of the Employee Retirement Income Security Act of 1974, as amended (or any rules or regulations promulgated thereunder), or similar provisions of any federal, state or local statutory or common law;

E.  by, on behalf of, or at the direction of any of the **Assureds**, except and to the extent such **Claim** is brought:

(1)  by a security holder of the **Company** who, when such **Claim** is first made, is acting independently of all other **Assureds**; or

(2)  by one any of the **Assureds** in the form of a crossclaim, third party claim or otherwise for contribution or indemnity, if such **Claim** directly results from another **Claim** that is otherwise covered under this Policy;

Provided, however, this Exclusion shall not apply to a derivative action brought or maintained on behalf of the **Company** by a regulator, receiver or trustee of the **Company**.

F.  based upon or attributable to any fraudulent, malicious criminal or dishonest act by any **Assured**; provided, however, that this exclusion shall only apply to an **Assured** which is determined, by a final judgement or adjudication:

    (1)  to have committed such acts;

    (2)  solely with respect to TRG Holding Corporation, to be adverse to such **Assured** as having been fraudulent, maliciously criminal or dishonest with actual fraudulent, criminal or dishonest intent and that such act or omission was material to the cause of action so adjudicated."

G.  based upon or arising from the return by any of the **Directors and Officers** of any remuneration paid to them without the previous approval of the appropriate governing body of the **Company**, which payment without such previous approval shall be held by a court to be in violation of the law; provided, however that this exclusion shall not apply unless a final judgment or adjudication establishes that such payment was made without the required approval.

H.  against any **Subsidiary** or the **Directors and Officers** of any **Subsidiary** based upon or arising from any **Wrongful Act** occurring prior to the date such entity became a **Subsidiary** or subsequent to the date such entity ceased to be a **Subsidiary**;

I.  based upon, arising out of, or relating to any legal proceeding filed against any **Assured** prior to the Prior/Pending Litigation Date set forth in Item H. of the Declarations;

Notwithstanding this Exclusion, coverage under this Coverage Section of this Policy is extended with respect to **Wrongful Acts** or **Interrelated Wrongful Acts** committed, attempted or allegedly committed or attempted prior to 1st September, 1997 with respect to TRG Holding Corporation or to 2nd October, 1997 for all entities except TRG Holding Corporation, but such coverage as is afforded by this extension shall apply only to Clause I. INSURING CLAUSES A. of this Coverage Section of this Policy and shall be specifically excess of any insurance in force as respects the Xerox Corporation (but only to the extent of actual payment) and any indemnification actually paid by the Xerox Corporation.

J.  for the performance or failure to perform **Professional Services** (as that term is defined in the Errors & Omissions Coverage Section); provided, however, that this exclusion shall not apply to:

    (1)  **Claims** brought by security holders of the **Company** in their capacity as such; or

    (2)  any derivative or security holder or policy holder class action claims against the **Directors and Officers** alleging failure to supervise those who performed or failed to perform **Professional Services**.

K.  solely with respect to Ranger Insurance Services, Inc., based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

    1.  any **Wrongful Act** actually or allegedly committed prior to 26th January, 2000, or

    2.  any **Wrongful Act** occurring on or subsequent to 26th January, 2000 which, together with a **Wrongful Act** occurring prior to such date would constitute **Interrelated Wrongful Acts**.

The **Wrongful Act** of any **Assured** shall not be imputed to any other **Assured** for purposes of applying Exclusions A, D, F, G and J set forth above.

## IV. LIMIT OF LIABILITY AND RETENTIONS

A. More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to Clause IV.B of the General Terms and Conditions Section of this Policy.

B. In the event a **Claim** is covered in part under Insuring Clause I.A., in part under Insuring Clause I.B., and/or in part under Insuring Clause I.C., the Retentions set forth in Item D. of the Declarations shall be applied separately to that part of **Loss** resulting from such **Claim** covered by each Insuring Clause. In no event shall the sum of the Retentions so applied exceed the Retention in Item D(2) of the Declarations.

The Retention applicable to Insuring Clause I.B. shall apply to **Loss** resulting from any **Claim** if indemnification by the **Company** is required by law or is legally permissible to the fullest extent permitted by law, regardless of whether or not actual indemnification is made, unless the **Company** is unable to make such actual indemnification by reason of its insolvency.

C. No Retention shall apply to **Costs, Charges and Expenses** incurred in defense of a **Securities Claim** in the event of either:

    (1) a finding of no liability on the part of all of the **Assureds**; or

    (2) a court-approved settlement which imposes no obligation on the **Assureds** to pay a monetary amount or other consideration.

A finding of no liability means:

    (a) a final judgment in favour of all **Assureds** after the exhaustion of all appeals with respect to the **Claim** made against them prior to trial by reason of a motion to dismiss or a motion for summary judgment; or

    (b) a final judgment of no liability in favour of all **Assureds** with respects to the **Claim** made against them after trial and after exhaustion of all appeals.

D. Payments of **Loss** (including **Costs, Charges and Expenses**) by Underwriters shall reduce the Limit of Liability.

E. Underwriters shall pay **Costs, Charges and Expenses** at least once every 90 days.

## SECTION TWO

## EMPLOYMENT PRACTICES COVERAGE SECTION

Underwriters and the Assureds agree as follows:

I. **INSURING CLAUSE**

Underwriters shall pay on behalf of the **Assureds Loss** resulting from any **Claim** first made against the **Assureds** for **Employment Practices**.

A **Claim** shall be deemed to have been first made against the **Assureds** on the date the **Assureds** provide written notice thereof to Underwriters in accordance with **CLAUSE IV. NOTIFICATION** of this Policy.

II. **DEFINITIONS**

The following terms, whenever used in this Coverage Section in boldface type, shall have the meanings indicated:

A. **Assured or Assureds** means the **Company** and the **Assured Persons**.

B. **Assured Persons** means the directors, officers and employees (whether full-time, part-time or temporary) of the **Company**, including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy. **Assured Persons** also includes non-employee natural persons engaged directly by the **Company** to perform employee duties for the **Company** or third parties, and whose activities are under the **Company's** governance and direction.

C. **Claim** means any judicial, administrative or arbitration proceeding initiated against an **Assured** in which such **Assured** may be subjected to a binding adjudication of liability for damages or other relief, including any appeal therefrom, which is brought and maintained by any past, present or prospective employee(s) of the **Company** for **Employment Practices**. **Claim** also means any written demand, or judicial or administrative proceeding, including any proceeding before the Equal Employment Opportunity Commission or any similar federal, state or local governmental body with jurisdiction over **Employment Practices**, made or initiated against an **Assured** for **Employment Practices**.

D. **Interrelated Employment Practices** means **Employment Practices** which are logically or causally connected by reason of any common fact, circumstance, situation, transaction, casualty, event or decision or series of facts, circumstances, situations, transactions, casualties, events or decisions, including any allegation of a pattern or practice of **Employment Practices**.

E. **Employment Practices** means those **Wrongful Acts** which relate to the following facts or allegations:

    (1)    wrongful dismissal or discharge or termination of employment, whether actual or constructive;

    (2)    employment-related misrepresentations;

    (3)    violation of any federal, state or local law concerning employment or discrimination in employment, including but not limited to the Americans With Disabilities Act of 1992, the Civil Rights Act of 1991, the Age Discrimination in Employment Act of 1967, Title VII of the Civil Rights Law of 1964, the Pregnancy Discrimination Act of 1978, the Civil Rights Act of 1866, the Fifth and Fourteenth Amendments to the United States Constitution, all as amended, or any rule or regulation promulgated thereunder;

    (4)    employment related sexual or other harassment;

    (5)    wrongful deprivation of career opportunity, employment or promotion;

    (6)    wrongful discipline or evaluation, or failure to adopt adequate employment or workplace policies and procedures;

(7)    libel, slander, defamation, bodily injury, sickness, disease, death, false imprisonment, assault, battery, mental anguish, emotional distress, invasion of privacy, damage to or destruction of tangible property (including loss of use thereof), but only if alleged together with other **Employment Practices**; or

(8)    any other matter alleged against any **Assured** based upon any duty or obligation created by an employment relationship; or

(9)    retaliation against employees for the exercise of any legally protected right or for engaging in any legally protected activity.

III.    **EXCLUSIONS**

Underwriters shall not be liable to make any payment in connection with any **Claim**:

A.    based upon or arising from any **Employment Practices**, or any fact, circumstance or situation, which has been the subject of notice to any insurer prior to the **Policy Period** under any other policy which provides coverage similar to that provided under this Coverage Section;

B.    based upon or arising from actual or alleged seepage, pollution or contamination of any kind;

C.    for violation of the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, all as amended (or any rules or regulations promulgated thereunder), or similar provisions of any federal, state or local statutory or common law; provided however that this exclusion shall not apply to any **Claim** based upon, arising out of, directly or indirectly resulting from, or in consequence of any actual or alleged discriminatory treatment or retaliatory discharge of a claimant by an **Assured** on account of the claimant's exercise of rights pursuant to any such law;

D.    brought about or contributed to by any deliberately dishonest, fraudulent or criminal act or omission or the gaining of any personal profit by any of the **Assureds** to which they were not legally entitled; provided, however, that this exclusion shall only apply to an **Assured** which is determined, by a final judgment or adjudication, to have committed such acts or omissions or to have received such personal profit;

E.    for any actual or alleged obligation of an **Assured** pursuant to any workers' compensation, unemployment insurance, social security, disability benefits or similar law; provided, however, that this exclusion shall not apply to any **Claim** based upon, arising out of, directly or indirectly resulting from, or in consequence of any actual or alleged discriminatory treatment or retaliatory discharge of a claimant by an **Assured** on account of the claimant's exercise of rights pursuant to any such law;

F.    against any **Subsidiary** or any of the **Assured Persons** of a **Subsidiary** based upon any **Employment Practice** occurring prior to the date such entity became a **Subsidiary** or subsequent to the date such entity ceased to be a **Subsidiary**;

G.    based upon, arising out of, or relating to any legal proceeding filed against any **Assured** prior to the Prior/Pending Litigation Date set forth in Item H. of the Declarations;

H.    to the extent that such **Claim** seeks amounts due and owing under contract; provided, however, that this exclusion shall not apply to any other item of **Loss** (including **Costs, Charges and Expenses**) incurred in connection with such **Claim**;

I.    that portion of **Loss** which is covered under any other Coverage Section of this Policy.

K.    solely with respect to Ranger Insurance Services, Inc., based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

1.  any **Wrongful Act** actually or allegedly committed prior to 26th January, 2000, or

2.  any **Wrongful Act** occurring on or subsequent to 26th January, 2000 which, together with a **Wrongful Act** occurring prior to such date would constitute **Interrelated Wrongful Acts**.

The **Wrongful Act** of any **Assured** shall not be imputed to any other **Assured** for the purposes of applying Exclusion I set forth above.

IV.    **LIMIT OF LIABILITY AND RETENTIONS**

A.   More than one **Claim** involving the same **Employment Practices** or **Interrelated Employment Practices** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest of the following times:

(1)   the time at which the first **Claim** involving the same **Employment Practices** or **Interrelated Employment Practices** is first made; or

(2)   the time at which the **Claim** involving the same **Employment Practices** or **Interrelated Employment Practices** shall be deemed to have been made pursuant to Clause IV.(C) of the General Terms and Conditions Section of this Policy.

B.   **Costs, Charges and Expenses** shall be part of and not in addition to the Limit of Liability as shown under Item C. of the Declarations, and such **Costs, Charges and Expenses**, and all other **Loss**, shall reduce such Limit of Liability.

C.   Underwriters shall pay **Costs, Charges and Expenses** at least once every 90 days.

V.    **SETTLEMENT**

In the event Underwriters recommend a settlement to the **Assureds** based upon a written demand by a claimant with respect to a covered **Claim** and any **Assureds** declines to settle on the terms recommended by Underwriters, then Underwriters' liability for **Loss** shall not exceed 50% of any greater settlement or judgment plus **Cost, Charges and Expenses** incurred up to the time of such declination, or the Limit of Liability, whichever is less.

## SECTION THREE

## FIDUCIARY LIABILITY

## COVERAGE SECTION

Underwriters and the **Assureds** agree as follows:

I.    **INSURING CLAUSE**

Underwriters shall pay on behalf of each of the **Assureds Loss** resulting from any **Claim** first made against the **Assureds** for a **Wrongful Act** by an **Assured** or by any person for whose **Wrongful Acts** the **Assured** is legally responsible.

A **Claim** shall be deemed to have been first made against the **Assureds** on the date the **Assureds** provide written notice thereof to Underwriters in accordance with **CLAUSE IV. NOTIFICATION** of this Policy.

II.    **DEFINITIONS**

The following terms, whenever used in this Coverage Section in boldface type, shall have the meanings indicated:

A.    **Administration** means giving advice to or effecting enrollment, termination or cancellation of any employees, beneficiary or participant of a **Benefit Program.**

B.    **Assured** or **Assureds** means the **Sponsor Organization**, any **Benefit Program**, and the **Assured Persons.**

C.    **Assured Persons** means:

(1)    any persons who were, now are, or shall be serving as a trustee, director, officer or employee of the **Sponsor Organization** or of any **Sponsored Plan**; and

(2)    any persons who were, now are, or shall be serving as a fiduciary of a plan within the **Benefit Program**;

including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy.

D.    **Benefit Program** means any past, present or future:

(1)    **Employee Benefit Plan,**

(2)    **Sponsored Plan,**

(3)    **Profit Sharing Plan,**

(4)    **Pension Benefit Plan, or**

(5)    **Welfare Benefit Plan.**

E.    **Employee Benefit Plan** means any plan as defined by **ERISA** which is operated for the benefit of the employees of the **Sponsor Organization.**

F.    **ERISA** means the Employee Retirement Income Security Act of 1974, including any amendments thereto, as well as any similar common or statutory law of:

(1)    any state, possession or territory of the United States of America, or

(2)    any country in the world.

G.    **Pension Benefit Plan** means any plan as defined by **ERISA** which is operated for the benefit of the employees of the **Sponsor Organization.**

H.    **Profit Sharing Plan** means any plan as defined by **ERISA** which is operated for the benefit of the employees of the **Sponsor Organization.**

I.    **Sponsor Organization** means the organization named in Item B of the Declarations for this Coverage Section.

J.   **Sponsored Plan** means:

   (1)   an **Employee Benefit Plan** which is operated for the benefit of the employees of the **Sponsor Organization**;

   (2)   any other plan, fund or program included as a **Sponsored Plan** in Item B of the Declarations for this Coverage Section; and

   (3)   any other employee benefit plan or program not subject to ERISA, sponsored solely by the **Sponsor Organization** for the benefit of the employees of the **Sponsor Organization**.

provided, however, that the **Sponsored Plan** shall not include any multiemployer plan, as defined by **ERISA**.

K.   **Welfare Benefit Plan** means any plan as defined by ERISA which is operated for the benefit of the employees of the **Sponsor Organization**.

L.   **Wrongful Act** means:

   (1)   any breach of the responsibilities, obligations or duties imposed upon fiduciaries of any **Benefit Program** by ERISA;

   (2)   any other matter claimed against the **Sponsor Organization** or the **Assured Persons** as a fiduciary of any **Benefit Program**; and

   (3)   any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty in the **Administration** of any **Benefit Program**.

M.   **Loss** means damages, judgements and **Costs, Charges and Expenses** incurred by any of the **Assureds** under the respective Coverage Section under which coverage is being provided, specifically including punitive, exemplary and multiple damages. Loss shall not include:

   (1)   taxes, criminal or civil fines or penalties imposed by law, except that:

      (a)   with respect to the Fiduciary Liability Coverage Section of this Policy, Loss shall include the 5% or less and the 20% or less penalties imposed on fiduciaries under Section 502(i) and Section 502(l) of ERISA (as defined in the Fiduciary Liability Coverage Section); and

      (b)   coverage shall be provided for civil fines and penalties imposed outside the United States by any foreign jurisdiction, subject always to the terms, conditions and exclusions of the Policy.

With respect to the insurability of punitive, exemplary or multiple damages, Underwriters agree not to raise the lack of insurability of punitive, exemplary or multiple damages as a coverage defense and, if a choice of law or conflict situation arises with respect to coverage for such damages, Underwriters consent to have the law applicable to such damages of the jurisdiction most favorable to the **Assured** apply. If necessary, Underwriters consent to removal of the action by the **Assured** to a jurisdiction that provides the most favorable coverage for such damages.

   (2)   conduct deemed uninsurable under the law pursuant to which this Policy shall be construed.

Notwithstanding the foregoing, **Loss** shall include penalties assessed against an **Assured** by the Internal Revenue Service pursuant to a voluntary resolution entered into by the Assured under a Closing Agreement Program (hereafter "CAP") provided:

   (A)   the **Assured** first approaches the Internal Revenue Service regarding the violation during the **Policy Period**, and

   (B)   the **Assured** gives written notice of such violation as soon as practicable, but in no event later than sixty (60) days after the **Policy Period**, and

    (c)    the **Assured** had no knowledge of the possible violation prior to the effective date of this Policy.

However, coverage provided by this paragraph is subject to an aggregate sublimit of USD1,000,000 for all penalties assessed under CAP and all Costs, Charges and Expenses incurred by the **Assured** in investigating the alleged violation and completing any voluntary resolution under CAP. Such sublimit shall be part of and not in addition to the Limit of Liability as shown under Item C(2) of the Declarations, and any payments made pursuant to this paragraph shall reduce the Limit of Liability as shown under Item C(2) of the Declarations.

## III.    EXCLUSIONS

Underwriters shall not be liable to make any payment in connection with any **Claim**:

A.    based upon the liability of others assumed by any **Assured** under any contract or agreement, either oral or in writing, unless the **Assured** would have been liable in the absence of such contract or agreement; except that this exclusion shall not apply with respect to any agreement or declaration of trust pursuant to which any **Benefit Program** was established;

B.    for actual or alleged bodily injury, sickness, disease, death, or damage to or destruction of tangible property (including loss of use thereof);

C.    based upon or arising out of any **Wrongful Act**, or any fact, circumstance or situation, which has been the subject of any notice given to an insurer prior to the **Policy Period** under any other policy which provides coverage similar to that provided under this Coverage Section;

D.    based upon or arising out of actual or alleged seepage, pollution or contamination of any kind;

E.    brought about or contributed to by any deliberately dishonest, fraudulent or criminal act or omission or the gaining of any personal profit by any of the **Assureds** to which they were not legally entitled; provided, however, that this exclusion shall only apply to an **Assured** which is determined, by a final judgment or adjudication, to have committed such acts or omissions or to have received such personal profit;

F.    based upon or arising from the failure of the **Assureds** to comply with any law governing workers' compensation, unemployment, social security, disability benefits or other work-related benefits for employees of the **Sponsor Organization**, except the consolidated Omnibus Budget Reconciliation Act of 1985 and amendments thereto;

G.    based upon, arising out of, or relating to any legal proceeding filed against any **Assured** prior to the Prior/Pending Litigation Date set forth in Item H. of the Declarations;

H.    against any **Subsidiary** or the **Directors and Officers** of any **Subsidiary** based upon or arising from any **Wrongful Act** occurring prior to the date such entity became a **Subsidiary** or subsequent to the date such entity ceased to be a **Subsidiary**;

I.    that portion of **Loss** which is covered under any other Coverage Section of this Policy.

J    solely with respect to Ranger Insurance Services, Inc., based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

    1.    any **Wrongful Act** actually or allegedly committed prior to 26th January, 2000, or

2.    any **Wrongful Act** occurring on or subsequent to 26th January, 2000 which, together with a **Wrongful Act** occurring prior to such date would constitute **Interrelated Wrongful Acts.**

Underwriters shall not be liable to make any payment, other than for **Costs, Charges and Expenses**, in connection with any **Claim**:

K     for any actual or attempted reversion or payment of assets of any **Benefit Program** to the **Sponsor Organization**, or to any successor or assign of the **Sponsor Organization**; or

L     for benefits due or to become due under the terms of a **Benefit Program** unless and to the extent that: (i) the **Assured** against which the **Claim** is made is a natural person; (ii) the benefits are payable by such **Assured** as a personal obligation; and (iii) recovery for the benefits is based upon a covered **Wrongful Act.**

The **Wrongful Act** of any **Assured** shall not be imputed to any other **Assured** for purposes of applying the Exclusions H and I, above.

IV.    **LIMIT OF LIABILITY AND RETENTION**

A.    More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to Clause IV.B. of the General Terms and Conditions Section of this Policy.

B.    Payment of **Loss** (including **Costs, Charges and Expenses**) by Underwriters shall reduce the Limit of Liability.

C.    No Retention shall apply to any portion of **Loss** incurred solely by an **Assured Person** in connection with a **Claim** if advancement or indemnification is not made by the **Company** solely by reason of its insolvency.

D.    Underwriters shall pay **Costs, Charges or Expenses** at least once every 90 days.

V.    **EXTENSIONS**

A.    In the event any **Benefit Program** is sold, merged into another plan which is not a **Benefit Program** or is terminated after the inception date of this Policy, this Coverage Section, subject to its terms, shall continue to apply with respect to **Claims** first made during the **Policy Period** for covered **Wrongful Acts** committed prior to the time of such sale, merger or termination.

**SECTION FOUR**

**ERRORS AND OMISSIONS COVERAGE SECTION**

Underwriters and the **Assureds** agree as follows:

I.  **INSURING CLAUSE**

A.  Underwriters shall pay on behalf of the **Assureds Loss** resulting from any **Claim** first made against the **Assureds** for a **Wrongful Act** in the performance of, or failure to perform, **Professional Services**.

B.  Underwriters shall pay on behalf of any bounty hunters for which the **Assureds** are legally liable resulting from any **Claim** first made against such bounty hunters for a **Wrongful Act** in the performance of, or failure to perform, **Professional Services**, provided however that such bounty hunters were acting on behalf of the **Assureds** pursuant to a written agreement with the **Assureds**.

A **Claim** shall be deemed to have been first made against the **Assureds** on the date the **Assureds** provide written notice thereof to Underwriters in accordance with **CLAUSE IV. NOTIFICATION** of this Policy.

II.  **DEFINITIONS**

The following terms, whenever used in this Coverage Section in boldface type, shall have the meanings indicated:

A.  **Assured** or **Assureds** means the **Company**, the **Directors and Officers**, and all employees (whether full-time, part-time or temporary) of the Company, including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy. **Assured** or **Assureds** includes natural persons engaged directly by the **Company** to perform employee duties for the **Company**, and whose activities are under the **Company's** governance and direction.

B.  **Professional Services** means the performance of or failure to perform:

(1)  insurance services by the **Assureds**, or by persons or entities for whose actions the **Assureds** are legally liable, for or on behalf of a customer or client of such **Assureds**, pursuant to an agreement between such customer or client and such **Assureds**;

(2)  actions resulting in alleged or actual discrimination or violation of an individuals' civil rights relating to such discrimination whether direct, indirect, intentional or unintentional and whether arising under federal or state statutory or common law;

(3)  Securities Dealer/Broker activities by Crum & Forster Custom Securities, Inc.;

(4)  solely with respect to the coverage afforded by Clause I.B., any services rendered by a bounty hunter.

III.  **EXCLUSIONS**

Underwriters shall not be liable to make any payment in connection with any **Claim**:

A.  based upon or attributable to any fraudulent, malicious criminal or dishonest act by any **Assured**; provided, however, that this exclusion shall only apply to an **Assured** which is determined, by a final judgement or adjudication, to have committed such acts;

B.  by, on behalf of, in the right of, at the behest of, for the benefit of, or with the solicitation, assistance, participation or intervention of any pool or association (including any officer, employee or director thereof) in which any **Assureds** are participants or by any participant (including any officer, employee or director thereof) in any such pool or association involving the business or operations of such pool or association;

01534580/MH                                    Page 87
05/06/2000

C.  for liability assumed under any contract or agreement unless:

    (1)  such liability arises solely and directly out of the **Assured's** failure or alleged failure to perform **Professional Services** required to be performed by such contract or agreement; or

    (2)  such liability would have attached to the **Assured** even in the absence of the contract or agreement;

D.  for benefits, coverage or amounts due or allegedly due, including any amount representing interest thereto, from the **Assured** as an insurer or reinsurer, under any policy or contract or treaty of insurance, reinsurance, suretyship, annuity or endowment;

E.  for indemnification pursuant to any contract or agreement entered into by any **Assured**;

F.  based upon or arising from the adequacy or redundancy of claim reserves;

G.  based upon or arising from express warranties or guarantees made in connection with **Professional Services**, except where such liability would have attached even in the absence of such warranty or guarantee; provided, however, that this exclusion shall not apply to the vicarious liability of the **Assured** where the liability or conduct of a program agent, insurance agent or broker is imputed to the **Assured**;

H.  which includes a demand for satisfaction of any obligation assumed by the **Assured** as an insurer or reinsurer under any policy or contract or treaty of insurance, reinsurance, suretyship, annuity or endowment; provided, however, that this exclusion shall not apply to those portions of a **Claim** which do not constitute such assumed obligations;

I.  made against any **Assured** which is brought by, on behalf of, in the right of, at the behest of or for the benefit of any other **Assured**, except and to the extent that:

    (1)  such **Claim** is brought for contribution or indemnity and directly results from another **Claim** that is otherwise covered under this Policy; or

    (2)  such **Claim** is brought by an **Assured** solely in his/her/its capacity as a policyholder of the **Company**;

J.  based upon or arising from any **Wrongful Act**, or any fact, circumstance or situation, which has been the subject of any notice given to any insurer prior to the **Policy Period** under any other policy which provides coverage similar to that provided under this Coverage Section;

K.  for any violation of the Employee Retirement Income Security Act of 1974, as amended (or any rules or regulations promulgated thereunder), or similar provisions of any federal, state or local statutory law or common law; or any breach of responsibility, obligations or duties in connection with the Assureds pension plan, profit sharing plan, health and welfare plan or any other benefit plan sponsored by the **Company** for its employees.

L.  for any actual or alleged bodily injury, sickness, disease or death of any person, or damage to or destruction of tangible property (including loss of use thereof), defamation or invasion of privacy;

M.  for premiums, return premiums, commissions or tax monies;

N.  based upon or arising from the actual or alleged seepage, pollution or contamination of any kind; provided, however, that this exclusion shall not apply to a **Claim** based upon any coverage position taken by the **Company** with respect to any insurance allegedly provided for any actual or alleged seepage, pollution or contamination;

O.    by, on behalf of, in the right of, at the behest of, for the benefit of, or with the solicitation, assistance, participation or intervention of any reinsurer of any contract, risk or program of the **Company**; provided, however, that this exclusion shall not apply to that part of **Loss** consisting of: (I) extracontractual damages awarded against the **Assured** as the result of a final judgment by a court or arbitrator in favor of such reinsurer; or (II) **Costs, Charges and Expenses** incurred in connection with such damages;

P.    based upon or arising from the **Company's** financial inability to pay claims;

Q.    for any violation of the Racketeer Influenced and Corrupt Organizations Act, or any similar state or local law, or any regulations promulgated thereunder; provided, however, that this exclusion shall not apply unless a judgment or other final adjudication establishes that such violation occurred;

R.    based upon or arising from classifications by the **Assured** for the purpose of determining rates, availability, or terms of coverage; provided, however, that this exclusion shall not apply to **Claims** arising from **Professional Services** as defined in Clause II.B(2) of this Policy;

S.    that portion of **Loss** which is covered under any other Coverage Section of this Policy;

T.    based upon, arising out of, or relating to any legal proceeding filed against any **Assured** prior to the Prior/Pending Litigation Date set forth in Item H. of the Declarations.

U.    against any **Subsidiary** or the **Directors and Officers** or employees of any **Subsidiary** based upon or arising from any **Wrongful Act** occurring prior to the date such entity became a **Subsidiary** or subsequent to the date such entity ceased to be a **Subsidiary**; provided, however, this exclusion shall not apply to:

(1)    Crum and Forster, and

(2)    TRG Holding Corporation.

V     solely with respect to Ranger Insurance Services, Inc., based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving;

1.    any **Wrongful Act** actually or allegedly committed prior to 26th January, 2000, or

2.    any **Wrongful Act** occurring on or subsequent to 26th January, 2000 which, together with a **Wrongful Act** occurring prior to such date would constitute **Interrelated Wrongful Acts**.

## IV.   LIMIT OF LIABILITY

A.    More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to Clause IV.B of the General Terms and Conditions Section of this Policy.

B.    **Costs, Charges and Expenses** shall be part of and not in addition to the Limit of Liability as shown under Item C. of the Declarations, and such **Costs, Charges and Expenses**, and all other **Loss**, shall reduce such Limit of Liability.

C.    Underwriters shall pay **Costs, Charges and Expenses** at least once every 90 days.

GENERAL ENDORSEMENT NUMBER 4

Attaching to and forming part of Certificate No. 823/FD0000493 issued by certain Lloyd's Underwriters in favour of FAIRFAX FINANCIAL HOLDINGS.

In consideration of the premium charged for this Certificate, it is hereby understood and agreed that with effect from 31st May, 2000:

1.    INSURING AGREEMENTS (A) FIDELITY of SECTION ONE, Part A of this Certificate is amended to read as follows:

FIDELITY

(A)    Loss resulting directly from dishonest, fraudulent or malicious acts by Employees of the Assured committed with the intent to cause the Assured to sustain such loss or to obtain an improper financial gain for

(i)    themselves, or

(ii)    another person or organisation whom the Employee committing the dishonest or fraudulent act intended should receive such improper financial gain.

The foregoing shall include loss of Property through such acts by an Employee.

Notwithstanding the foregoing, it is agree that with regard to trading and loans, transactions in the nature of a loan or other extensions of credit, this Insuring Agreement covers only loss resulting directly from dishonest, fraudulent or malicious acts by Employees of the Assured committed with the intent to obtain and which results in improper financial gain for

(i)    themselves, or

(ii)    another person or organisation with whom the Employee committing the dishonest, fraudulent or malicious act was acting in collusion provided that the Assured establishes that the Employee intended to participate in improper financial gain.

Salaries, fees, commissions, bonuses, promotions and other similar emoluments shall not constitute an improper financial gain.

In determining loss covered by this Insuring Agreement the Assured may include as part of its loss any specific bonus, commission or similar emolument paid to an Employee as the direct result of a specific dishonest, fraudulent or malicious act covered by this Insuring Agreement where such bonus, commission or emolument would not have been paid or payable by the Assured if such act had not been committed.

2.    DEFINITIONS (q) under CONDITIONS AND LIMITATIONS of SECTION ONE, Part A of this Certificate is amended to read as follows:

(q)    Subsidiary means:

(1)    any entity in which more than 50% of the outstanding securities representing the present right to vote for the election of such entity's directors are owned by the First Named Assured, directly or indirectly, if such entity:

(a)    was so owned prior to the inception date of this Policy, or

(b)    becomes so owned after the inception date of this Policy, provided that the assets of the entity do not exceed 10% of the consolidated assets of the Assured as set forth in the Assured's latest combined quarterly convention statements and then only with respect to losses discovered after the date such entity became a Subsidiary; or

(c)     becomes so owned after the inception date of this Policy, provided that if the assets of the entity exceed 10% of the consolidated assets of the Assured as set forth in the Assured's latest combined quarterly convention statements and the Assured gives written notice to Underwriters of such acquisition within one hundred and twenty (120) days after the effective date of such acquisition, together with such information as Underwriters reasonably may require, and shall pay any additional premium required by Underwriters. If the Assured fails to comply with the foregoing, coverage otherwise afforded hereunder shall terminate as of one hundred and twenty (120) days after the effective date of such acquisition; or

(2)     TRG Associates, L.L.C.; or

(3)     Ranger Insurance Services, Inc.; or

(4)     any entity which is not described in (1), (2) or (3) above in which the First Named Assured or any Subsidiary maintains an ownership interest but only to the extent of such ownership interest

3.     Paragraph 12. of Endorsement Number One of SECTION ONE, Part A of this Certificate is amended to read as follows:

12.     Coverage under Insuring Agreement (A) of this Policy shall also apply to loss of property or funds of policyholders of the Assured or beneficiaries under policies issued by the Assured resulting directly from dishonest or fraudulent acts committed by a Soliciting Agent acting alone or in collusion with others. Such dishonest or fraudulent acts must be committed with the intent:

(a)     to cause such policyholder or beneficiary to sustain such loss or

(b)     to obtain financial benefit for the Soliciting Agent or other person or entity.

As used herein, "financial benefit" does not include any benefits earned in the normal course of the agency relationship, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions.

4.     Endorsement Number Five Applicable to both SECTIONS of this Certificate is amended to read as follows:

It is understood and agreed that the term Assured shall mean as follows:

1.     the entity named in the respective Schedules, and

2.     any entity in which more than 50% of the outstanding securities representing the present right to vote for the election of such entity's directors are owned by the Assured, directly or indirectly, if such entity:

(a)     was so owned prior to the inception date of this Policy, or

(b)     becomes so owned after the inception date of this Policy, provided that the assets of the entity do not exceed 10% of the consolidated assets of the Assured as set forth in the Assured's latest combined quarterly convention statements; or

(c)     becomes so owned after the inception date of this Policy, provided that if the assets of the entity exceed 10% of the consolidated assets of the Assured as set forth in the Assured's latest combined quarterly convention statements, the Assured shall give written notice to Underwriters of such acquisition within one hundred and twenty (120) days after the effective date of such acquisition, together with such information as Underwriters reasonably may require, and shall pay any additional premium required by Underwriters. If the Assured fails to comply with the foregoing, coverage otherwise afforded hereunder shall terminate as of one hundred and twenty (120) days after the effective date of such acquisition.

01534580/MH
05/06/2000

3.   TRG Associates, L.L.C.; or

4.   Ranger Insurance Services, Inc.; or

5   any entity which is not described in (1) to (4) above in which the Assured maintains an ownership interest but only to the extent of such ownership interest.

5.   Clause XXII. CANCELLATION CLAUSE C. of SECTION TWO of this Certificate is amended to read as follows:

C.   If this Policy is canceled pursuant to A., above, Underwriters shall retain the pro rata proportion of the premium hereon.  Payment or tender of any unearned premium by Underwriters shall not be a condition precedent to the effectiveness of cancellation.

All other terms, conditions and limitations remain unaltered.

FOR AND ON BEHALF OF AON GROUP LIMITED

SIGNED _____       SIGNED _____

DATED _____       DATED _____

## ENDORSEMENT NUMBER 1
## APPLICABLE TO SECTION 4 OF PART B

Attaching to and forming part of Certificate No. 823/FD0000493 issued by certain Lloyd's Underwriters in favour of FAIRFAX FINANCIAL HOLDINGS.

In consideration of the premium charged for this Policy, it is hereby understood and agreed that with effect from 31st May, 2000 Clause II. DEFINITIONS B. of SECTION FOUR - ERRORS AND OMISSIONS COVERAGE SECTION is deleted and the following is substituted therefor:

G.     **Professional and Consulting Services** shall include but not be limited to:

    (1)     Property/Casualty Insurance/Reinsurance activities, including but not limited to, underwriting, policy issuance, cancellations, rescissions, premium accounting, premium financing; Insurance Agency and Brokerage activities, including but not limited to sales, marketing and soliciting; Staff activities, including but not limited to, Accountants, Actuaries, Attorneys, Employee Benefit Managers, Risk Managers, Notary Publics, and Investment Management; Loss Control Services, including but not limited to, assisting in loss control program development, safety engineering, and safety inspections; Claims Service activities, including but not limited to, personal injury rehabilitation, claims investigations, credit investigations, claim handling and adjusting, co-ordination of defense with outside counsel, defense activities through staff counsel and claim payments; Insurance Consulting, including but not limited to, risk management and actuarial consulting.

    (2)     actions resulting in alleged or actual discrimination or violation of an individuals' civil rights relating to such discrimination whether direct, indirect, intentional or unintentional and whether arising under federal or state statutory or common law;

    (3)     Securities Dealer/Broker activities by Crum & Forster Custom Securities, Inc.;

    (4)     solely with respect to the coverage afforded by Clause I.B., any services rendered by a bounty hunter.

In consideration of the foregoing, wherever the term **Professional Services** appears in this Certificate it shall be replaced by **Professional and Consulting Services**.

All other terms, conditions and limitations remain unaltered.

FOR AND ON BEHALF OF AON GROUP LIMITED

SIGNED _____      SIGNED _____

DATED _____      DATED _____

01534580/MH
05/06/2000

## GENERAL ENDORSEMENT NUMBER 5 APPLICABLE TO PART B

Attaching to and forming part of Certificate No. 823/FD0000493 issued by certain Lloyd's Underwriters in favour of FAIRFAX FINANCIAL HOLDINGS.

In consideration of the premium charged for this Policy, it is hereby understood and agreed that with effect from 31st May, 2000 Clause X. NOTICE TO LEAD UNDERWRITER. is deleted and the following is substituted therefor:

X.      **NOTICE TO LEAD UNDERWRITER**

Notice to the Lead Underwriter shall be provided to **Sedgwick, Detert, Moran & Arnold, 209 South LaSalle Street, Seventh Floor, Chicago, Illinois 60604, Attention:  Christopher Kerns.**  If mailed, the date of mailing of such notice shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

All other terms, conditions and limitations remain unaltered.

FOR AND ON BEHALF OF AON GROUP LIMITED

SIGNED _____     SIGNED _____

DATED _____     DATED _____

01534580/MH
05/06/2000

Page 94

<u>ENDORSEMENT NUMBER 1</u>
<u>APPLICABLE TO SECTION 3 OF PART B</u>

Attaching to and forming part of Certificate No. 823/FD0000493 issued by certain Lloyd's Underwriters in favour of FAIRFAX FINANCIAL HOLDINGS.

In consideration of the premium charged for this Policy, it is hereby understood and agreed that with effect from 31st May, 2000 Clause III. EXCLUSIONS of SECTION THREE - FIDUCIARY LIABILITY COVERAGE SECTION is amended by the addition of the following:

M. based upon, arising out of, directly or indirectly relating to, or in any way involving the claims already reported to previous insurers as described in the facsimile dated 16th February, 2001 issued by Crum & Forster Insurance.

All other terms, conditions and limitations remain unaltered.

FOR AND ON BEHALF OF AON LIMITED

SIGNED _____    SIGNED _____

DATED _____    DATED _____

01534580/MH
05/06/2000                        Page 95

## ENDORSEMENT NUMBER 2
## APPLICABLE TO SECTION 4 OF PART B

Attaching to and forming part of Certificate No. 823/FD0000493 issued by certain Lloyd's Underwriters in favour of FAIRFAX FINANCIAL HOLDINGS.

In consideration of the premium charged for this Policy, it is hereby understood and agreed that with effect from 31st May, 2000 Clause III. EXCLUSIONS L. of SECTION FOUR - ERRORS AND OMISSIONS COVERAGE SECTION is deleted and the following is substituted therefor:

L.      for any actual or alleged bodily injury, sickness, disease or death of any person, or damage to or destruction of tangible property (including loss of use thereof), defamation or invasion of privacy, provided, however, this exclusion shall not apply to any **Claim** made against the **Assureds** for a **Wrongful Act** in the performance of **Professional Services**.

All other terms, conditions and limitations remain unaltered.

FOR AND ON BEHALF OF AON LIMITED

SIGNED _____     SIGNED _____

DATED _____     DATED _____

01534580/MII                                    Page 96
05/06/2000

## GENERAL ENDORSEMENT NUMBER 6
### APPLICABLE TO PART B

Attaching to and forming part of Certificate No. 823/FD0000493 issued by certain Lloyd's Underwriters in favour of FAIRFAX FINANCIAL HOLDINGS.

In consideration of the premium charged for this Policy, it is hereby understood and agreed that with effect from 11th July, 2001 Clause IV. NOTIFICATION. A. of the General Terms and Conditions Section of Part B of this Policy is amended by the addition of the following:

Provided, however, that in respect of the following claims the said amount of USD1,000,000 shall be substituted by the respective amounts shown below:

| | |
|---|---|
| Fiduciary Liability Claims but excluding such Claims in respect of Ranger Insurance Services, Inc. | USD250,000 |
| All Claims in respect of Ranger Insurance Services, Inc. | USD100,000 |
| Directors and Officers Liability Securities Claims in respect of TIG Holdings, Inc. | USDNil |

All other terms, conditions and limitations remain unaltered.

FOR AND ON BEHALF OF AON LIMITED

SIGNED _____    SIGNED _____

DATED _____    DATED _____

01534580/MH
05/06/2000

Page 97

## GENERAL ENDORSEMENT NUMBER 7
## APPLICABLE TO PART B

Attaching to and forming part of Certificate No. 823/FD0000493 issued by certain Lloyd's Underwriters in favour of FAIRFAX FINANCIAL HOLDINGS.

In consideration of the Premium charged for this Policy it is hereby understood and agreed that with effect from 31st May, 2000 Item D. Retentions. (1) of the Declarations of Part B of the Policy is deleted and the following is substituted therefor:

(1)     Under the Directors and Officers section, USDNil under Insuring Clause I.A. and USD1,000,000 each Claim under (i) Insuring Clause I.B., (ii) Insuring Clause I.C., however, USDNil with respect to TIG Holdings, Inc. and its subsidiaries, and (iii) in the aggregate where coverage for a single Claim is provided under Insuring Clauses I.B. and I.C.

All other terms, conditions and limitations remain unaltered.


FOR AND ON BEHALF OF AON LIMITED

SIGNED _____     SIGNED _____

DATED _____     DATED _____


01534580/MH                     Page 98
05/06/2000

<u>GENERAL ENDORSEMENT NUMBER 8</u>

Attaching to and forming part of Certificate No. 823/FD0000493 issued by certain Lloyd's Underwriters in favour of FAIRFAX FINANCIAL HOLDINGS.

In consideration of an additional premium of USD675,000 hereon USD181,654.99 being 76.891% part of 100% of 35%, it is hereby understood and agreed that with effect from 23.59 p.m. Local Standard Time on the 31st May, 2001:

1.  Item 1. Name of Assured/Principal Address of the Declarations of Section One of Part A of this Policy is deleted and the following is substituted therefor:

    Item 1.  Name of Assured (herein called the Assured):

    (1)  FAIRFAX FINANCIAL HOLDINGS; and

    (2)  HUB INTERNATIONAL LIMITED and subsidiaries

    Principal Address:

    (1)  95 Wellington Street West
         Suite 800
         Toronto M5J 2N7
         Canada; and

    (2)  214 King Street West
         Suite 314
         Toronto M5H 3L8
         Canada

2.  Item 2. Name of Insured of the Declarations of Section Two of Part A of this Policy is deleted and the following is substituted therefor:

    ITEM 2.  NAME OF INSURED:

    (1)  FAIRFAX FINANCIAL HOLDINGS; and

    (2)  HUB INTERNATIONAL LIMITED and subsidiaries

    PRINCIPAL ADDRESS:

    (1)  95 Wellington Street West
         Suite 800
         Toronto M5J 2N7
         Canada; and

    (2)  214 King Street West
         Suite 314
         Toronto M5H 3L8
         Canada

3.  Solely with respect to the coverage provided to Hub International Limited and subsidiaries by this endorsement, Discovery Limitation Clause No. 2, as attached, is added to Part A of this Policy, however, with respect to Kaye Group, Inc. the attachment date of this endorsement shall be 23.59 p.m. Local Standard Time on the 27th June, 2001.

4.  Clause II. DEFINITIONS M. of the General Terms and Conditions Section of Part B of this Policy is deleted and the following is substituted therefor:

    M.  **Subsidiary** means:

        (1)  any entity in which more than 50% of the outstanding securities representing the present right to vote for the election of such entity's directors are owned by the **Parent Company**, directly or indirectly, if such entity:

            (a)  was so owned prior to the inception date of this Policy; or

(b)    becomes so owned after the inception date of this Policy, provided that the assets of the entity do not exceed 10% of the consolidated assets of the **Company** as set forth in the **Company's** latest combined quarterly convention statements, subject to the provisions of Clause XX.A(1); or

(c)    becomes so owned after the inception date of this Policy, provided that if the assets of the entity exceed 10% of the consolidated assets of the **Company** as set forth in the **Company's** latest combined quarterly convention statements, the provisions of Clause XX.A(2). must be fulfilled; or

(2)    TRG Associates, L.L.C.; or

(3)    Ranger Insurance Services, Inc.; or

(4)    Hub International Limited and subsidiaries; or

(5)    any entity which is not described in (1), (2), (3) or (4) above in which the **Parent Company** or any **Subsidiary** maintains an ownership interest but only to the extent of such ownership interest

5.    Item D. Retentions (4) of the Declarations of Part B of this Policy is deleted and the following is substituted therefor:

(4)    USD1,000,000 each **Claim** under Errors and Omissions Section, however:

With respect to TIG Holdings, Inc., TRG Holding Corporation and Hub International Limited and subsidiaries, USD5,000,000 each **Claim**; and

With respect to Crum and Forster, USD2,500,000 each **Claim**.

6.    Item H. of the Declarations of Part B of this Policy is deleted and the following is substituted therefor:

Item H.    Prior/Pending Litigation Date applicable to Limits of Liability available under expired policies shall be as follows:

| | |
|---|---|
| Crum & Forster: | 31st March, 1999 |
| TIG Holdings, Inc: | 27th April, 1993 |
| TRG Holding Corporation: | 1st September, 1997 |
| Hub International Limited and subsidiaries including Kaye Group, Inc.: | 31st March, 1999 |

With respect to Limits of Liability excess of the expired policies, the Prior/Pending Litigation date shall be 31st May, 2000, however, with respect to:

| | |
|---|---|
| Hub International Limited and subsidiaries as of 31st May, 2001: | 31st May, 2001 |
| Kaye Group, Inc.: | 28th June, 2001 |

With respect to Clause I.B. of the Errors and Omissions Coverage Section, the Prior/Pending Litigation date shall be 11th October, 1999.

7.    Clause III. EXCLUSIONS H. of Section One of Part B of this Policy is deleted and the following is substituted therefor:

H.    against any **Subsidiary** or the **Directors and Officers** of any **Subsidiary** based upon or arising from any **Wrongful Act** occurring prior to the date such entity became a **Subsidiary** or subsequent to the date such entity ceased to be a **Subsidiary**; provided, however, this exclusion shall not apply to:

(1)    Hub International Limited and subsidiaries as of 31st May, 2001, with respect to any **Wrongful Act** occurring on or prior to 31st May, 2001; and

        (2)      Kaye Group, Inc. and subsidiaries as of 28th June, 2001, with respect to any **Wrongful Act** occurring on or prior to 28th June, 2001.

8.     Clause III. EXCLUSIONS F. of Section Two of Part B of this Policy is deleted and the following is substituted therefor:

    F.      against any **Subsidiary** or any of the **Assured Persons** of a **Subsidiary** based upon any **Employment Practice** occurring prior to the date such entity became a **Subsidiary** or subsequent to the date such entity ceased to be a **Subsidiary**; provided, however, this exclusion shall not apply to:

        (1)      Hub International Limited and subsidiaries as of 31st May, 2001, with respect to any **Employment Practice** occurring on or prior to 31st May, 2001, and

        (2)      Kaye Group, Inc. and subsidiaries as of 28th June, 2001, with respect to any **Employment Practice** occurring on or prior to 28th June, 2001.

9.     Clause III. EXCLUSIONS H. of Section Three of Part B of this Policy is deleted and the following is substituted therefor:

    H.      against any **Subsidiary** or the **Directors and Officers** of any **Subsidiary** based upon or arising from any **Wrongful Act** occurring prior to the date such entity became a **Subsidiary** or subsequent to the date such entity ceased to be a **Subsidiary**; provided, however, this exclusion shall not apply to:

        (1)      Hub International Limited and subsidiaries as of 31st May, 2001, with respect to any **Wrongful Act** occurring on or prior to 31st May, 2001, and

        (2)      Kaye Group, Inc. and subsidiaries as of 28th June, 2001, with respect to any **Wrongful Act** occurring on or prior to 28th June, 2001.

10.     Clause III. EXCLUSIONS U. of Section Four of Part B of this Policy is deleted and the following is substituted therefor:

    U.      against any **Subsidiary** or the **Directors and Officers** or employees of any **Subsidiary** based upon or arising from any **Wrongful Act** occurring prior to the date such entity became a **Subsidiary** or subsequent to the date such entity ceased to be a **Subsidiary**; provided, however, this exclusion shall not apply to:

        (1)      Crum and Forster,

        (2)      TRG Holding Corporation,

        (3)      Hub International Limited and subsidiaries as of 31st May, 2001, with respect to any **Wrongful Act** occurring on or prior to 31st May, 2001, and

        (4)      Kaye Group, Inc. and subsidiaries as of 28th June, 2001, with respect to any **Wrongful Act** occurring on or prior to 28th June, 2001.

All other terms, conditions and limitations remain unaltered.

                        FOR AND ON BEHALF OF AON LIMITED

               SIGNED _____   SIGNED _____

               DATED _____   DATED _____

## B. E. J. & H. DISCOVERY LIMITATION CLAUSE NO. 2

With respect to the coverage afforded by the endorsement to which this clause is attached, in addition to the Exclusion contained in the Policy, the Underwriters shall not be liable for any claim which arises out of or in any way involves

(a)     any act or omission by any person (whether an Employee or not), or

(b)     any transaction, casualty or event,

which has been notified to the Insurer on any other Policy of insurance prior to the attachment date of the endorsement to which this clause is attached, or, of which the Insured is aware prior to the attachment date of the endorsement to which this clause is attached and has cause to believe could potentially give rise to a loss which may be covered under this Policy.

All other terms, conditions and limitations remain unaltered.

## GENERAL ENDORSEMENT NUMBER 9

Attaching to and forming part of Certificate No. 823/FD0000493 issued by certain Lloyd's Underwriters in favour of FAIRFAX FINANCIAL HOLDINGS.

It is understood and agreed that with effect from 31st May 2001 the Schedules of Underwriters shown on the face of this Policy are deleted and the following substituted therefor:

<div align="center">

IN RESPECT OF COMPREHENSIVE CRIME
SCHEDULE –A–

</div>

UNDERWRITING MEMBERS OF LLOYD'S

Schedule of Lloyd's Underwriters

| Share | Pseudonym | Syndicate No. |
|---|---|---|
| 3.5700% | SJB | 01212 |
| 5.3500% | SJB | 01212 |
| 8.5800% | SJB | 01212 |
| 10.0000% | AGY | 00376 |
| 3.1970% | MHW | 01007 |
| 3.1980% | MHW | 01007 |
| 10.2860% | FDY | 00435 |
| 7.1630% | PJG | 00079 |
| 1.5000% | HGJ | 00205 |
| 2.5580% | WNM | 00250 |
| 2.5580% | AML | 02001 |
| 1.7060% | PJB | 00456 |
| 1.7050% | PJB | 00456 |
| 1.7050% | PJB | 00456 |
| 4.6050% | WEL | 02020 |
| 4.6050% | FRW | 00190 |
| 2.5580% | RGW | 01047 |
| 2.0470% | DRE | 01400 |

76.8910%   part of 100.00% of 23.80%  of Sum Insured.

FOR AND ON BEHALF OF AON LIMITED

SIGNED _____   SIGNED _____

DATED _____   DATED _____

01534580/MH
05/06/2000

<div align="center">Page 103</div>

IN RESPECT OF INSURANCE COMPANIES PROFESSIONAL LIABILITY

DIRECTORS AND OFFICERS LIABILITY AND COMPANY REIMBURSEMENT
EMPLOYMENT PRACTICES LIABILITY AND FIDUCIARY LIABILITY.

SCHEDULE --A-

UNDERWRITING MEMBERS OF LLOYD'S

Schedule of Lloyd's Underwriters

| Share | Pseudonym | Syndicate No. |
|---|---|---|
| 6.7200% | SJB | 01212 |
| 3.3600% | SJB | 01212 |
| 7.4200% | SJB. | 01212 |
| 10.0000% | AGY | 00376 |
| 3.1970% | MHW | 01007 |
| 3.1980% | MHW | 01007 |
| 10.2860% | FDY | 00435 |
| 7.1630% | PJG | 00079 |
| 1.5000% | HGJ | 00205 |
| 2.5580% | AML | 02001 |
| 2.5580% | WNM | 00250 |
| 1.7390% | PJB | 00456 |
| 1.3310% | PJB | 00456 |
| 1.0230% | PJB | 00456 |
| 1.0230% | PJB | 00456 |
| 4.6050% | WEL | 02020 |
| 4.6050% | FRW | 00190 |
| 2.5580% | RGW | 01047 |
| 2.0470% | DRE | 01400 |

76.8910%    part of 100.00% of 23.80% of Sum Insured

IN RESPECT OF COMPREHENSIVE CRIME

SCHEDULE –B-

UNDERWRITING MEMBERS OF LLOYD'S

Schedule of Lloyd's Underwriters

| Share | Pseudonym | Syndicate No. |
|---|---|---|
| 6.7200% | SJB | 01212 |
| 3.3600% | SJB | 01212 |
| 7.4200% | SJB | 01212 |
| 10.0000% | AGY | 00376 |
| 3.1970% | MHW | 01007 |
| 3.1980% | MHW | 01007 |
| 10.2860% | FDY | 00435 |
| 7.1630% | PJG | 00079 |
| 1.5000% | HGJ | 00205 |
| 2.5580% | AML | 02001 |
| 2.5580% | WNM | 00250 |
| 1.7390% | PJB | 00456 |
| 1.3310% | PJB | 00456 |
| 1.0230% | PJB | 00456 |
| 1.0230% | PJB | 00456 |
| 4.6050% | WEL | 02020 |
| 4.6050% | FRW | 00190 |
| 2.5580% | RGW | 01047 |
| 2.0470% | DRE | 01400 |

76.8910%   part of 100.00% of 11.20% of Sum Insured

IN RESPECT OF INSURANCE COMPANIES PROFESSIONAL LIABILITY
DIRECTORS AND OFFICERS LIABILITY AND COMPANY REIMBURSEMENT
EMPLOYMENT PRACTICES LIABILITY AND FIDUCIARY LIABILITY.

SCHEDULE –B–

UNDERWRITING MEMBERS OF LLOYD'S

Schedule of Lloyd's Underwriters

| Share | Pseudonym | Syndicate No. |
|---|---|---|
| 3.5700% | SJB | 01212 |
| 5.3550% | SJB | 01212 |
| 8.5750% | SJB | 01212 |
| 10.0000% | AGY | 00376 |
| 3.1970% | MHW | 01007 |
| 3.1980% | MHW | 01007 |
| 10.2860% | FDY | 00435 |
| 7.1630% | PJG | 00079 |
| 1.5000% | HGJ | 00205 |
| 2.5580% | AML | 02001 |
| 2.5580% | WNM | 00250 |
| 1.7390% | PJB | 00456 |
| 1.3310% | PJB | 00456 |
| 1.0230% | PJB | 00456 |
| 1.0230% | PJB | 00456 |
| 4.6050% | WEL | 02020 |
| 4.6050% | FRW | 00190 |
| 2.5580% | RGW | 01047 |
| 2.0470% | DRE | 01400 |

76.8910%   part of 100.00% of 11.20% of Sum Insured

## GENERAL ENDORSEMENT NUMBER 10
## APPLICABLE TO PART B

Attaching to and forming part of Certificate No. 823/FD0000493 issued by certain Lloyd's Underwriters in favour of FAIRFAX FINANCIAL HOLDINGS.

In consideration of the Premium charged for this Policy it is hereby understood and agreed that with effect from 31st May, 2000 Clause XX. ADJUSTMENT CLAUSE of the General Terms and Conditions Section of Part B of this Policy is deleted and the following is substituted therefor:

**XX.    ADJUSTMENT CLAUSE**

A(1)    If, during the **Policy Period**, the **Company** acquires securities or voting rights in any other entity, which as a result of such acquisition becomes a **Subsidiary**, or acquires another entity by merger or consolidation with the **Company**, and if the assets of such other entity do not exceed 10% of the consolidated assets of the **Company** as set forth in the **Company's** latest combined quarterly convention statement, such other entity and its employees, directors and officers shall be **Assureds** under this Policy, but only for **Wrongful Acts** actually occurring after the date such entity becomes a **Subsidiary**; provided, however, that Underwriters shall not be liable to make any payment in connection with any **Claim** which is based upon or arises out of any litigation brought against such entity, its employees or directors or officers prior to the date of such acquisition.

A(2)    If, during the **Policy Period**, the **Company** acquires securities or voting rights in any other entity, which as a result of such acquisition becomes a **Subsidiary**, or acquires another entity by merger or consolidation with the **Company**, and if the assets of such other entity exceed 10% of the consolidated assets of the **Company** as set forth in the **Company's** latest combined quarterly convention statement, such other entity and its employees, directors and officers shall be **Assureds** under this Policy, but only for **Wrongful Acts** actually occurring after the date such entity becomes a **Subsidiary**; provided, however, that Underwriters shall not be liable to make any payment in connection with any **Claim** which is based upon or arises out of any litigation brought against such entity, its employees or directors or officers prior to the date of such acquisition; and provided further that, as a condition precedent to such coverage, the **Company** shall give written notice to Underwriters of such acquisition within one hundred and twenty (120) days after the effective date of such acquisition, together with such information as Underwriters reasonably may require, and shall pay any additional premium required by Underwriters.  If the **Company** fails to comply with the foregoing, coverage otherwise afforded hereunder shall terminate as of one hundred and twenty (120) days after the effective date of such acquisition.

B.    In the event any entity ceases to be a **Subsidiary** after the inception date of this Policy, this Policy, subject to its terms, shall continue to apply with respect to **Claims** first made against that entity during the **Policy Period** for **Wrongful Acts** actually committed prior to the time such entity ceased to be a **Subsidiary**.

All other terms conditions and limitations remain unaltered.

FOR AND ON BEHALF OF AON LIMITED

SIGNED _____    SIGNED _____

DATED _____    DATED _____

01534580/MH
05/06/2000

**GENERAL ENDORSEMENT NUMBER 11**



**Attaching to and forming part of Certificate No. 823/FD0000493 issued by Aon Limited on behalf of certain Underwriters at Lloyd's, London under Contract Numbers 823/FB0000295 & 823/FB0000296 in favour of FAIRFAX FINANCIAL HOLDINGS and as more fully set forth in the Certificate Wording.**

It is understood and agreed that with effect from 31st May 2002 the Schedules of Underwriters shown on the face of this Policy are deleted and the following substituted therefor:

IN RESPECT OF COMPREHENSIVE CRIME INSURANCE

SCHEDULE A

UNDERWRITING MEMBERS OF LLOYD'S

Schedule of Lloyd's Underwriters

| Share | Pseudonym | Syndicate No. |
|---|---|---|
| 3.5700% | SVB | 1241 |
| 5.3550% | SVB | 1241 |
| 8.5750% | SVB | 1241 |
| 10.0000% | AGY | 0376 |
| 3.1970% | SVB | 1007 |
| 3.1980% | SVB | 1007 |
| 2.5580% | BRT | 2987 |
| 2.5580% | AML | 2001 |
| 2.0470% | DRE | 1400 |
| 10.2860% | FDY | 0435 |
| 4.6050% | WEL | 2020 |
| 1.5000% | HGJ | 0205 |
| 7.1630% | PJG | 0079 |
| 4.6050% | FRW | 0190 |
| 2.5580% | RGW | 1047 |
| 1.7060% | PJB | 0456 |
| 1.7050% | PJB | 0456 |
| 1.7050% | PJB | 0456 |
| 76.8910% | part of 100.00% of 23.80% of Sum Insured | |

For and on behalf of Aon Limited

Signed _____     Signed _____

Dated _11th May 2003_     Dated _13 May 2003_

02244183/JC
24/04/2003

Page 1 of 4

IN RESPECT OF INSURANCE COMPANIES PROFESSIONAL LIABILITY, DIRECTORS
AND OFFICERS LIABILITY AND COMPANY REIMBURSEMENT,
EMPLOYMENT PRACTICES LIABILITY AND FIDUCIARY LIABILITY INSURANCE

## SCHEDULE A

UNDERWRITING MEMBERS OF LLOYD'S

### Schedule of Lloyd's Underwriters

| Share | Pseudonym | Syndicate No. |
|---|---|---|
| 6.7200% | SVB | 1241 |
| 3.3600% | SVB | 1241 |
| 7.4200% | SVB | 1241 |
| 10.0000% | AGY | 0376 |
| 3.1970% | SVB | 1007 |
| 3.1980% | SVB | 1007 |
| 2.5580% | BRT | 2987 |
| 2.5580% | AML | 2001 |
| 2.0470% | DRE | 1400 |
| 10.2860% | FDY | 0435 |
| 4.6050% | WEL | 2020 |
| 1.5000% | HGJ | 0205 |
| 7.1630% | PJG | 0079 |
| 4.6050% | FRW | 0190 |
| 2.5580% | RGW | 1047 |
| 1.7060% | PJB | 0456 |
| 1.7050% | PJB | 0456 |
| 1.7050% | PJB | 0456 |
| 76.8910% | part of 100.00% of 23.80% of Sum Insured | |

IN RESPECT OF COMPREHENSIVE CRIME INSURANCE

SCHEDULE B

UNDERWRITING MEMBERS OF LLOYD'S

Schedule of Lloyd's Underwriters

| Share | Pseudonym | Syndicate No. |
|---|---|---|
| 6.7200% | SVB | 1241 |
| 3.3600% | SVB | 1241 |
| 7.4200% | SVB | 1241 |
| 10.0000% | AGY | 0376 |
| 3.1970% | SVB | 1007 |
| 3.1980% | SVB | 1007 |
| 2.5580% | BRT | 2987 |
| 2.5580% | AML | 2001 |
| 2.0470% | DRE | 1400 |
| 10.2860% | FDY | 0435 |
| 4.6050% | WEL | 2020 |
| 1.5000% | HGJ | 0205 |
| 7.1630% | PJG | 0079 |
| 4.6050% | FRW | 0190 |
| 2.5580% | RGW | 1047 |
| 1.7390% | PJB | 0456 |
| 1.3310% | PJB | 0456 |
| 1.0230% | PJB | 0456 |
| 1.0230% | PJB | 0456 |
| 76.8910% | part of 100.00% of 11.20% of Sum Insured | |

02244183/JC
24/04/2003

Page 3 of 4

IN RESPECT OF INSURANCE COMPANIES PROFESSIONAL LIABILITY, DIRECTORS
AND OFFICERS LIABILITY AND COMPANY REIMBURSEMENT,
EMPLOYMENT PRACTICES LIABILITY AND FIDUCIARY LIABILITY INSURANCE

### SCHEDULE B

UNDERWRITING MEMBERS OF LLOYD'S

Schedule of Lloyd's Underwriters

| Share | Pseudonym | Syndicate No. |
|---|---|---|
| 3.5700% | SVB | 1241 |
| 5.3550% | SVB | 1241 |
| 8.5750% | SVB | 1241 |
| 10.0000% | AGY | 0376 |
| 3.1970% | SVB | 1007 |
| 3.1980% | SVB | 1007 |
| 2.5580% | BRT | 2987 |
| 2.5580% | AML | 2001 |
| 2.0470% | DRE | 1400 |
| 10.2860% | FDY | 0435 |
| 4.6050% | WEL | 2020 |
| 1.5000% | HGJ | 0205 |
| 7.1630% | PJG | 0079 |
| 4.6050% | FRW | 0190 |
| 2.5580% | RGW | 1047 |
| 1.7390% | PJB | 0456 |
| 1.3310% | PJB | 0456 |
| 1.0230% | PJB | 0456 |
| 1.0230% | PJB | 0456 |
| 76.8910% | part of 100.00% of 11.20% of Sum Insured | |

All other terms, conditions and limitations remain unaltered.

02244183/JC
24/04/2003

Page 4 of 4

## GENERAL ENDORSEMENT NUMBER 12

Attaching to and forming part of Certificate No. 823/FD0000493 issued by Aon Limited on behalf of certain Lloyd's Underwriters in favour of FAIRFAX FINANCIAL HOLDINGS.

In consideration of an additional premium of USD2,043,017 hereon USD549,813.87 being 76.891% part of 100% of 35%, notwithstanding anything to the contrary contained in this Policy, it is hereby understood and agreed that with effect from 31st May, 2003:

1.  Item 2. Bond Period of DECLARATIONS of Section One of Part A of this Policy is deleted and the following is substituted therefor:

    Item 2.  Bond Period:  From:  31st May, 2000

    To:  31st May, 2004

    both days at 23.59 p.m. Local Standard Time at the Principal Address

2.  Item 3. POLICY PERIOD of the SCHEDULE of Section Two of Part A of this Policy is deleted and the following is substituted therefor:

    Item 3.  POLICY PERIOD:  From:  31st May, 2000

    To:  31st May, 2004

    Both days at 23.59 p.m. Local Standard Time at the Principal Address

3.  Item B. Policy Period of DECLARATIONS of Part B of this Policy is deleted and the following is substituted therefor:

    Item B. Policy Period:  From 31st May, 2000 to 31st May, 2004 both days at 23.59 p.m. Local Standard Time at the Principal Address stated in Item A.

4.  This Bond or Policy shall definitely terminate in its entirety on the date shown in items 1, 2 and 3 above without further notice by or on behalf of Underwriters. No further extension of the Bond or Policy Period will be afforded under Clause III. OPTIONAL EXTENSION PERIOD of GENERAL TERMS AND CONDITIONS of Part B of this Policy, or any other clause of this Bond or Policy.

5.  Section 2, EXCLUSIONS of CONDITIONS AND LIMITATIONS of Section One of Part A of this Policy is amended by the addition of the following:

    (v)  loss resulting directly or indirectly from any act or acts committed or allegedly committed subsequent to 23.59 p.m. 31st May 2003.

6.  Clause III. EXCLUSIONS of Section Two of Part A of this Policy is amended by the addition of the following:

    (v)  loss resulting directly or indirectly from any act, transaction or event which occurred subsequent to 23.59 p.m. 31st May 2003.

7.  Clause III. EXCLUSIONS of Section One of Part B of this Policy is amended by the addition of the following:

    L.  based upon or arising from any Wrongful Act actually or allegedly committed subsequent to 23.59 p.m. 31st May 2003.

8.  Clause III. EXCLUSIONS of Section Two of Part B of this Policy is amended by the addition of the following:

    L.  based upon or arising from any Wrongful Act actually or allegedly committed subsequent to 23.59 p.m. 31st May 2003.

9.   Clause III. EXCLUSIONS of Section Three of Part B of this Policy is amended by the addition of the following:

     M.   Underwriters shall not be liable to make any payment in connection with any Claim based upon or arising from any Wrongful Act actually or allegedly committed subsequent to 23.59 p.m. 31st May 2003.

10.  Clause III. EXCLUSIONS of Section Four of Part B of this Policy is amended by the addition of the following:

     W.   based upon or arising from any Wrongful Act actually or allegedly committed subsequent to 23.59 p.m. 31st May 2003.

11.  Clause A. ADDITIONAL OFFICES OR EMPLOYEES - CONSOLIDATION, MERGER OR PURCHASE OF ASSETS - NOTICE of GENERAL AGREEMENTS of Section One of Part A is amended by the addition of the following:

     Provided, however, coverage afforded under this clause shall not apply to any additional offices or employees; consolidation or merger with, or purchase or acquisition of assets or liabilities of, another institution, subsequent to 23.59 p.m. 31st May 2003.

12.  Clause (C). ADDITIONAL OFFICES, COMPUTER SYSTEMS - CONSOLIDATION, MERGER OR PURCHASE OF ASSETS - NOTICE of GENERAL CONDITIONS of Section Two of Part A is amended by the addition of the following:

     Provided, however, coverage afforded under this clause shall not apply to any additional offices or computer systems; consolidation or merger with, or purchase or acquisition of assets or liabilities of, another institution, subsequent to 23.59 p.m. 31st May 2003.

13.  Clause II. DEFINITIONS M. of GENERAL TERMS AND CONDITIONS of Part B of this Policy is amended by the addition of the following:

     Provided, however, coverage afforded under this clause shall not apply to any such entity which becomes so owned after 23.59 p.m. 31st May 2003.

14.  Clause XX. ADJUSTMENT CLAUSE of GENERAL TERMS AND CONDITIONS of Part B of this Policy is amended by the addition of the following:

     Provided, however, coverage afforded under this clause shall not apply to any such entity which becomes so owned after 23.59 p.m. 31st May 2003.

All other terms, conditions and limitations remain unchanged.

FOR AND ON BEHALF OF AON LIMITED

SIGNED _____   SIGNED _____

DATED _24th October 2003_   DATED _24 Oct 2003_